**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| Corrigent Corporation<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>Cisco Systems, Inc.<br><br>　　　　　　　Defendant. | Civil Action No. 6:22-cv-00396-ADA<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Plaintiff Corrigent Corporation ("Corrigent" or "Plaintiff"), by its attorneys, demands a trial by jury on all issues so triable and for its complaint against Defendant Cisco Systems, Inc. ("Cisco" or "Defendant").  Pursuant to the Court's June 24, 2024 order permitting amended pleadings, Corrigent hereby submits its First Amended Complaint, and alleges as follows:

**NATURE OF THE ACTION**

1.　　　　This is a civil action for patent infringement under the patent laws of the United States, Title 35, United States Code, Section 271, *et seq.*, involving the following United States Patents, collectively, "Asserted Patents," and seeking damages and injunctive relief as provided in 35 U.S.C. §§ 281 and 283–285.

| |
|---|
| U.S. Patent No. 6,957,369 (Exhibit 1, "'369 patent") |
| U.S. Patent No. 7,113,485 (Exhibit 2, "'485 patent") |
| U.S. Patent No. 7,330,431 (Exhibit 3, "'431 patent") |
| U.S. Patent No. 7,593,400 (Exhibit 4, "'400 patent") |
| U.S. Patent No. 9,118,602 (Exhibit 5, "'602 patent") |

**THE PARTIES**

2.　　　　Plaintiff is a Delaware Corporation.  Plaintiff may be served with process through its registered agent for service at Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes,

Delaware 19958.  Plaintiff is the owner by assignment of the Asserted Patents.

3.       Defendant Cisco Systems, Inc. ("Cisco" or "Defendant") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 170 West Tasman Dr., San Jose, California 95134, and has regular and established places of business throughout this District, including at least at 18615 Tuscany Stone, San Antonio, Texas 78258 and 12515 Research Blvd Bldg 3, Austin, Texas 78759.  Defendant may be served with process through its registered agent for service in Texas at Corporation Service Company dba CSC, 211 E. 7th St., Suite 620, Austin, Texas 78701-3218.

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.       On information and belief, jurisdiction and venue for this action are proper in this Judicial District.

6.       This Court has personal jurisdiction over Defendant because it (i) has a regular and established place of business in the State of Texas and this Judicial District; (ii) has purposefully availed itself of the rights and benefits of the laws of the State of Texas and this Judicial District; (iii) has done and is doing substantial business in the State of Texas and this Judicial District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including its one or more acts of infringement in the State of Texas and this Judicial District; (iv) maintains continuous and systematic contacts in the State of Texas and this Judicial District; (v) and/or places products alleged to be infringing in this Complaint in the stream of commerce with awareness that those products are sold and offered for sale in the State of Texas and this Judicial District.  Defendant has established sufficient minimum

contacts with the State of Texas and this Judicial District such that it should reasonably and fairly anticipate being brought into court in the State of Texas and this Judicial District without offending traditional notions of fair play and substantial justice; and Defendant has purposefully directed activities at residents of the State of Texas and this Judicial District.  Moreover, at least a portion of the patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities.  On information and belief, a substantial part of the events giving rise to Plaintiff's claims, including acts of patent infringement, have occurred in the State of Texas and this Judicial District.

7.     Venue is proper in this Judicial District as to Defendant under 28 U.S.C. § 1400(b) at least because it has committed acts of infringement and has a regular and established place of business in this Judicial District.

**CORRIGENT-SYSTEMS AND ITS
PIONEERING TELECOMMUNICATIONS TECHNOLOGY**

8.     Corrigent-Systems Ltd. (a.k.a. Orckit Communications Ltd.) ("Corrigent-Systems" or "Orckit") was founded in 1990 by Izhak Tamir, and went public and was listed on the Nasdaq Stock Exchange in 1996.

9.     Corrigent-Systems was a pioneer in the telecommunications field, with sales of its telecommunications products exceeding $500M to various global telecommunications providers such as Deutche Telekom (Germany) and Kokusai Denshin Denwa International ("KDDI") (Japan).  Between 1990 and 2000, Corrigent-Systems became the market leader in asymmetric digital subscriber line (ADSL) technology.

10.     In 2000, Corrigent-Systems started to develop new telecommunications products in the area of Ethernet switching and routing to optimize the transmission of voice and data over Internet Protocol (IP) telecommunications networks.  At the time, the field of Ethernet switching

and routing suffered many drawbacks.  Early Ethernet technology used for sharing data in offices and enterprises was not easily suited to serve as the backbone for telecommunications service providers.  For example, early Ethernet technology, used to connect a few computers in an office, could not meet the reliability and resiliency requirements of service providers, where a single connection may serve thousands of subscribers using different services in parallel.  Nor could early Ethernet technology support real-time streaming, guarantee a minimum or even consistent delay, avoid back-up delay if a failure in the network occurs (e.g., a cable is damaged), or support the broadcasting of high-data-rate data to multiple end points required by, for example, television service providers.

11.     Corrigent-Systems was a pioneer in overcoming these technology challenges.  Between 2000 and 2010, Corrigent-Systems invested approximately $200M toward research and development of its new Ethernet switching and routing products.  Corrigent-Systems identified and solved several obstacles in the field, and, as a result, was awarded hundreds of patents including the Asserted Patents, spanning over 70 patent families.  Corrigent-Systems' product line revolutionized the telecommunications industry.  For example, KDDI in Japan deployed a country-wide network of more than 2,000 Corrigent-Systems Ethernet switch products as early as 2005, a time when Corrigent-Systems' competitors lagged significantly behind Corrigent-Systems and its innovative products and solutions.

12.     The industry recognized Corrigent-Systems' innovation.  In a research study by Bart Stuck & Michael Weingarten published in IEEE, Corrigent-Systems was ranked in the top twenty innovative companies among hundreds of public companies.  Stuck, B. and Weingarten, M., "How Venture Capital Thwarts Innovation," IEEE Spectrum (April 2005).

13.     Plaintiff Corrigent Corporation obtained all rights in the asserted patents.

## THE ASSERTED PATENTS

### U.S. Patent No. 6,957,369

14.     Plaintiff is the lawful owner of all right, title, and interest in U.S. Patent No. 6,957,369 ("'369 patent") entitled "HIDDEN FAILURE DETECTION," including the right to sue and recover for infringement thereof.  A copy of the '369 patent is attached hereto as Exhibit 1, which was duly and legally issued on October 18, 2005, naming Leon Bruckman and Shmuel Ilan as the inventors.

15.     The '369 patent has 26 claims: 4 independent claims and 22 dependent claims.  The claims that Corrigent asserts infringe the '369 Patent in this proceeding are claims 1, 2, 15, 18, and 22.  The '369 patent is both valid over the prior art and patent-eligible, as evidenced by facts and opinions recited in expert reports and declarations provided in Exhibit 6 (¶¶ 70-81), Exhibit 7 (¶¶ 75-76, 80-315), Exhibit 8 (¶¶ 13-16) and Exhibit 9  (¶¶ 11-30), which are incorporated herein by reference.

16.     As of the priority date of the '369 patent, a specific problem that existed in the art pertained to detecting hidden failures in networking communications systems.  Failures within networking components commonly went undetected, and network administrators would not realize that such failures were occurring until after the fact that data was not received or transmitted properly.  The emergence of such failures without proactively detecting them could lead to catastrophic consequences for network administrators. As of the priority date, methodologies for conducting failure testing were limited, with most prior art techniques requiring the network administrator to take systems or portions of system offline to conduct testing.  The tests were also frequently required to be conducted manually by the network administrator, over the course of several steps, that required "a lot of work" and "require a very detailed knowledge," and were not

"particularly easy to use." Ex. 27, Joseph D. Sloan, Network Troubleshooting Tools (August 2001), at 184.  Other types of network testing flooded the network with packets, "produce a considerable strain on your network," and it was recommended that "[y]ou should use these tools to test systems offline, perhaps in a testing laboratory prior to deployment or during scheduled downtime." *Id.* at 190-191. In many cases, these and other known testing techniques prevented the network from running network traffic on some or all portions of the system while network testing was being conducted.  Additionally, to the extent failure testing existed in the prior art that did not require a system to be taken offline, it was commonly limited to individual components of a network, utilizing dedicated test circuitry that required the provisioning of additional hardware that required the use of additional memory, circuitry, and system resources.

17.    The '369 patent presented novel and unconventional systems and methods for "diagnostic testing of electronic equipment, and specifically to non-intrusive self-testing of communication systems," so as to ensure that hidden failures are detected within computer networking components in a manner that improved network failure testing and addressed the above problems in the network communications field. Ex. 1, '369 patent at 1:5–7; *id*. at Abstract.  The '369 patent, therefore, was directed to the specific problems known in the art referenced above, including the problem of testing for failures in network communications systems while regular traffic is running within the system.  As of the priority date, there were not seamless methods of network failure testing that promoted flexibility and efficiency, increased performance, decreased the amount of necessary hardware, and reduced human intervention and system downtime to detect hidden failures amongst networking components.  The inventions of the '369 patent provide these benefits.  For example, they "enable[] an electronic system to test its idle lines and components and detect hidden failures without intruding on normal traffic carried by the system's active lines."

*Id.* at 2:26–29.  "The testing method makes use of existing components in the system and requires substantially no dedicated testing hardware.  It is applicable to all types of subsidiary modules, even in systems that mix different modules using different data formats and communication protocols."  *Id.* at 31–28. Although it makes use of existing hardware components, the self-testing methodology performs failure testing in a particular manner, using a particular configuration of testing and components that was more than what was well-understood, routine, and conventional in the art.  Unlike prior art methods, it does not require additional testing hardware or the need to disable components of the system, thereby saving system resources and memory, as well as costs (both time and money) of both implementing and running network testing.  Additionally, unlike prior art methods, it does not require disabling hardware components during testing, thereby permitting non-intrusive forms of testing that can seamlessly run in the background while network traffic is being transmitted on a system.  And, unlike prior art methods, the testing method is agnostic to data formats and can be implemented without requiring the processing of packet data during the testing process, thereby reducing the amount of bandwidth necessary to conduct testing. The failures of the prior art combined with the '369 patent inventions' advantages demonstrate that the claimed inventions, discussed below, improve the functioning of network computer systems to perform conduct diagnostic failure detection. One embodiment of the inventions of the '369 patent is shown in FIG. 1, reproduced below.



*Id.* at Fig. 1; *see also id.* at 4:54–5:54.

18.    The asserted claims of the '369 patent, including claims 1, 2, 15, 18, and 21 (reproduced below), are not directed to an abstract idea, but instead recite specific implementations of failure testing technology to address a specific problem that improves computer networking functionality: identifying failures of network components in a complex, interconnected networking system.  Moreover, the asserted claims of the '369 patent recite several inventive concepts.  Claim 1 recites the following:

> 1. In an electronic system that includes a main module and at least first and second subsidiary modules, each of said at least first and second subsidiary modules connected to the main module by one or more lines for carrying data, at least some of which lines are sometimes idle, the main module including a switch having ports connected to the lines, a method for self-testing the system, comprising:
>
> selecting a first idle line among idle lines connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid line;
>
> instructing the first subsidiary module to loop back traffic reaching the first subsidiary module via the aid line;
>
> selecting for testing a second idle line among the idle lines connecting the second subsidiary module to a second port of the switch on the main module;
>
> configuring the switch to link the first and second ports;

transmitting test traffic over the second idle line from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid line connecting to the first subsidiary module; and

reporting that a failure has occurred if the test traffic does not return to the second subsidiary module within a predetermined period of time.

19.     Method claim 1 constitutes a specific improvement in computer networking failure testing technology over the prior art and includes several inventive concepts.  The '369 patent is a specific improvement to self-testing methodologies of failure testing that can identify hidden failures in networking systems, because the method includes the testing of "idle lines" using test traffic, even when those lines are not running data traffic.  This "enables an electronic system to test its idle lines and components and detect hidden failures" in a non-intrusive manner, as the specification explains.  Ex. 1, '369 Patent at 2:26-30.

20.     Method claim 1 also constitutes a specific improvement in computer networking failure testing technology over the prior art because it uses off-the-shelf networking components and modules without the need to include add additional hardware, such as dedicated test circuits, and can be utilized with a "main module," and first and second "subsidiary modules," as claimed.  This underscores that the claimed invention (unlike testing methods in the prior art) does not require the provisioning of additional hardware or memory to perform the testing functionality, and that it makes the hardware testing more efficient and faster than prior art techniques that required the use of additional resources.  The '369 patent explains that "[t]he testing method makes use of existing components in the system and requires substantially no dedicated testing hardware."  Ex. 1, '369 Patent at 2:29-31.  The invention, unlike prior art testing methods, "is applicable to all types of subsidiary modules, even in systems that mix different modules using different data formats and communication protocols."  *Id.* at 2:29-31.  This makes the testing method of the '369 patent more robust and versatile than prior art methods.

21.     The particular method of the '369 patent also is a specific improvement over the prior art because it tests modules of a networking system using a specified sequence of steps and arrangement of modules that was not previously disclosed in the art, and which can perform such testing in a preconfigured, non-intrusive manner that can detect hidden failures on idle components that might not have active data traffic at particular points in time.  The particular configuration requires that the components are interconnected in the manner recited in the claims involving three modules—a main module, a first subsidiary module, and a second subsidiary module that are connected in a manner as recited in the claims above, with a first idle line "connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid line," and a second idle line "connecting the second subsidiary module to a second port of the switch on the main module," and transmitting test traffic such that the traffic flows through "the second idle line from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid line connecting to the first subsidiary module," and loops back to "the second subsidiary module."  This particular testing methodology that transmits test traffic using three modules in that specific testing configuration was not known in the art.  Nor was the particular sequence of "selecting," "instructing," "configuring," and "transmitting" steps is required by the claims.  Specifically, the Court construed the claims of the '369 patent (including Claim 1) to require that "[t]he instruct[ing] step must be performed after the completion of the first selection; the configur[ing/e] step must be performed after the [completion] of both selections; and the transmit[ting] step must be performed after both selections."  ECF No. 69, Claim Construction Order at 2.  Given all of the above, it was unconventional to perform failure testing on networking equipment using the particular arrangement of components, the particular interconnection and test traffic flow between those components, and the particular loopback mechanism utilizing idle lines

recited within Claim 1 of the '369 patent.  Indeed, during prosecution the inventor successfully distinguished the unique testing configuration and methodology of claim 1 of the '369 patent over the prior art.  Ex. 21, '369 Prosecution History at COR-CSC000000160-161 (discussing that "Claim 1 recites a method for self-testing that uses a switch in a main module and two different subsidiary modules, which are connected to the main module and exchange test traffic via the switch," and why this was innovative over the prior art that used a different network testing configuration (Serikawa)).

22.     The invention of claim 1 employs several concepts that, when viewed individually or together, are specific improvements over the prior art—this includes the particular configuration of components disclosed in the methods (including the arrangement of modules and lines being tested), the ability to use dedicated "test traffic" to test idle lines (including those that are not actively receiving data traffic), and the use of preconfigured configurations of links and loopbacks that can autonomously run in the background of a networking system to detect failures of various networking components and traffic lines.  These concepts were more than what was well-understood, routine, and conventional, whether viewed individually or as an ordered combination.  Prior to the '369 patent's invention, no one had adopted a particular failure testing methodology that could autonomously self-test and detect hidden failures in networking systems, and that could do so in a preconfigured manner, as claimed.  This is in contrast to prior art testing methods, such as the use of a ping, which required manually transmitting packets to individual network nodes one-at-a-time to check for failures.  Indeed, methods like ping required a network administrator to "run it repeatedly, changing your destination address so that you work your way through each intermediate device to your destination," because ping required repeated manual transmissions to be sent to isolate network failures.  Ex. 27, Joseph D. Sloan, Network Troublehsooting Tools, at

47.  Despite Cisco's resources and extensive efforts in this case, it has not been able to identify a single ground of anticipation that it intends to pursue at trial in this case.[1]  This itself underscores that Claim 1 is not directed to abstract ideas, and was instead directed to specific implementation details of network failure testing that were more than what was well understood, routine, and conventional in the art.  Further, the failure testing methodology recited in Claim 1 of the '369 patent is not results-based—instead, the methodology provides a specific means for performing failure testing to address a specific problem in the computer networking field—identification of unknown, failed components.  In sum, the claim is directed to specific improvements in the functioning of computer networking equipment to detect failures amongst modular components. The claim is not directed to forwarding, analyzing, or collecting data.

23.  Claim 2 of the '369 Patent depends from claim 1, and claims "[a] method according to claim 1, wherein instructing the first subsidiary module comprises configuring the first subsidiary module to loop back the traffic to the main module substantially without processing data comprised in the test traffic."  As with claim 1, claim 2 is not directed to an abstract idea, and was instead directed to failure detection techniques that were more than what was well-understood, routine, and conventional in the art, for the reasons stated above with respect to claim 1.  When viewed in combination with the claim requirements of claim 1, moreover, the additional requirement of claim 2 includes an additional inventive concept, which is one of conducting background failure testing in an even more efficient manner that further minimizes the intrusiveness of the testing on the bandwidth and processing capacity of the networking system. As the specification states, the loopback function of the invention "does not require that the

---

[1] All of the grounds that Cisco has elected to pursue in this case are based on obviousness because it has not been able to identify a reference that allegedly anticipates claim 1 or any of the asserted claims of the '369 patent.

subsidiary module decode or process the traffic—only that it send it back bit by bit over the aid line to the master module." Ex. 1, '369 Patent at 2:9-12.  This is in contrast to alleged prior art methods of utilizing loopbacks in the context of network diagnostics, such as ping functionality, which requires some processing and the generation of new packets at a receiving node, as well as other failure testing techniques that required data processing at a receiving node.  Ex. 27, Joseph D. Sloan, Network Troubleshooting Tools, at 42 (discussing generation of two specific ICMP messages, ECHO_REQUEST and ECHO_REPLY, that are used in connection with ping functionality).  Implementing methodologies that do not require data processing at the loopback nodes improves both the speed and efficiency of network failure detection systems, constitutes an inventive concept, and underscores that the method of claim 2 does not claim failure testing techniques that are abstract, and claims methods that are more than what was well-understood, routine, or conventional in the art.

24. Apparatus claim 15 of the '369 patent is also not directed to an abstract idea, and is directed to network failure detection concepts that were more than what was well understood, routine, and conventional in the art.  As with claim 1, claim 15 is not directed to an abstract idea, and is instead directed to more than was well-understood, routine, and conventional in the network failure testing art for the reasons stated above with respect to claim 1.  It recites the following:

15. Modular electronic apparatus, comprising:

a backplane, which comprises traces for carrying data between modules that are plugged into the backplane;

a main module, plugged into the backplane, the main module comprising a switch having ports for connection to the traces of the backplane;

at least first and second subsidiary modules, plugged into the backplane so as to be connected to the main module by the traces, at least some of which traces are sometimes idle; and

a system control processor, which is operative to select a first idle trace among idle

13

traces connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid trace, to instruct the first subsidiary module to loop back traffic reaching the first subsidiary module via the aid trace, to select for testing a second idle trace among the idle traces connecting the second subsidiary module to a second port of the switch on the main module, and to configure the switch to link the first and second ports, the system control processor being further operative to cause test traffic to be transmitted over the second idle trace from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid trace connecting to the first subsidiary module, and to report that a failure has occurred if the test traffic does not return to the second subsidiary module within a predetermined period of time.

*Id.* at claim 15.  Claim 15, as an apparatus claim, recites particular hardware components and limitations that further underscore that the claims of the '369 patent are directed to computer networking technologies, and to the specific problem of conducting new and improved failure testing of networking components.  Claim 15, like claim 1, recites components that are unique to computer networking, including a "backplane," "main module," first and second subsidiary modules, and "system control processor."  The claim also recites "traces," which like the lines of Claim 1, are understood in the art as interconnections between networking components.  Claim 15, despite reciting the aforementioned networking components and modules, does not require dedicated testing hardware (improving the efficiency of the failure testing without the need for additional memory or hardware), and facilitates preconfigured failure testing that can be conducted without manual intervention and in a non-intrusive manner.  Moreover, by using networking components and hardware modules in the claimed manner, without the need for dedicated testing hardware, the claimed inventions of both claims 1 and 15 promote hardware testing that can be conducted in a flexible manner.

25.    Claim 18 depends from claim 15 and is likewise not directed to an abstract idea. Claim 18 is also directed to concepts that were more than what was well-understood, routine and conventional in the art.  It is directed to a new and improved networking apparatus that addresses the problem of network failures by self-testing and diagnosing networking components.  It includes

all of the inventive concepts discussed above with respect to claims 1 and 15.  The claim adds the requirement over claim 15 that "the system control processor is operative to select one or more further idle traces for testing among the idle traces in the system, wherein the further idle traces connect to further ports of the switch on the main module, and to repeatedly configure the switch, cause the test traffic to be transmitted, and report the failure when it occurs with respect to the further idle traces until all the idle lines have been tested."  This claim includes yet another inventive concept, which is that the failure testing system can be configured to autonomously conduct failure testing on all of the idle traces in a system without the need for manual intervention.  This again, was advantageous over prior art methods for several reasons, including the fact that prior art techniques (such as ping functionality) would have required setting up numerous manual tests to check for all failures, and the fact that prior art systems used dedicated testing hardware on individual circuits and would have required the addition of numerous pieces of additional hardware (and the corresponding need for additional memory) to test all of the idle lines.  The invention and techniques of the '369 patent vitiated this need through its new and innovative network failure testing technique that arranges the components and performs the failures testing steps in the particular manner claimed.

26.     Claim 21, as with the other asserted claims, is likewise not directed to an abstract idea.  Instead, it is directed to concepts that were more than those that were well-understood, routine and conventional in the art.  Claim 21 is directed to a new and improved networking apparatus that addresses the problem of network failures by self-testing and diagnosing networking components.  It includes all of the inventive discussed above with respect to claims 1, 15, and 18, and recites the following:

21. Modular electronic apparatus, comprising:

15

a backplane, which comprises traces for carrying data between modules that are plugged into the backplane;

a main module, plugged into the backplane;

a plurality of subsidiary modules, plugged into the backplane so as to be connected to the main module by the traces; and

a system control processor, which is operative to select first and second subsidiary modules of different types for testing among the multiple subsidiary modules, the first and second subsidiary modules being configured to transmit and receive the data in different, respective first and second formats, and which is further operative to test the modules by causing the first subsidiary module to loop back traffic reaching the first subsidiary module from the main module, by configuring the main module to connect the first and second subsidiary modules, so that a traffic transmitted by the second subsidiary module is conveyed to the first subsidiary module via the main module and is then looped back via the main module to the second subsidiary module, and by causing the second subsidiary module to transmit test traffic in the second format to the main module, and assessing whether the test traffic is returned intact from the first module.

Claim 21, like the other claims discussed above, is directed to a new and improved networking apparatus that addresses the problem of network failures by self-testing and diagnosing networking components. It includes all of the inventive concepts discussed above with respect to claims 1 and 15. The claim also adds the requirement that "the first and second subsidiary modules [are] configured to transmit and receive the data in different, respective first and second formats." By interposing this requirement, this claim reinforces that the claimed invention includes the inventive concept of ensuring that failure testing within networking systems can be conducted in a flexible manner, even with respect to different networking components, due to the versatility of the "test traffic" that runs separately from the data traffic, as well as the testing method's use of loopback testing techniques that do not require the processing of the test traffic at the respective nodes. This flexibility again underscores the efficiency and resource-saving nature of the novel failure testing technique claimed. This flexibility was referenced in the prosecution history with respect to claim 8, which includes the same limitation as claim 21. *See* Ex. 21, '369 Prosecution History at COR-

CSC00000162 (distinguishing over the prior art and noting that the combination of features "underscores the flexibility afforded by the invention recited therein to choose any pair of subsidiary modules to connect and test through the main module, regardless of whether the subsidiary modules are of the same or different types").

27.     Because claims 1, 2, 15, 18, and 21 have various distinct claim limitations that are relevant to the claimed implementations of network failure testing as outlined in the above paragraphs, the POSA would understand that each of the asserted claims recites a unique invention and that the claims are not representative of one another.

28.     The specification of the '369 Patent provides further reasons that the above-discussed claims are not directed to abstract ideas, are instead directed to specific implementations and improvements in network failure testing, and would have been understood by the POSA to have been more than what were understood to have been well-understood, routine, or conventional failure testing techniques in the art.  The specification explains that the invention is intended to "provide improved methods and systems for non-intrusive testing of electronic systems."  Ex. 1, '369 Patent at 1:56-60.  While the specification acknowledges that other methods of failure testing were known in the art as of the priority date, the specification discusses and incorporates by reference two prior art failure testing references that it uses to show examples of how the inventions of the '369 patent are specific implementations of diagnostic failure testing of network components that are more than what was well-understood, routine, or conventional in the art.  Specifically, the '369 Patent incorporates discussion of U.S. Patent No. 5,841,788 to Ke (Ex. 22) ("Ke"), and WO 01/93499 to Fainguelerent (Ex. 23) ("Fainguelerent").  Ex. 1, '369 Patent at 1:37-54.  The differences between the inventions claimed in the '369 Patent and these two references underscore that inventions claimed in the '369 Patent would have been more than what was understood to

17

have been well understood, routine, or conventional in the art, and reinforce that the asserted claims of the '369 patent include numerous inventive concepts.

29.     *First*, with respect to Fainguelerent, there was an ATM system known in the art with "non-intrusive self-test capability," but the specification explained that the system utilized "dedicated self-test circuit[s]" (i.e., additional hardware that needed to be provisioned to perform the testing), and multiple such dedicated self-test circuits were utilized in the system when needed to test multiple physical layer devices in the ATM.  As Fainguelerent explains, "[t]he dedicated self test circuit 405 incudes external logic either in the form of a programmable device or discrete components which is coupled to the bus 402." Ex. 23, Fainguelerent at 4:20-22, Fig. 4.  And "[t]he present invention" has N dedicated test circuits corresponding to the number of physical devices being testing.   Ex. 23, Fainguelerent at 6:9-11 ("According to the teachings of the present invention, each dedicated self test circuit 509-1, 509-2, . . ., 509-N coupled to the bus 505 in the number of interface layer circuit packs 503-1, 503-2, . . ., 503-N is generic and independent from a functionality for the number of drivers 511-1, 511-2, . . . ., 511-N."), Fig. 5.  This underscores that in the prior art, failure testing methods required the use of dedicated testing hardware that required the provisioning of additional memory and equipment, which is yet another problem that the '369 patent addresses through its use of existing networking modules and components, as well as the unique and innovative arrangement, sequence of steps, and setup of the testing that it claims.

30.     *Second*, with respect to the Ke reference, the '369 Patent states that Ke was a method for backplane interconnect testing, but that "[t]est vectors are applied to individual circuit boards in a system while the remaining circuit boards are disabled."  Ex. 1, '369 Patent at 1:48-54; Ke at Abstract, 2:21-28.  Thus, the POSA would have understood that a disadvantage of Ke was that it could not detect hidden failures within parts of the system while data traffic was still

running on other portions of the system, unlike the innovative testing technique of the '369 Patent's claims.  Thus, one disadvantage of failure testing in the prior art was that it tested individual components of a system one at a time while disabling other components.  The fact that Ke disables individual circuit boards was relevant to why institution was denied by the PTAB—twice—in connection with efforts to assert obviousness using Ke.  Many prior art techniques were like Ke and were highly intrusive on system operations and decreased the efficiency of failure testing, causing system downtime and incurring significant operational and financial thoughts.

31.     To date, neither Cisco nor any other defendant in ongoing litigation has successfully asserted that the Asserted Claims of the '369 Patent is anticipated or obvious, underscoring that the claims of that patent were more than what was well understood, routine, or conventional as of the priority date of the patent.  This includes attempts to invalidate the '369 Patent (based on Ke), as well as based on other references that Cisco and others have attempted to rely on.  This is also reinforced by the prosecution history itself, which determined that the asserted claims of the '369 Patent were patentable over several references, including Ke (which appears among the "References Cited" on the face of the '369 Patent), as well as other references that were explicitly "cited by examiner" on the face of the patent, including U.S. Patent No. 5,541,862 to Bright, U.S. Patent No. 6,028,845 to Serikawa, U.S. Patent No. 6,233,073 to Bowers, U.S. Patent 6,366,556 to Ballintine, and U.S. Patent No. 6,456,586 to Taniguchi.  Ultimately, based on its review of those references and several others cited on the face of the '369 Patent, the Examiner concluded that "[t]he prior arts of record taken alone or in combination fail to teach, anticipate, suggest or render obvious the claimed invention of a method for self testing an electronic system and a modular electronic apparatus recited in the independent claims."  Ex. 21, '369 Prosecution History at COR-CSC00000175.

32.     After the original complaint in this case was filed, Cisco and its co-petitioner, Dell, attempted to rely on Ke, among other references in an *inter partes review* proceeding (IPR2023-00464).  Cisco and Dell did not raise any anticipation grounds or single-reference obviousness grounds, implying that these sophisticated companies were unable to find a single prior art reference that it believed taught or rendered obvious the precise failure testing methods claimed in the '369 patent.  Instead, Cisco and Dell asserted only two or three reference obviousness grounds, including obviousness grounds based on combinations of Ke and U.S. Patent No. 4,675,102 to Lewis ("Lewis"); Ke, Lewis, and U.S. Patent Pub. No US/2003/0101426 to Sarkinen ("Sarkinen"); U.S. Patent No. 4,074,352 to Cook ("Cook") and Lewis; and Cook, Lewis, and Sarkinen.  The Patent Trial and Appeal Board (PTAB) denied institution of the IPR on all of these grounds, finding that there was not even a *reasonable likelihood* that the asserted claims of the '369 Patent were unpatentable over combinations of any of the references.  Ex. 24, IPR2023-00464, Paper 19. It held that the POSA would not have been motivated to combine backplane testing in Ke with loopback testing described in Lewis, emphasizing that in Ke testing is only performed on one circuit board at a time while disabling all others.  Ex. 24, IPR2023-00464, Paper 19, at 5-8; Ex. 22, Ke at 7:26-34 ("[T]est vectors are applied to drivers on a single board at a time while the other boards in the system are disabled.").  Thus, Ke teaches away from loopback testing that spans multiple modules in the manner claimed in the '602 Patent.  And for the combination of Cook and Lewis, Cook utilized dedicated testing lines that were also inconsistent with the unique and innovative failure testing methodology required by the '369 Patent claims.  Ex. 24, IPR2023-00464, Paper 19, at 8-12.  Arista, a defendant in a related district court proceeding, also had the opportunity to identify additional prior art against the '369 Patent, and likewise identified the Ke, Cook, and Lewis references.  It too failed to garner institution of the IPR for substantially similar

reasons as the failure of Cisco and Dell's Petition.  Ex. 25, IPR2023-00837, Paper 9.

33.     The results from the PTAB are unsurprising because the available prior art is readily distinguishable from the claimed inventions of the Asserted Claims for the '369 Patent for the various reasons pleaded above, and reinforces that there are numerous inventive concepts within the claims that were not well understood and conventional in the prior art.  To date, the USPTO and the PTAB have had the opportunity to consider numerous prior art references, including all of those discussed above, and the asserted claims have repeatedly been found valid, patentable, novel and nonobvious under Sections 102 and 103.  Meanwhile, those references do at least to some extent relate to the field of invention, which relates to failure testing of networking components. The divergence between the various prior art references and the claimed inventions of the asserted claims of the '369 patent underscores, yet again, that the asserted claims recite techniques that are more than what was well understood, routine, and conventional, and that they are not directed towards an abstract concept that somehow "preempts" the field of computer network failure testing.  Instead, they are directed to a specific implementation of computer network failure testing that is meant to solve a problem that is unique and specific to the computer networking field.

34.     Consistent with the above, another Court has considered the eligibility of Claim 15 of the '369 Patent and found it eligible at Step One of the *Alice* test, noting that the patent "claims an apparatus that performs diagnostic testing on idle traces, and it seems sufficiently specific I do not think I can say it is claiming an abstract idea."  Ex. 26, *Corrigent Corp. v. Dell Techs.*, No. 22-cv-00496-RGA, D.I. 21, at 1 (March 3, 2023).  The Court did not "consider its representativeness," meaning that it did not need to consider the additional specificity of the failure testing improvements recited in claims 2, 18, and 21 and discussed above.

35.     In sum, the subject matter described and claimed in the '369 patent, including the

subject matter of claim 15, was an improvement in computer and communications functionality, performance, and efficiency, and was novel and is more than what was well-understood, routine, or conventional in the network communications art at the time of the '369 patent.

36.    On information and belief, Defendant had knowledge of the '369 patent, including at least as of March 2017 when Orckit IP LLC ("Orckit IP")—a prior owner of the Asserted Patents—initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

## U.S. Patent No. 7,113,485[2]

37.    Plaintiff is the lawful owner of all right, title, and interest in U.S. Patent No. 7,113,485 ("'485 patent") entitled "LATENCY EVALUATION IN A RING NETWORK," including the right to sue and recover for infringement thereof.  A copy of the '485 patent is attached as Exhibit 2, which was duly and legally issued on September 26, 2006, naming Leon Bruckman as the inventor.

38.    The '485 patent has 20 claims: 6 independent claims and 14 dependent claims.

39.    The '485 patent presented novel and unconventional systems and methods "for measuring network latency, particularly in ring topologies."  Ex. 2, '485 patent at 2:59–61; *id.* at 1:6–10, Abstract.  The inventions of the '485 patent, for example, "provide simple, accurate methods for measuring round-trip latency between pairs of nodes in a network."  *Id.* at 2:65–67. One embodiment of the inventions of the '485 patent is shown in FIG. 1, reproduced below.

---

[2] Corrigent is not amending its pleadings at this time with respect to the '485 Patent, notwithstanding the Court's decision to grant Cisco's motion under Rule 12(c) regarding the eligibility of the '485 Patent.  Corrigent reserves all rights with regard to the Court's previous ruling under 35 U.S.C. § 101 with respect to the '485 patent based on its initial pleadings and the briefing previously submitted with respect to the '485 patent on this issue.  *See* ECF No. 108.



FIG. 1

*Id*. at Fig. 1; *see also id*. at 6:22–40.

40.    The claims of the '485 patent, including claim 16 (reproduced below), recite at least these inventive concepts of the '485 patent.

> 16. Apparatus for measuring latency in a network in which traffic is transmitted in a plurality of classes of service, the apparatus comprising a node in the network, which generates a latency measurement packet containing an indication that the packet belongs to a selected one of the classes of service and to transmit the latency measurement packet, so that the packet is passed through the network at a level of service accorded to the class, the node notes a time of receipt of the latency measurement packet at a destination in the network and to calculate the latency for the selected one of the classes of service by taking a difference between a time of transmission of the latency measurement packet and the time of receipt thereof.

*Id*. at claim 16.

41.    The subject matter described and claimed in the '485 patent, including the subject matter of claim 16, was an improvement in computer and communications functionality, performance, and efficiency, and was novel and not well-understood, routine, or conventional at the time of the '485 patent.

42.    On information and belief, Defendant had knowledge of the '485 patent, including at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent

portfolio, including the Asserted Patents, and at least as of November 20, 2017, when Orckit IP notified Defendant of the asserted '485 patent, among others in its portfolio, and offered to send Defendant exemplary "evidence of use charts" relating to the '485 patent, as described and alleged below, and at least as of the filing of this Complaint.  Ex. 20, 2018-11-20 Wan Email.

### U.S. Patent No. 7,330,431

43.     Plaintiff is the lawful owner of all right, title, and interest in U.S. Patent No. 7,330,431 ("'431 patent") entitled "MULTIPOINT TO MULTIPOINT COMMUNICATION OVER RING TOPOLOGIES," including the right to sue and recover for infringement thereof.  A copy of the '431 patent is attached as Exhibit 3, which was duly and legally issued on February 12, 2008, naming Leon Bruckman as the inventor.

44.     The '431 patent has 30 claims: 5 independent claims and 25 dependent claims.

45.     The '431 patent presented novel and unconventional systems and methods concerning communications within a network, and specifically for "optimizing bandwidth allocation for the data in the network."  Ex. 3, '431 patent at 1:7–9; *id*. at Abstract ("A method for assigning bandwidth in a network including nodes coupled by links arranged in a physical topology . . . .").  In embodiments of the '431 patent, actual bandwidths of links in a physical network are assigned according to the logical connectivity of notes in services carried by the network.  *Id*. at 2:11–35.  The inventions of the '431 patent, for example, provide "a simple and effective way to allocate bandwidth correctly and efficiently, particularly guaranteed bandwidth."  *Id*. at 2:31–35. One embodiment of the inventions of the '431 patent is shown in FIG. 1, reproduced below.



Id. at Fig. 3; *see also id.* at 7:63–10:8.

46.     The claims of the '431 patent, including claim 25, recite at least these inventive concepts of the '431 patent.

25. Apparatus for assigning bandwidth in a network including nodes coupled by links arranged in a physical topology, the apparatus comprising:

a controller which is adapted to:

receive a definition of logical connections between the nodes, the logical connections being associated with a data transmission service to be provided over the network, the logical connections having a connection topology different from the physical topology,

determine respective bandwidth requirements for the logical connections based on parameters of the service,

map the connection topology to the physical topology, so that each of the logical connections is associated with one or more links of the physical topology, and

allocate a bandwidth for the service on each of the links in response to the bandwidth requirements of the logical connections and to the mapping.

Id. at claim 25.

47.     The subject matter described and claimed in the '431 patent, including the subject matter of claim 25, was an improvement in computer and communications functionality, performance, and efficiency, and was novel and not well-understood, routine, or conventional at the time of the '431 patent.

48.     On information and belief, Defendant had knowledge of the '431 patent, including at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

## U.S. Patent No. 7,593,400

49.     Plaintiff is the lawful owner of all right, title, and interest in U.S. Patent No. 7,593,400 ("'400 patent") entitled "MAC ADDRESS LEARNING IN A DISTRIBUTED BRIDGE," including the right to sue and recover for infringement thereof.  A copy of the '400 patent is attached as Exhibit 4, which was duly and legally issued on September 22, 2009, naming David Zelig, Leon Bruckman, Ronen Solomon, Zeev Oster, David Rozenberg, and Uzi Khill as the inventors.

50.     The '400 patent has 20 claims: 2 independent claims and 18 dependent claims.

51.     The '400 patent presented novel and unconventional systems and methods "for bridging in virtual private LAN services (VPLS) and other distributed bridging systems."  Ex. 4, '400 patent at 1:6–9.  The inventions of the '400 patent, for example, provide "improved methods for MAC learning and network nodes that implement such methods," which "are useful especially in the context of nodes that are configured to serve as virtual bridges in Layer 2 virtual private networks, as well as in distributed bridge nodes of other types, particularly when multiple ports of the node are conjoined in a LAG group," and may be applied in different situations to, for example, "to facilitate MAC learning in any distributed MAC learning environment."  *Id*. at 2:60–3:2.  One embodiment of the inventions of the '400 patent is shown in FIG. 3, "a flow chart that schematically illustrates a method for MAC learning," reproduced below.



FIG. 3

*Id.* at Fig. 3; *see also id.* at 7:55–10:48.

52.     The claims of the '400 patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '400 patent.

1. A method for communication, comprising:

configuring a network node having a plurality of ports, and at least first and second line cards with respective first and second ports, to operate as a distributed media access control (MAC) bridge in a Layer 2 data network;

configuring a link aggregation (LAG) group of parallel physical links between two endpoints in said Layer 2 data network joined together into a single logical link, said LAG group having a plurality of LAG ports and a plurality of conjoined member line cards;

providing for each of said member line cards a respective forwarding database (FDB) to hold records associating MAC addresses with ports of said plurality of ports of said network node;

receiving a data packet on an ingress port of said network node from a MAC source address, said data packet specifying a MAC destination address on said Layer 2 data network;

conveying, by transmitting said data packet to said MAC destination address via said first port, said received data packet in said network node to at least said first line card for transmission to said MAC destination address;

if said MAC destination address does not appear in said FDB, flooding said data packet via one and only one LAG port of said plurality of LAG ports;

checking said MAC source address of the data packet against records in said FDB of said first line card; and

if said FDB of said first line card does not contain a record of an association of said MAC source address with said ingress port, creating a new record of said association, adding said new record to the FDB of said first line card, and sending a message of the association to each member line card of said plurality of member line cards.

*Id*. at claim 1.

53.     The subject matter described and claimed in the '400 patent, including the subject matter of claim 1, was an improvement in computer and communications functionality, performance, and efficiency, and was novel and not well-understood, routine, or conventional at the time of the '400 patent.

54.     On information and belief, Defendant had knowledge of the '400 patent, including at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

**U.S. Patent No. 9,118,602**

55.     Plaintiff is the lawful owner of all right, title, and interest in U.S. Patent No. 9,118,602 ("'602 patent") entitled "TUNNEL PROVISIONING WITH LINK AGGREGATION," including the right to sue and recover for infringement thereof.  A copy of the '602 patent is attached as Exhibit 5, which was duly and legally issued on August 25, 2015, naming Ronen

Solomon as the inventor.

56.    The '602 patent has 26 claims: 3 independent claims and 23 dependent claims.

57.    The '602 patent presented novel and unconventional systems and methods concerning communication networks, including for "performing link aggregation in tunneled networks." *See* Ex. 5, '602 patent at 1:19–20; *see also id.* at Abstract.  The '602 patent describes:

> In MPLS, each packet is assigned to a Forwarding Equivalence Class (FEC) when it enters the network, depending on its destination address. The packet receives a fixed-length label, referred to as an "MPLS label" identifying the FEC to which it belongs. All packets in a given FEC are passed through the network over the same path by label-switching routers (LSRs). The flow of packets along a label-switched path (LSP) under MPLS is completely specified by the label applied at the ingress node of the path. Therefore, an LSP can be viewed as a tunnel through the network.

*Id*. at 1:34–43.  The '602 further describes "Ethernet Link Aggregation":

> Link aggregation (LAG) is a technique by which a group of parallel physical links between two endpoints in a data network can be joined together into a single logical link (referred to as a "LAG group"). Traffic transmitted between the endpoints is distributed among the physical links in a manner that is transparent to the clients that send and receive the traffic. For Ethernet networks, link aggregation is defined by Clause 43 of IEEE Standard 802.3ad, Carrier Sense Multiple Access with Collision Detection (CSMA/CD) Access Method and Physical Layer Specifications (2002 Edition), which is incorporated herein by reference. Clause 43 defines a link aggregation protocol sub-layer, which interfaces between the standard Media Access Control (MAC) layer functions of the physical links in a link aggregation group and the MAC clients that transmit and receive traffic over the aggregated links.

*Id*. at 2:2–17.

58.    The inventions of the '602 patent, for example, "provide tunnel provisioning with link aggregation."  *Id*. at 2:29–30.  The '602 describes how describe how its inventions "ensure that sufficient bandwidth will be available on the links in the group in order to meet service guarantees, notwithstanding load fluctuations and link failures."  *Id*. at 2:22–25.  One embodiment of the inventions of the '602 patent is shown in FIGs. 1A and 1B, reproduced below.



*Id.* at FIGs. 1A and 1B; *see also id.* at 3:62–5:22.

59. The claims of the '602 patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '602 patent.

1. A method for assigning and utilizing an Ethernet physical data port in an Ethernet Link Aggregation Group (LAG) in a Multi-Protocol Label Switching (MPLS) network, the method comprising the steps of:

assigning, by a first MPLS/LAG switch, a single physical tunnel port of a LAG to a network tunnel, wherein the single physical tunnel port of the LAG meets a bandwidth requirement of the network tunnel, and wherein said single physical tunnel port of the LAG has a port serial number;

dedicating a sub-set of bits in a data packet label prepared by the first MPLS/LAG switch to encode said port serial number of said single physical tunnel port of the LAG into the data packet label;

sending, by said first MPLS/LAG switch, the data packet label, in which said port serial number of said single physical tunnel port is encoded, to a preceding node;

receiving from the preceding node, by said first MPLS/LAG switch, a data packet comprising said data packet label, in which said port serial number of said single physical tunnel port is encoded; and

sending said data packet from said first MPLS/LAG switch to a second MSPLS/LAG switch via said single physical tunnel port having the port serial number encoded in the data packet label.

*Id.* at claim 1.

60.     The subject matter described and claimed in the '602 patent, including the subject matter of claim 1 of the '602 patent, was an improvement in computer and communications functionality, performance, and efficiency, and was novel and not well-understood, routine, or conventional at the time of '602 patent.

61.     On information and belief, Defendant had knowledge of the '602 patent, including at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

## **BACKGROUND OF DEFENDANT'S INFRINGING CONDUCT**

62.     Defendant Cisco Systems Inc. is a networking hardware company that makes, uses, sells, offers for sale in the United States, and/or imports into the United States, or has otherwise made, used, sold, offered for sale in the United States, and/or imported in the United States, routers and switches that infringe the Asserted Patents.

63.     Defendant's products that infringe the Asserted Patents (collectively, "Accused Products") include the following:

| Accused Products | Asserted Patents |
|---|---|
| Cisco ASR 9000 | '485 and '400 patents |
| Cisco Nexus 9000 Series Switches | '369 and '602 patents |
| Cisco's "Collaboration Platform" Compatible Products (*e.g.*, Cisco BE7000) | '431 patent |

The above-listed Accused Products are non-limiting.  Additional products may infringe the Asserted Patents, and the above-listed Accused Products may infringe additional patents or other Asserted Patents.

64.     Defendant infringes and continues to infringe the Asserted Patents by making, using, selling, offering to sell, and/or importing, without license or authority, the Accused Products

as alleged herein.

65. Comparison of claims of the Asserted Patents to the Accused Products are provided with respect to the '369 patent, '485 patent, '400 patent, and '602 patent in the expert reports of record in this proceeding attached as Exhibit 6 and Exhibit 8.  Specifically, comparisons are provided with respect to the '369 patent (Ex. 6, ¶¶ 229-357 & Ex. 8, ¶¶ 11-122), '485 patent (Ex. 6, ¶¶ 358-456 & Ex. 8, ¶¶ 123-186), '400 patent (Ex. 6, ¶¶ 457-600 & Ex. 8, ¶¶ 187-244), and '602 patent (Ex. 6, ¶¶ 601-715 & Ex. 8, ¶¶ 245-360).  Exhibit 10 also provides a comparison of claims of the '431 patent to the Accused products. These respective materials are incorporated herein by reference.  Defendant markets, advertises, offers for sale, and/or otherwise promotes the Accused Products and, on information and belief, does so to induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, and/or offer to sell their Accused Products. For example, Defendant advertises, offers for sale, and/or otherwise promotes the Accused Products on its website.  Defendant further publishes and distributes data sheets, manuals, and guides for the Accused Products. *See, e.g.*, Ex. 11, "Cisco ASR 9000 Series Aggregation Services Routers" (2021) (publicly available at https://www.cisco.com/c/en/us/products/collateral/routers/asr-9000-series-aggregation-services-routers/data_sheet_c78-501767.pdf); Ex. 12, "Segment Routing Configuration Guide for Cisco ASR 9000 Series Routers, IOS XR Release 7.3.x," Chapter 1100 (March 11, 2022) (publicly available at https://www.cisco.com/c/en/us/td/docs/routers/asr9000/software/asr9k-r7-3/segment-routing/configuration/guide/b-segment-routing-cg-asr9000-73x/b-segment-routing-cg-asr9000-71x_chapter_01100.pdf); Ex. 13, "Cisco Nexus 9500 Series Switches" (2021) (publicly available at https://www.cisco.com/c/en/us/products/collateral/switches/nexus-9000-series-switches/datasheet-c78-729404.pdf); Ex. 14, excerpt of "Preferred Architecture for Cisco

Collaboration 14 Enterprise On-Premises Deployments, Cisco Validated Design (CVD) Guide"
(May 21, 2021) (publicly available at
https://www.cisco.com/c/en/us/td/docs/solutions/CVD/Collaboration/enterprise/14/collbcvd.pdf);
Ex. 15, "Cisco Collaboration Preferred Architectures" (Jan. 14, 2022) (publicly available at
https://www.cisco.com/c/en/us/td/docs/voice_ip_comm/uc_system/design/guides/PAdocs.pdf).
Therein, Defendant describes and touts the use of the subject matter claimed in the Asserted
Patents, as described and alleged below.

## BACKGROUND OF DEFENDANT'S KNOWLEDGE OF THE INVENTIONS DESCRIBED AND CLAIMED IN THE ASSERTED PATENTS

66.     On information and belief, Defendant has had knowledge of the Asserted Patents
and the inventions described and claimed therein since at least around March 2017, when Orckit
IP—a prior owner of the Asserted Patents—initiated discussions with Defendant about the
Asserted Patents and the Accused Products.

67.     On March 20 2017, Orckit IP sent letter to Defendant concerning its "Patent
Portfolio." Ex. 16, 2017-03-20, Hallaj Ltr.  In that letter, Orckit IP notified Defendant that it "owns
a patent portfolio related to certain communications technologies developed by Orckit
Communications Ltd. and Corrigent Systems Ltd. (f/k/a Orckit-Corrigent Ltd.).  Orckit IP's patent
portfolio includes over 100 patents and pending patent applications.  One or more of these patents
and patent applications may be of interest to Cisco and require your company's attention."  *Id*.
Orckit IP further identified several "Cisco switches and routers," including the Cisco Nexus 9000
Series Switches, which are accused of infringing the Asserted Patents in this case.  *Id*.  Orckit IP
concluded: "Accordingly, Cisco may be interested in obtaining a license to (or acquiring) the '983
Patent and/or other patent assets from Orckit IP's patent portfolio."  *Id*.

68.     On April 10, 2017, Defendant responded by letter and requested additional

information.  Ex. 17, 2017-04-10, Showalter Ltr.

69.     On July 11, 2018, Orckit IP sent a second notice letter to Defendant, again concerning its "Patent Portfolio."  Ex. 18, 2018-07-11, Hallaj Ltr.  Orckit IP again notified Defendant that Orckit IP's patent portfolio relates to Defendant's switch and router products.  *Id*.  Orckit IP concluded: "Accordingly, Cisco may be interested in obtaining a license to (or acquiring) the '821 Patent, the '928 Patent, and/or other patent assets from Orckit IP's patent portfolio (in addition to the '983 Patent, discussed above)."  *Id*.

70.     On July 25, 2018, Defendant responded by letter and requested additional information.  Ex. 19, 2018-07-25, Walters Ltr.

71.     On November 20, 2018, Orckit IP identified additional patents within its patent portfolio, including the asserted '485 patent.  Ex. 20, 2018-11-20 Wan Email.  Orckit IP offered to send Defendant exemplary "evidence of use charts" relating to any of the patents, including the asserted '485 patent.  *Id*.

72.     Defendant has also had knowledge of the Asserted Patents and the inventions described and claimed therein since at least as of the filing of this Complaint.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,957,369

73.     Plaintiff incorporates by reference the allegations contained in paragraphs 1–72.

74.     Defendant has made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '369 patent in violation of 35 U.S.C. § 271(a), including claim 15.  A comparison of the asserted claims of the '369 patent to the Accused Products is included in Exhibit 6 (¶¶ 229-357) and Exhibit 8 (¶¶ 11-122), which are incorporated herein by reference.

75.     On information and belief, with knowledge of the '369 patent, Defendant has

actively induced and continues to induce the direct infringement of one or more claims of the '369 patent, including claim 15, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '369 patent, including claim 15, with the intent to encourage those customers and/or end-users to infringe the '369 patent.

76.    By way of example, on information and belief, Defendant actively induces infringement of the '369 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Defendant's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Defendant's products, including at least the Accused Products, in a manner that infringes at least one claim of the '369 patent, including claim 15.  For example, as described above, Defendant actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products on its website.  Defendant further actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products.  Therein, Defendant describes and touts the use of the subject matter claimed in the '369 patent.

77.    On information and belief, with knowledge of the '369 patent, Defendant also contributes to the infringement of one or more claims of the '369 patent in violation of 35 U.S.C. § 271(c), including claim 15, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused Products, knowing the same to be especially made or especially adapted for use in an

infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use.  This is evidenced by, among other things, the design, configuration, and functionality of Defendant's Accused Products, which are especially made or especially adapted for use in an infringement of the '369 patent when used for their normal and intended purpose. This is also evidenced by, among other things, Defendant's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '369 patent.

78.     As a result of Defendant's inducement of, and/or contribution to, infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Defendant's products, including the Accused Products, in ways that directly infringe one or more claims of the '369 patent, including claim 15.  On information and belief, Defendant had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Defendant's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

79.     On information and belief, with knowledge of the '369 patent, Defendant has willfully, deliberately, and intentionally infringed the '369 patent, and continues to willfully, deliberately, and intentionally infringe the '369 patent.  On information and belief, Defendant had actual knowledge of the '369 patent and Defendant's infringement of the '369 patent as set forth above.  On information and belief, after acquiring that knowledge, Defendant directly and indirectly infringed the '369 patent as set forth above.  On information and belief, Defendant knew or should have known that its conduct amounted to infringement of the '369 patent at least because

Plaintiffs notified Defendant of the '369 patent and its infringement of the '369 patent as set forth above.

80.     On information and belief, Defendant will continue to infringe the '369 patent unless and until it is enjoined by this Court.  Defendant, by way of its infringing activities, has caused and continues to cause Plaintiff to suffer damages in an amount to be determined, and has caused and is causing Plaintiff irreparable harm.  Plaintiff has no adequate remedy at law against Defendant's acts of infringement and, unless it is enjoined from its infringement of the '369 patent, Plaintiff will continue to suffer irreparable harm.

81.     Plaintiff is entitled to recover from Defendant damages at least in an amount adequate to compensate for its infringement of the '369 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

82.     Plaintiff has complied with 35 U.S.C. § 287 with respect to the '369 patent.

### COUNT II – INFRINGEMENT OF U.S. PATENT NO. 7,113,485

83.     Plaintiff incorporates by reference the allegations contained in paragraphs 1–82.

84.     Defendant has made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '485 patent in violation of 35 U.S.C. § 271(a), including claim 16.  A comparison of the asserted claims of the '485 patent to the Accused Products is included in Exhibit 6 (¶¶ 358-456) and Exhibit 8 (¶¶ 123-186), which are incorporated herein by reference.

85.     On information and belief, with knowledge of the '485 patent, Defendant has actively induced and continues to induce the direct infringement of one or more claims of the '485 patent, including claim 16, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing

instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '485 patent, including claim 16, with the intent to encourage those customers and/or end-users to infringe the '485 patent.

86.     By way of example, on information and belief, Defendant actively induces infringement of the '485 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Defendant's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Defendant's products, including at least the Accused Products, in a manner that infringes at least one claim of the '485 patent, including claim 16.  For example, as described above, Defendant actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products on its website.  Defendant further actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products.  Therein, Defendant describes and touts the use of the subject matter claimed in the '485 patent.

87.     On information and belief, with knowledge of the '485 patent, Defendant also contributes to the infringement of one or more claims of the '485 patent in violation of 35 U.S.C. § 271(c), including claim 16, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused Products, knowing the same to be especially made or especially adapted for use in an infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use.  This is evidenced by, among other things, the design, configuration, and functionality of Defendant's Accused Products, which are especially made or especially adapted

for use in an infringement of the '485 patent when used for their normal and intended purpose. This is also evidenced by, among other things, Defendant's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '485 patent.

88.     As a result of Defendant's inducement of, and/or contribution to, infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Defendant's products, including the Accused Products, in ways that directly infringe one or more claims of the '485 patent, including claim 16.  On information and belief, Defendant had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Defendant's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

89.     On information and belief, with knowledge of the '485 patent, Defendant has willfully, deliberately, and intentionally infringed the '485 patent, and continues to willfully, deliberately, and intentionally infringe the '485 patent.  On information and belief, Defendant had actual knowledge of the '485 patent and Defendant's infringement of the '485 patent as set forth above.  On information and belief, after acquiring that knowledge, Defendant directly and indirectly infringed the '485 patent as set forth above.  On information and belief, Defendant knew or should have known that its conduct amounted to infringement of the '485 patent at least because Plaintiffs notified Defendant of the '485 patent and its infringement of the '485 patent as set forth above.

90.     On information and belief, Defendant will continue to infringe the '485 patent

unless and until it is enjoined by this Court.  Defendant, by way of its infringing activities, has caused and continues to cause Plaintiff to suffer damages in an amount to be determined, and has caused and is causing Plaintiff irreparable harm.  Plaintiff has no adequate remedy at law against Defendant's acts of infringement and, unless it is enjoined from its infringement of the '485 patent, Plaintiff will continue to suffer irreparable harm.

91.     Plaintiff is entitled to recover from Defendant damages at least in an amount adequate to compensate for its infringement of the '485 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

92.     Plaintiff has complied with 35 U.S.C. § 287 with respect to the '485 patent.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 7,330,431

93.     Plaintiff incorporates by reference the allegations contained in paragraphs 1–92.

94.     Defendant has made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '431 patent in violation of 35 U.S.C. § 271(a), including claim 25.  A comparison of claim 25 of the '431 patent to the Accused Products is attached as Exhibit 10, which is incorporated herein by reference.

95.     On information and belief, with knowledge of the '431 patent, Defendant has actively induced and continues to induce the direct infringement of one or more claims of the '431 patent, including claim 25, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '431 patent, including claim 25, with the intent to encourage those customers and/or end-users to infringe the '431 patent.

96.    By way of example, on information and belief, Defendant actively induces infringement of the '431 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Defendant's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Defendant's products, including at least the Accused Products, in a manner that infringes at least one claim of the '431 patent, including claim 25.  For example, as described above, Defendant actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products on its website.  Defendant further actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products.  Therein, Defendant describes and touts the use of the subject matter claimed in the '431 patent.

97.    On information and belief, with knowledge of the '431 patent, Defendant also contributes to the infringement of one or more claims of the '431 patent in violation of 35 U.S.C. § 271(c), including claim 25, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused Products, knowing the same to be especially made or especially adapted for use in an infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use.  This is evidenced by, among other things, the design, configuration, and functionality of Defendant's Accused Products, which are especially made or especially adapted for use in an infringement of the '431 patent when used for their normal and intended purpose. This is also evidenced by, among other things, Defendant's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for

a use that infringes the '431 patent.

98.     As a result of Defendant's inducement of, and/or contribution to, infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Defendant's products, including the Accused Products, in ways that directly infringe one or more claims of the '431 patent, including claim 25.  On information and belief, Defendant had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Defendant's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

99.     On information and belief, with knowledge of the '431 patent, Defendant has willfully, deliberately, and intentionally infringed the '431 patent, and continues to willfully, deliberately, and intentionally infringe the '431 patent.  On information and belief, Defendant had actual knowledge of the '431 patent and Defendant's infringement of the '431 patent as set forth above.  On information and belief, after acquiring that knowledge, Defendant directly and indirectly infringed the '431 patent as set forth above.  On information and belief, Defendant knew or should have known that its conduct amounted to infringement of the '431 patent at least because Plaintiffs notified Defendant of the '431 patent and its infringement of the '431 patent as set forth above.

100.     On information and belief, Defendant will continue to infringe the '431 patent unless and until it is enjoined by this Court.  Defendant, by way of its infringing activities, has caused and continues to cause Plaintiff to suffer damages in an amount to be determined, and has caused and is causing Plaintiff irreparable harm.  Plaintiff has no adequate remedy at law against Defendant's acts of infringement and, unless it is enjoined from its infringement of the '431 patent,

Plaintiff will continue to suffer irreparable harm.

101.    Plaintiff is entitled to recover from Defendant damages at least in an amount adequate to compensate for its infringement of the '431 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

102.    Plaintiff has complied with 35 U.S.C. § 287 with respect to the '431 patent.

### COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 7,593,400

103.    Plaintiff incorporates by reference the allegations contained in paragraphs 1–102.

104.    Defendant has made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '400 patent in violation of 35 U.S.C. § 271(a), including claim 1.  A comparison of the asserted claims of the '400 patent to the Accused Products is included in Exhibit 6 (¶¶ 457-600) and Exhibit 8 (¶¶ 187-244), which are incorporated herein by reference.

105.    On information and belief, with knowledge of the '400 patent, Defendant has actively induced and continues to induce the direct infringement of one or more claims of the '400 patent, including claim 1, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '400 patent, including claim 1, with the intent to encourage those customers and/or end-users to infringe the '400 patent.

106.    By way of example, on information and belief, Defendant actively induces infringement of the '400 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate,

and use Defendant's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Defendant's products, including at least the Accused Products, in a manner that infringes at least one claim of the '400 patent, including claim 1.  For example, as described above, Defendant actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products on its website.  Defendant further actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products.  Therein, Defendant describes and touts the use of the subject matter claimed in the '400 patent.

107.   On information and belief, with knowledge of the '400 patent, Defendant also contributes to the infringement of one or more claims of the '400 patent in violation of 35 U.S.C. § 271(c), including claim 1, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused Products, knowing the same to be especially made or especially adapted for use in an infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use.  This is evidenced by, among other things, the design, configuration, and functionality of Defendant's Accused Products, which are especially made or especially adapted for use in an infringement of the '400 patent when used for their normal and intended purpose. This is also evidenced by, among other things, Defendant's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '400 patent.

108.   As a result of Defendant's inducement of, and/or contribution to, infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell,

or offer to sell Defendant's products, including the Accused Products, in ways that directly infringe one or more claims of the '400 patent, including claim 1.  On information and belief, Defendant had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Defendant's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

109.    On information and belief, with knowledge of the '400 patent, Defendant has willfully, deliberately, and intentionally infringed the '400 patent, and continues to willfully, deliberately, and intentionally infringe the '400 patent.  On information and belief, Defendant had actual knowledge of the '400 patent and Defendant's infringement of the '400 patent as set forth above.  On information and belief, after acquiring that knowledge, Defendant directly and indirectly infringed the '400 patent as set forth above.  On information and belief, Defendant knew or should have known that its conduct amounted to infringement of the '400 patent at least because Plaintiffs notified Defendant of the '400 patent and its infringement of the '400 patent as set forth above.

110.    On information and belief, Defendant will continue to infringe the '400 patent unless and until it is enjoined by this Court.  Defendant, by way of its infringing activities, has caused and continues to cause Plaintiff to suffer damages in an amount to be determined, and has caused and is causing Plaintiff irreparable harm.  Plaintiff has no adequate remedy at law against Defendant's acts of infringement and, unless it is enjoined from its infringement of the '400 patent, Plaintiff will continue to suffer irreparable harm.

111.    Plaintiff is entitled to recover from Defendant damages at least in an amount adequate to compensate for its infringement of the '400 patent, which amount has yet to be

determined, together with interest and costs fixed by the Court.

112.     Plaintiff has complied with 35 U.S.C. § 287 with respect to the '400 patent.

**COUNT V – INFRINGEMENT OF U.S. PATENT NO. 9,118,602**

113.     Plaintiff incorporates by reference the allegations contained in paragraphs 1–112.

114.     Defendant has made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '602 patent in violation of 35 U.S.C. § 271(a), including claim 1.  A comparison of the asserted claims of the '602 patent to the Accused Products is included in Exhibit 6 (¶¶ 601-715) and Exhibit 8 (¶¶ 245-360), which are incorporated herein by reference.

115.     On information and belief, with knowledge of the '602 patent, Defendant has actively induced and continues to induce the direct infringement of one or more claims of the '602 patent, including claim 1, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '602 patent, including claim 1, with the intent to encourage those customers and/or end-users to infringe the '602 patent.

116.     By way of example, on information and belief, Defendant actively induces infringement of the '602 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Defendant's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Defendant's products, including at least the Accused Products, in a manner that infringes at least one claim of the '602 patent, including claim 1.  For example, as described above,

Defendant actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products on its website. Defendant further actively markets, advertises, offers for sale, and/or otherwise promotes its Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, Defendant describes and touts the use of the subject matter claimed in the '602 patent.

117. On information and belief, with knowledge of the '602 patent, Defendant also contributes to the infringement of one or more claims of the '602 patent in violation of 35 U.S.C. § 271(c), including claim 1, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused Products, knowing the same to be especially made or especially adapted for use in an infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of Defendant's Accused Products, which are especially made or especially adapted for use in an infringement of the '602 patent when used for their normal and intended purpose. This is also evidenced by, among other things, Defendant's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '602 patent.

118. As a result of Defendant's inducement of, and/or contribution to, infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Defendant's products, including the Accused Products, in ways that directly infringe one or more claims of the '602 patent, including claim 1. On information and belief, Defendant had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of

its sales, instruction, and/or otherwise promotion of Defendant's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Defendant about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

119.    On information and belief, with knowledge of the '602 patent, Defendant has willfully, deliberately, and intentionally infringed the '602 patent, and continues to willfully, deliberately, and intentionally infringe the '602 patent.  On information and belief, Defendant had actual knowledge of the '602 patent and Defendant's infringement of the '602 patent as set forth above.  On information and belief, after acquiring that knowledge, Defendant directly and indirectly infringed the '602 patent as set forth above.  On information and belief, Defendant knew or should have known that its conduct amounted to infringement of the '602 patent at least because Plaintiffs notified Defendant of the '602 patent and its infringement of the '602 patent as set forth above.

120.    On information and belief, Defendant will continue to infringe the '602 patent unless and until it is enjoined by this Court.  Defendant, by way of its infringing activities, has caused and continues to cause Plaintiff to suffer damages in an amount to be determined, and has caused and is causing Plaintiff irreparable harm.  Plaintiff has no adequate remedy at law against Defendant's acts of infringement and, unless it is enjoined from its infringement of the '602 patent, Plaintiff will continue to suffer irreparable harm.

121.    Plaintiff is entitled to recover from Defendant damages at least in an amount adequate to compensate for its infringement of the '602 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

122.    Plaintiff has complied with 35 U.S.C. § 287 with respect to the '602 patent.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Corrigent Corporation requests that the Court enter judgment for Plaintiff and against Defendant Cisco Systems, Inc. and enter the following relief:

A.      A judgment that Defendant infringes the following, Asserted Patents:

| U.S. Patent No. 6,957,369 (Exhibit 1, "'369 patent") |
| U.S. Patent No. 7,113,485 (Exhibit 2, "'485 patent") |
| U.S. Patent No. 7,330,431 (Exhibit 3, "'431 patent") |
| U.S. Patent No. 7,593,400 (Exhibit 4, "'400 patent") |
| U.S. Patent No. 9,118,602 (Exhibit 5, "'602 patent") |

B.      A permanent injunction restraining and enjoining Defendant, its officers, partners, agents, servants, employees, parents, subsidiaries, divisions, affiliate corporations, joint ventures, other related business entities and all other persons acting in concert, participation, or in privity with them, and their successors and assigns, from infringing the Asserted Patents;

C.      An award of damages to Plaintiff arising from Defendant's past and continuing infringement up until the date Defendant is finally and permanently enjoined from further infringement, including compensatory damages;

D.      A determination that Defendant's infringement of the Asserted Patents has been willful, and an award of treble damages to Plaintiff pursuant to 35 U.S.C. § 284;

E.      A determination that this is an exceptional case and awarding Plaintiff's attorneys' fees pursuant to 35 U.S.C. § 285;

F.      An order awarding Plaintiff costs and expenses in this action;

G.      An order awarding Plaintiff pre- and post-judgment interest on its damages; and

H.     An award to Plaintiff of such further relief at law or in equity as the Court deems just and proper.

Dated: July 12, 2024

Respectfully submitted,

By: */s/ James R. Nuttall*

Charles Ainsworth
State Bar No. 00783521
Robert Christopher Bunt
State Bar No. 00787165
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 418
Tyler, TX 75702
(903) 531-3535
E-mail: charley@pbatyler.com
E-mail: rcbunt@pbatyler.com

James R. Nuttall (IL 6243585)*
Robert F. Kappers (IL 6313187)*
Daniel F. Gelwicks (IL 6320663)*
Candice J. Kwark (IL 6332282)*
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
(312) 577-1300
E-mail: jnuttall@steptoe.com
E-mail: rkappers@steptoe.com
E-mail: dgelwicks@steptoe.com
E-mail: ckwark@steptoe.com

Christopher A. Suarez (IL 6307113)*
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
E-mail: csuarez@steptoe.com

Michael C. Miller (NY 2066256)*
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
E-mail: mmiller@steptoe.com

Jennifer Parker Ainsworth
TX State Bar No. 00784720
jainsworth@wilsonlawfirm.com
WILSON ROBERTSON &
VANDEVENTER, P.C.
909 ESE Loop 323, Suite 400
Tyler, TX 75701
Telephone: (903) 509-5000
Facsimile: (903) 509-5091
E-mail: jainsworth@wilsonlawfirm.com

*pro hac vice admission*

*Attorneys for Plaintiff Corrigent Corporation*