1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                        WACO DIVISION

 3   CORRIGENT CORPORATION    *
                              *     June 24, 2024
 4   VS.                      *
                              * CIVIL ACTION NO. 6:22-CV-396
 5   CISCO SYSTEMS, INC.      *

 6          BEFORE THE HONORABLE ALAN D ALBRIGHT
                      PRETRIAL HEARING
 7
     APPEARANCES:
 8
     For the Plaintiff:    James R. Nuttall, Esq.
 9                         Robert F. Kappers, Esq.
                           Steptoe & Johnson LLP
10                         227 West Monroe, Suite 4700
                           Chicago, IL 60606
11
                           Christopher A. Suarez, Esq.
12                         Steptoe & Johnson LLP
                           1330 Connecticut Ave, Nw
13                         Washington, DC 20036

14                         Michael C. Miller, Esq.
                           Steptoe & Johnson LLP
15                         1114 Avenue Of The Americas
                           New York, NY 10036
16
                           Charles L. Ainsworth, Esq.
17                         Parker, Bunt & Ainsworth, P.C.
                           100 East Ferguson, Suite 418
18                         Tyler, TX 75702

19                         Jennifer Parker Ainsworth, Esq.
                           Wilson, Robertson & VanDeventer,PC
20                         909 ESE Loop 323, Suite 400
                           Tyler, TX 75701
21
     For the Defendant:    Stuart M. Rosenberg, Esq.
22                         Gibson, Dunn & Crutcher LLP
                           1881 Page Mill Road
23                         Palo Alto, CA 94304

24

25
</pre>

1                        Audrey Yang, Esq.
                         Philip J. Spear, Esq.
2                        Gibson, Dunn & Crutcher LLP
                         2001 Ross Avenue, Suite 2001
3                        Dallas, TX 75201

4                        Elizabeth R. Moulton, Esq.
                         Orrick Herrington & Sutcliffe LLP
5                        405 Howard Street
                         San Francisco, CA 94105
6
                         Emily M. Whitcher, Esq.
7                        Gibson, Dunn & Crutcher LLP
                         3161 Michelson Drive
8                        Irvine, CA 92612

9                        Michael E. Jones, Esq.
                         Shaun William Hassett, Esq.
10                       Potter Minton PC
                         110 N College, Suite 500
11                       Tyler, TX 75702

12   Court Reporter:     Kristie M. Davis, CRR, RMR
                         PO Box 20994
13                       Waco, Texas 76702-0994
                         (254) 340-6114

14

15      Proceedings recorded by mechanical stenography,

16   transcript produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25

08:45  1              DEPUTY CLERK:  Court calls Case

09:02  2    6:22-CV-396, Corrigent Corporation versus Cisco

09:02  3    Systems, Incorporated.  Case called for a pretrial

09:02  4    conference.

09:02  5              THE COURT:  Mr. Ainsworth or whomever.

09:02  6              MR. AINSWORTH:  Judge, Charley Ainsworth

09:02  7    on behalf of the plaintiff Corrigent Corporation.

09:02  8    Along with me today is Jay Nuttall, Michael Miller,

09:03  9    Chris Suarez, Robert Kappers, and for the first time in

09:03  10   32 years of practicing law, Jennifer Ainsworth.

09:03  11             THE COURT:  You mean together with you?

09:03  12             MR. AINSWORTH:  I have co-counsel for the

09:03  13   first time that I've ever worked on a case with her --

09:03  14   I've worked against her and on -- with other parties,

09:03  15   but never as co-counsel.

09:03  16             THE COURT:  I was going to ask you when I

09:03  17   saw y'all walking in this morning.  I don't know that

09:03  18   I've ever seen you.  There may be some law of

09:03  19   physics where --

09:03  20             MR. AINSWORTH:  It's a first.

09:03  21             THE COURT:  -- two matters can't be in

09:03  22   the same space.

09:03  23             Yes, sir, Mr. Jones.

09:03  24             MR. JONES:  Thank you, Your Honor.  Mike

09:03  25   Jones on behalf of Cisco.

```
         1              And the first thing I'd like to do is
09:03    2    object to them tag-teaming me for the first time in 32
09:03    3    years.
09:03    4              THE COURT:  Either Ainsworth would be a
09:03    5    formidable opponent.
09:03    6              MR. JONES:  Yeah, we certainly do.
09:03    7              Your Honor, the first thing I'd like to
09:03    8    do is say on behalf of Cisco and Bryan Sinclair that he
09:03    9    apologizes for not being here, but he's in trial in
09:03   10    another court.  Brian Rosenthal, okay, I'm sorry.  Too
        11    many Brians.
09:04   12              On behalf of Cisco, besides myself today,
09:04   13    will be Mr. Stuart Rosenberg, Ms. Libby Moulton,
09:04   14    Ms. Emily Whitcher, Ms. Audrey Yang, Mr. Philip Spear
09:04   15    and my partner Shaun Hassett, and also here on behalf
09:04   16    of Cisco itself from the general counsel's office is
09:04   17    Mr. Bryan Sinclair, and we're ready to proceed.  Thank
09:04   18    you, Your Honor.
09:04   19              THE COURT:  Very good.  The first issue
09:04   20    I'm going to take up is Cisco's motion under 101 with
09:04   21    regard to the '485 patent, Claims 4, 9 and 14; and with
09:04   22    regard to the '369 patent, Claims 1, 2, 15, 18 and 21.
09:04   23    I'll hear from Cisco on that, please.
09:04   24              Good morning.
09:04   25              MS. YANG:  Good morning, Your Honor.
```

| | | |
|---|---|---|
| 09:04 | 1 | Audrey Yang on behalf of Cisco. |
| 09:04 | 2 | THE COURT:  You have the same problem I |
| | 3 | do.  I always have to pull the microphone down when I |
| 09:05 | 4 | go -- I was in Marshall during trial and after the |
| 09:05 | 5 | trial was over, Chief Judge Gilstrap asked me why I |
| 09:05 | 6 | kept stepping to the side of the podium to ask |
| 09:05 | 7 | questions, and I said it was because I couldn't see |
| 09:05 | 8 | over the monitor to see the witnesses.  So... |
| 09:05 | 9 | MS. YANG:  So Cisco's Rule 12(c) motion |
| 09:05 | 10 | is moving for ineligibility of the '369 patent and the |
| 09:05 | 11 | '485 patent, and I will address the '369 patent first. |
| 09:05 | 12 | So the claims of the '369 patent are |
| 09:05 | 13 | directed to a method for self-testing.  I'm just going |
| 09:05 | 14 | to quickly walk through one of the claims to orient |
| 09:05 | 15 | everyone on what the claim is about.  So you see here |
| 09:06 | 16 | Claim 1 with Figure 1 next to it.  If we go to the next |
| 09:06 | 17 | slide. |
| 09:06 | 18 | You'll see that the claim -- it claims a |
| 09:06 | 19 | main module including a switch. |
| | 20 | Next, please. |
| 09:06 | 21 | And then it has multiple subsidiary |
| 09:06 | 22 | modules.  The -- the claim discusses first selecting a |
| 09:06 | 23 | first idle line, which the claim refers to as an aid |
| 09:06 | 24 | line, and it is connected to the first port on the |
| 09:06 | 25 | switch. |

| | | |
|---|---|---|
| 09:06 | 1 | And next we see that it instructs the |
| 09:06 | 2 | subsidiary module to actually move that traffic across |
| 09:06 | 3 | this aid line and then it selects a second idle line |
| 09:06 | 4 | which is the -- |
| 09:06 | 5 | THE COURT:  You might do a little better |
| 09:06 | 6 | facing me.  I just think Kristie will be able to hear |
| 09:06 | 7 | you better, and I can see what you're -- |
| | 8 | MS. YANG:  Oh, I apologize. |
| 09:07 | 9 | THE COURT:  No, no, I'm just trying to |
| 09:07 | 10 | help you out -- and I can see what you're talking |
| 09:07 | 11 | about.  And I'm sure you know it well enough that you |
| 09:07 | 12 | can look towards me. |
| 09:07 | 13 | MS. YANG:  I'll do my best, Your Honor. |
| 09:07 | 14 | (Clarification by Reporter.) |
| 09:07 | 15 | MS. YANG:  So as I was saying, the claim, |
| 09:07 | 16 | then, claim selecting a second idle line, which is |
| 09:07 | 17 | referred to as the test line, and this is connected to |
| 09:07 | 18 | the second subsidiary module to the switch via a second |
| 09:07 | 19 | port.  The claim then configures the switch to connect |
| 09:07 | 20 | the first and second ports. |
| 09:07 | 21 | Finally, we have transmitting the test |
| 09:07 | 22 | traffic from the test line to the switching the main |
| 09:07 | 23 | module and then down to the aid line as you can see by |
| 09:07 | 24 | the animation here. |
| 09:08 | 25 | And then last, the claim reports whether |

09:08  1   there's a failure if a test traffic does not return to

09:08  2   that second subsidiary module.

09:08  3            And so looking at this, the claims are

09:08  4   directed to the abstract idea of transmitting a test

09:08  5   communication and reporting whether the communication

09:08  6   is received.  And this is true for Claim 1 as we see

09:08  7   here, and also independent Claims 15 and 21 recite

09:08  8   substantially similar limitations.

09:08  9            And if we look at what the Federal

09:08  10  Circuit has found --

09:08  11           THE COURT:  I'm good on the law.  Why

09:08  12  don't you focus, if you would, on Claim 9.

09:08  13           MS. YANG:  Claim 9 of the '36- --

09:08  14           THE COURT:  Of the '485 patent.  I'm

09:08  15  sorry.  I should have said that.

09:09  16           MS. YANG:  Okay.  Sure.  Let's go ahead

09:09  17  and jump ahead to --

09:09  18           THE COURT:  And I'm sorry.  That's the

09:09  19  order -- I have them in the order, in my head at least,

09:09  20  '485 first and the '369, if that helps you, and on the

09:09  21  '485 patent I think where we were focused was on

09:09  22  Claim 9.

09:09  23           MS. YANG:  Sure.  Okay.

09:09  24           THE COURT:  And specifically with regard

09:09  25  to the out of sequence patent packets.

| | | |
|---|---|---|
| 09:09 | 1 | MS. YANG:  Absolutely.  Let's go ahead |
| 09:09 | 2 | and jump to Slide 27, if you could. |
| 09:09 | 3 | So the claims of the '485 patent, and |
| 09:09 | 4 | this is true for independent Claims 1, 9 and 11, which |
| 09:09 | 5 | the asserted Claims 4 and 14 depend from independent |
| 09:09 | 6 | Claims 1 and 11.  They are all directed to measuring |
| 09:09 | 7 | latency of communications. |
| 09:09 | 8 | As Your Honor asked about, Claim 9 |
| 09:10 | 9 | specifically is directed to one wait latency and |
| 09:10 | 10 | sending a sequence of packets.  However, if we move |
| 09:10 | 11 | ahead to Slide 35, I believe it is, sending packets in |
| 09:10 | 12 | a sequence is not -- does not -- is not inventive, was |
| 09:10 | 13 | not something new with the '485 patent, and both the |
| 09:10 | 14 | inventor here Mr. Bruckman and Corrigent's expert |
| 09:10 | 15 | Dr. Akl admitted that this is not something that the |
| 09:10 | 16 | '485 patent invented.  And so it does not add anything |
| 09:10 | 17 | to the abstract idea of measuring latency of |
| 09:10 | 18 | communications. |
| 09:10 | 19 | If we look at Slide 28, and you can see |
| 09:10 | 20 | here that the specification confirms that these claims |
| 09:10 | 21 | are all directed to measuring latency.  It's in the |
| 09:11 | 22 | title, it is in the abstract.  And if we move on to |
| 09:11 | 23 | Slide 29, it's also in the summary of invention, and we |
| 09:11 | 24 | see a embodiment from the specification which notes |
| 09:11 | 25 | that the latency is really -- boils down to some |

09:11  1    mathematical formulas and different calculations.  And

09:11  2    so at the end of the day these claims are all directed

09:11  3    to the abstract idea of measuring latency of

09:11  4    communications.

09:11  5              On the next slide we see that measuring

09:11  6    latency is not an improvement in technology.  In fact,

09:11  7    the patent admits that methods of network latency

09:11  8    measurement were known in the art.  And so before the

09:11  9    '485 patent, measuring latency was already being done

09:11  10   and is not a technical improvement attributable to the

09:12  11   '485 patent.

09:12  12             And Slide 31, the Federal Circuit has

09:12  13   told us that even improvements in abstract ideas or in

09:12  14   the case of SAP versus Investpic, an improvement in

09:12  15   mathematical analysis, still means that it is an

09:12  16   abstract idea.  So what the -- what we believe the

09:12  17   Federal Circuit was saying is that an improvement in an

09:12  18   abstract idea is still an abstract idea.

09:12  19             So if the '485 patent is directed to even

09:12  20   a new improved way of measuring latency allegedly, that

09:12  21   would still be an abstract idea.

09:12  22             And if we look at the next slide.

09:12  23             There are a few things that we believe

09:12  24   Corrigent has pointed to to say that there were

09:12  25   improvements -- technical improvements in the claims.

09:12   1   One thing that was mentioned was the latency

09:13   2   measurement packet, and just a reminder, the Court did

09:13   3   construe this claim as plain and ordinary meaning

09:13   4   wherein the latency measurement packet contains at

09:13   5   least some of the fields in Table 1 of the '485 patent,

09:13   6   which is up on this slide here on the right, and the

09:13   7   fields contain things like the destination and source

09:13   8   address, class of service, and also the last four rows

09:13   9   on the bottom there are the different timestamps that

09:13   10  are contained or may be contained in a latency

09:13   11  measurement packet.

09:13   12          But if you look at the next slide, these

09:13   13  improvements -- sorry -- the latency measurement

09:13   14  packet, as Mr. Bruckman the inventor admitted, was not

09:13   15  something that he invented.  So these alleged

09:13   16  improvements were not attributable to the '485 patent.

09:13   17          On the next slide another potential

09:13   18  improvement that was pointed out by Corrigent was the

09:14   19  class of service, but again, Mr. Bruckman and

09:14   20  Corrigent's expert Dr. Akl admitted that the '485

09:14   21  patent did not invent -- was not the first to come up

09:14   22  with a class of service and that was already known in

09:14   23  the art.

09:14   24          On the next slide again we discussed this

09:14   25  earlier with respect to Claim 9, the sending packets in

09:14   1   a sequence was also not something that was invented by

09:14   2   Mr. Bruckman the inventor, and Dr. Akl agreed.

09:14   3            And then finally, we also see here that

09:14   4   the idea of subtracting the turnaround time was also

09:14   5   not something invented by the inventor of the '485

09:14   6   patent.  We can see here an excerpt from the

09:14   7   prosecution history where the -- the examiner had cited

09:14   8   a prior art reference that already taught this notion

09:14   9   of a turnaround time.  So again, this is also not a

09:15   10  technical improvement, at least one that can be

09:15   11  attributable to the '485 patent.

09:15   12            If we go on to the next slide.

09:15   13            So we submit to the Court that under

09:15   14  Step 1 the asserted Claims 4, 9 and 14 are all directed

09:15   15  to the abstract idea of measuring latency of

09:15   16  communications which means we must go on to Step 2

09:15   17  and see --

09:15   18            THE COURT:  Before you do, do you want to

09:15   19  address -- I think I'm going to hear from the plaintiff

09:15   20  how their -- the elements of the claim provide

09:15   21  improvements over the basic concept -- over the basic

09:15   22  latency concept.  Do you want to address why you don't

09:15   23  think they do or do you want to rebut that when they

09:15   24  argue that?  I anticipate they're going to argue that.

09:16   25            MS. YANG:  Sure.  And if we go back to

12

09:16    1    Slide 32.

09:16    2              So this is one of the concepts that they

09:16    3    pointed to in the claims that provide a technical

09:16    4    improvement to -- to get the claims out of being an

09:16    5    abstract idea, but as we've shown -- if you can go to

09:16    6    the next slide.

09:16    7              This is not a technical improvement.

09:16    8    Mr. Bruckman admitted that he didn't invent the idea of

09:16    9    latency measurement packet.

09:16   10              THE COURT:  Okay.  But I'm -- I think

09:16   11    they're going to say -- and you do it however you want,

09:16   12    but I think they're going to come in and argue that

09:16   13    there were improvements over this that get it out of

09:16   14    the -- past the Step 1, and I just want to know -- I

09:16   15    heard your argument on this.  I get that your argument

09:16   16    is that each of these elements were well-known and they

09:16   17    didn't invent them and the combination by itself

09:16   18    doesn't get them there, but I just want you to address

09:16   19    any of the improvements you think that were made if --

09:17   20    that I'm going to hear from them about.

09:17   21              MS. YANG:  Sure, Your Honor.  We don't

09:17   22    think that there are any technical improvements.  In

09:17   23    fact, the claims are all directed to the idea of

09:17   24    measuring latency.  It doesn't recite any improvements

09:17   25    or -- any technical improvements for network equipment

09:17  1    or anything.  All the claims recite or -- sorry -- all

09:17  2    the claims are directed to is allegedly an improved way

09:17  3    of measuring latency which does not change or make any

09:17  4    improvements on any technical equipment.

09:17  5                So if we also move forward to Slide 37.

09:17  6                So again, Your Honor, we submit that

09:17  7    under Step 1 the claims are directed to an abstract

09:17  8    idea of measuring latency, and there are no technical

09:17  9    improvements that are recited in the claims, which

09:18  10   means we must go on to Step 2 of the analysis.

09:18  11               And if we review the different -- if we

09:18  12   look at the claims defined in the inventive concept, we

09:18  13   find that there are only routine and conventional

09:18  14   components that are recited.  For example, here, again

09:18  15   we see the recitation of the latency measurement

09:18  16   packet, which as the inventor had admitted, this was

09:18  17   routine and conventional.

09:18  18               On the next slide, we see the recitation

09:18  19   of an originating node and a peer node, and network

09:18  20   nodes were, again, routine and conventional components.

09:18  21   There's nothing here reciting any sort of inventive

09:18  22   concept.

09:18  23               And if we look at the last slide, the

09:18  24   class of service again was not something that was new.

09:18  25   Again, just something routine and conventional, which

09:18  1   even the inventor himself admitted.

09:18  2           So we think that there's nothing in

09:18  3   Step 2 that would take the claims outside of the

09:19  4   patented-ineligible context into a patent-eligible

09:19  5   subject matter.

09:19  6           THE COURT:  Thank you, ma'am.

09:19  7           MS. YANG:  I'm sorry, Your Honor.  Do you

09:19  8   want me to address the '369 patent as well?

09:19  9           THE COURT:  Yes.

09:19  10          MS. YANG:  Okay.

09:19  11          THE COURT:  Well, let me ask.  Would the

09:19  12  plaintiff prefer to go on this patent and do it that

09:19  13  way, or would -- I'm agnostic.  I'm ready for you to

09:19  14  handle both, but if the plaintiff thinks --

09:19  15          MR. SUAREZ:  Whatever Your Honor -- I'm

09:19  16  sorry.  Whatever Your Honor's preference is.

09:19  17          THE COURT:  I think you can go ahead and

09:19  18  finish, wrap up with the other patent.

09:19  19          MS. YANG:  Yes, Your Honor.

09:19  20          So if we look at Slide 14, as you recall,

09:19  21  we walked through Claim 1 of the '369 patent and the

09:19  22  method for self-testing recited in the -- in Claim 1.

09:19  23  And we think here that the claims are directed to an

09:19  24  abstract idea of transmitting a test communication and

09:20  25  reporting whether a communication is received.

| | | |
|---|---|---|
| 09:20 | 1 | And Independent Claims 1, 15, and 21 all |
| 09:20 | 2 | recite substantially the same limitation, so we believe |
| 09:20 | 3 | that all three of these independent claims are directed |
| 09:20 | 4 | to the same abstract idea. |
| 09:20 | 5 | The other two asserted claims, Dependent |
| 09:20 | 6 | Claims 2 and 18, do not add anything more.  For |
| 09:20 | 7 | example, Claim 2 recites the additional limitation of |
| 09:20 | 8 | not processing the data packets.  So again, it's not |
| 09:20 | 9 | adding anything new or anything additional to the |
| 09:20 | 10 | abstract idea.  And finally, Claim 18 recites simply |
| 09:20 | 11 | repeating this -- this method of self-testing.  So |
| 09:20 | 12 | again, it doesn't change the nature of the claims, and |
| 09:20 | 13 | all the asserted claims are directed to the same |
| 09:20 | 14 | abstract idea. |
| 09:20 | 15 | And this is similar to a case from the |
| 09:21 | 16 | Federal Circuit Electric Power, where the Federal |
| 09:21 | 17 | Circuit held that collecting information, analyzing it, |
| 09:21 | 18 | and displaying certain results of the collected |
| 09:21 | 19 | analysis were abstract. |
| 09:21 | 20 | And also, another Federal Circuit case, |
| 09:21 | 21 | Two-Way Media, again, we submit, this is even more |
| 09:21 | 22 | similar to the claims at issue where the Federal |
| 09:21 | 23 | Circuit held that claims directed to sending |
| 09:21 | 24 | information, directing the sent information, monitoring |
| 09:21 | 25 | receipt of the sent information, and accumulating |

09:21  1    records about receipt of that sent information were

09:21  2    abstract.

09:21  3                    And we believe this characterization is

09:21  4    very similar to the claims at issue here which are

09:21  5    directed to transmitting a test communication and

09:21  6    reporting whether that test communication is received.

09:21  7                    We do note that Judge Andrews in a

09:22  8    related proceeding had -- had found that the claims

09:22  9    recited, Claim 15 specifically recited the limitations

09:22  10   that were sufficiently specific, and he found that the

09:22  11   claims were eligible.  However, specificity is not the

09:22  12   test for whether the claims are directed to an abstract

09:22  13   idea.

09:22  14                   And if we go on to the next slide, we can

09:22  15   see here that, for example, in Electric Power, Claim 12

09:22  16   was very specific.  There are multiple limitations,

09:22  17   lots of technical components, and we think that this

09:22  18   claim here shows that the claim can be very specific

09:22  19   yet still be abstract.

09:22  20                   Similarly, on the next slide, the claims

09:23  21   of Two-Way Media again recite very specific

09:23  22   limitations.  However, the claims were still found to

09:23  23   be directed to an abstract idea.

09:23  24                   If we go to the next slide.

09:23  25                   We can see that Corrigent cites to

09:23    1    various 101 cases where the Court did find the claims

09:23    2    were eligible.  However, in each of these cases, the

09:23    3    Court found that there was an improvement in

09:23    4    technology.

09:23    5          For example, in Enfish, there was a new

09:23    6    referential database.  In Core Wireless, a new type of

09:23    7    digital interface.  Rembrandt, the claims were directed

09:23    8    to stop nontarget transceivers from interfering with

09:23    9    transmissions.  On the last one here, there was an

09:23   10    improvement in network bandwidth.  But that is not the

09:23   11    case here.

09:23   12          The claims here do not recite any

09:24   13    improvement in the technology.  Again, the claims

09:24   14    simply are directed to transmitting a test

09:24   15    communication and reporting whether the communication

09:24   16    is received.

09:24   17          So we -- we submit that under Step 1, the

09:24   18    claims are directed to an abstract idea, and thus, that

09:24   19    means we move on to Step 2.

09:24   20          So if we go to the next slide.

09:24   21          And we take a look to see what else are

09:24   22    in the claims, whether or not there are any inventive

09:24   23    concepts.

09:24   24          Here, we can see that the claim recites a

09:24   25    main module, which is a routine and conventional

09:24    1    component.

09:24    2              In the next slide, we see the claims also

09:24    3    recite subsidiary modules, which again, modules are

09:24    4    routine and conventional technical components.

09:24    5              And then in the next slide, the claim

09:24    6    recites these multiple steps; however, each of these

09:24    7    steps are routine and conventional operation of the

09:25    8    underlying technologies not working in any new or

09:25    9    improved manner.

09:25    10             And so we do not think that there is

09:25    11   anything in Step 2 where the claims recite any

09:25    12   inventive concept that would take it out of the

09:25    13   patent -- that would make it patent eligible.

09:25    14             So we submit to the Court that the

09:25    15   asserted claims of the '369 patent are directed to

09:25    16   patent-ineligible subject matter.

09:25    17             THE COURT:  Thank you, ma'am.

09:25    18             MS. YANG:  Thank you.

09:25    19             THE COURT:  Response?

09:25    20             MR. SUAREZ:  Yes, Your Honor.

         21             Good morning, Your Honor.  This is

09:25    22   Christopher Suarez on behalf of Corrigent.

09:25    23             I'll start with the '485 patent, given

09:26    24   that was Your Honor's predilection before.

09:26    25             THE COURT:  I may be wrong, but I don't

09:26  1   know that -- have you appeared in front of me before in

09:26  2   person?

09:26  3                   MR. SUAREZ:  Not in person.

       4                   THE COURT:  Okay.

09:26  5                   MR. SUAREZ:  I've appeared for you in a

09:26  6   couple of Markman hearings.

       7                   THE COURT:  Yeah.

09:26  8                   MR. SUAREZ:  Virtual, but not in person.

09:26  9                   THE COURT:  Well, it's a pleasure.

09:26  10                  MR. SUAREZ:  It's a pleasure being in

09:26  11  front of you, sir.  First time.

09:26  12                  So, Your Honor, I'll just start with the

09:26  13  '485 patent and your question about Claim 9, because I

09:26  14  think this is important because there is a context

09:26  15  here.

09:26  16                  The context is, as Your Honor is aware,

09:26  17  there was a ruling by another court on Claim 16 of this

09:26  18  patent that determined that it was invalid on a 12(b)

09:26  19  motion under Section 101.  And that claim, if you look

09:26  20  at Claim 16, it recites the reference to including a

09:26  21  class of service in the packet and it says, you take a

09:26  22  difference.  And so Judge Andrews, in the other case,

09:26  23  he said that that was -- that claim was directed to the

09:26  24  concept of measuring latency by subtraction.

09:26  25                  Now, counsel for Cisco is now trying to

09:26   1    argue with respect to these much narrower claims that

09:26   2    the claims are still directed to the generic concept of

09:27   3    latency.  But the key is, these claims are not directed

09:27   4    to simply latency by distraction (sic), they are

09:27   5    directed to something significantly more.  And that is

09:27   6    why the focus of our arguments in both the 12(c) motion

09:27   7    primarily and in our motion for summary judgment on

09:27   8    this is focused on Step 1, because Step 1 purely looks

09:27   9    at the claims from a legal matter, as Your Honor is

09:27   10   well aware, and asks if they are directed to a specific

09:27   11   improvement.  And to look at that, whether they're

09:27   12   directed to a specific improvement, you must look at

09:27   13   the claims as a whole and you must look at them as an

        14   ordered combination.

09:27   15          And so with regard to Claim 9, you have

09:27   16   these transmissions; you have the noting the respective

09:27   17   times and receipts; you have looking at these latencies

09:27   18   in a sequence; you also have this monitoring the

09:27   19   variation of latencies, looking at that.

09:27   20          And then you also have, as Your Honor

09:27   21   asked about, you are recording the serial numbers,

09:27   22   you're putting -- you're looking at patents in a

09:28   23   sequence, and you're discarding the ones, and so

09:28   24   completely getting rid of the ones that are not

09:28   25   receiving the sequence.  And so that results in a new

09:28   1   and improved latency measurement calculation, and we

09:28   2   submit that that is a specific improvement over a

09:28   3   generic latency measurement method that would simply do

09:28   4   a subtraction.

09:28   5           And so when you look at the claims of the

09:28   6   ordered combination, when you look at them

09:28   7   specifically, our position is that it's directed to a

09:28   8   specific improvement at Step 1, see, e.g., Enfish, see,

09:28   9   e.g., the other cases that we cited in our briefs.

09:28   10          And so we feel very strongly that Your

09:28   11  Honor should just deny the 12(c) motion at Step 1 and

09:28   12  grant our summary judgment motion for no invalidity at

09:28   13  Step 1 as well.

09:28   14          With regard to Claim 4 and 14, these

09:28   15  claims also relate to the measurement of a variation of

09:28   16  latencies.  You're monitoring them and you're typically

09:28   17  looking at differences.  So you are not simply just

09:29   18  calculating a difference.

09:29   19          Moreover, Your Honor, Claim 1, from which

09:29   20  Claim 4 depends, takes the measurements, four different

09:29   21  timestamps.  And the reason why it does that -- and

09:29   22  this is explained in the specification, and it's

09:29   23  explained in our briefing -- is because that allows you

09:29   24  to avoid the need to synchronize clocks between nodes.

09:29   25          And so unlike Claim 16, which is just a

—22—

09:29  1    pure difference measurement with a class of service in

09:29  2    there, the Claim 1 is directed to this specific

09:29  3    implementation where you are avoiding the need for

09:29  4    clock synchronization.

09:29  5                So again, that means there's a specific

09:29  6    improvement at Step 1.  It is transforming it into

09:29  7    something that is innovative and beyond something that

09:29  8    is super-duper abstract, to use a colloquial term.

09:29  9                So at the end of the day, our position is

09:29  10   that with respect to the '485 patent, Your Honor should

09:29  11   deny the 12(c) motion, that it should grant our motion

09:29  12   for summary judgment at Step 1 with respect to all

09:30  13   three claims.  But let me briefly address that too

09:30  14   because counsel did address it.

09:30  15               Several of the arguments that were made

09:30  16   concerned whether this was a known concept in the art

09:30  17   or whether this was inventive, things like that.  We

09:30  18   submit, Your Honor, that's all Step 2 agrees, and so

09:30  19   those are all relevant to the Step 1.

09:30  20               But to the extent that Your Honor is

09:30  21   inclined to go to Step 2 on the 12(c) motion, we just

09:30  22   point out that that motion was premature and that

09:30  23   they're disputing issues of material fact that remain

09:30  24   on Step 2.

09:30  25               We cited -- in ECF 210 at Footnote 2, we

09:30   1   made a note that our expert put in evidence on Step 2

09:30   2   that would create a dispute of material fact as to

09:30   3   that.  And I further note, Your Honor, that Cisco has

09:30   4   not moved for summary judgment under Section 101.

09:30   5           And so even in the world where you do not

09:30   6   agree with us at Step 1, with respect to the '485

09:30   7   patent, Your Honor should deny the motion in the

09:30   8   pleadings and permit us to go to trial on Step 2.  But

09:31   9   again, we submit that this can all be mooted if Your

09:31   10   Honor grants summary judgment on Step 1 of the '485

09:31   11   patent.

09:31   12           Does Your Honor have further questions --

09:31   13   any questions on the '485 patent?

09:31   14           THE COURT:  No.

09:31   15           MR. SUAREZ:  Okay.  Thank you, Your

09:31   16   Honor.

09:31   17           So with regard to the '369 patent, we --

09:31   18   again I note that another court has already looked at

09:31   19   these claims, Judge Andrews, and he specifically found

09:31   20   that the claims include a significant amount of

09:31   21   information, significantly more than the other claims

09:31   22   he was looking at on the '485 patent.

09:31   23           (Clarification by Reporter.)

09:31   24           MR. SUAREZ:  And so he -- in making that

09:31   25   ruling, as counsel acknowledged, he said that the

09:31  1  claims were specific, and counsel has made this

09:31  2  argument that, oh, well, specificity alone doesn't

09:31  3  matter.  But the case law, Your Honor, is specific

09:31  4  improvement.  That's what the case law says, Enfish and

09:31  5  all of those cases.  And so we submit that when

09:31  6  Judge Andrews, and obviously we can't read his mind,

09:31  7  but when he made that ruling about specificity, it was

09:32  8  directed to the fact that the claims are specific.

09:32  9        Counsel for Cisco put up slides that

09:32  10  showed the claims, it shows that you don't just check

09:32  11  whether a packet is received or a failure task

09:32  12  generically, you pick these lines.  You have a specific

09:32  13  order of steps that Your Honor ruled on in claim

09:32  14  construction.  You have the transmission going a

09:32  15  certain way.

09:32  16        So all of those things are specific and

09:32  17  that's why Judge Andrews' instinct was to say that

09:32  18  these claims are not invalid under 101, and why we

09:32  19  submit, Your Honor, that you should grant our summary

09:32  20  judgment motion of no invalidity at Step 1 with respect

09:32  21  to the '369 patent.

09:32  22        Again, if Your Honor were to go to

09:32  23  Step 2, there would be disputes of fact on that.  They

09:32  24  have not filed a summary judgment motion as to

09:32  25  Section 101, and so we submit that you should grant our

09:32  1    101 motion at Step 1 for both of the patents.

09:32  2                    Does Your Honor have any questions?

09:32  3                    THE COURT:  No.

09:32  4                    MR. SUAREZ:  Okay.  Thank you, Your

09:33  5    Honor.

09:33  6                    THE COURT:  Yes, ma'am.

09:33  7                    MS. YANG:  Your Honor, I'll just briefly

09:33  8    respond to --

09:33  9                    (Clarification by Reporter.)

09:33 10                    MS. YANG:  So counsel mentioned that --

09:33 11    for the '485 patent they mentioned specific

09:33 12    improvements recited in the claims.  However, as we

09:33 13    have argued, the -- sending the packets in a sequence,

09:33 14    disregarding the packets that are out of sequence, do

09:33 15    not change or improve how equipment or computers work.

09:33 16    This is not an improvement in -- in -- this is not a

09:33 17    technical improvement.

09:33 18                    Furthermore, regarding Step 2 and the

09:34 19    fact that Cisco has moved under 12(c), we do not think

09:34 20    that there is anything from Corrigent's expert that can

09:34 21    contradict admissions in the patent on what was routine

09:34 22    and conventional under Step 2.  And so we do not think

09:34 23    that it is necessary for this to go to the jury.  We

09:34 24    believe that the Court can rule on our 12(c) motion

09:34 25    with just admissions that are in the patent itself.

```
09:34   1              THE COURT:  Opposing counsel put a lot of
09:34   2    weight on the fact that Judge Andrews has weighed in on
09:34   3    this.  Do you want to respond to that at all?
09:34   4              MS. YANG:  Yes, Your Honor.
09:34   5              It is true that Judge Andrews had
09:34   6    discussed the fact that at least Claim 15 recited
09:34   7    sufficiently specific limitations, but again, as we
09:34   8    have shown, just because claims are specific, just
09:34   9    because claims recite many limitations, does not make
09:35  10    them directed to a patent eligible nonabstract idea,
09:35  11    and this is the case that we have here.  We have
09:35  12    multiple limitations, but that doesn't change the
09:35  13    nature of the claims being directed to an abstract
09:35  14    idea.
09:35  15              THE COURT:  Do I owe any deference to
09:35  16    what another district judge has done with regard to the
09:35  17    same patent?
09:35  18              MS. YANG:  I don't believe -- I don't
09:35  19    believe you do.  And we'll submit here that with all
09:35  20    due respect to Judge Andrews, we believe that he
09:35  21    unfortunately did not apply the correct test.  The
09:35  22    correct test for deciding whether claims are directed
09:35  23    to an abstract idea does not take into account the fact
09:35  24    that the claims are sufficiently specific.
09:35  25              So our position is that the claims are
```

| 09:35 | 1 | directed to an abstract idea regardless of how much |
| 09:35 | 2 | specificity is in the claims. |
| 09:35 | 3 | THE COURT:  Did you have anything else? |
| 09:35 | 4 | MS. YANG:  I'll just end with one final |
| 09:36 | 5 | thing that the different -- the different components of |
| 09:36 | 6 | the claims, for example, picking the different idle |
| 09:36 | 7 | lines, the order steps, all of these things that |
| 09:36 | 8 | counsel mentioned, again, does not change what the |
| 09:36 | 9 | claims are directed to, and so we believe the claims |
| 09:36 | 10 | are directed to an abstract idea in that there was |
| 09:36 | 11 | nothing inventive in Step 2, and therefore the claims |
| 09:36 | 12 | should be found to be ineligible under Section 101. |
| 09:36 | 13 | Thank you. |
| 09:36 | 14 | THE COURT:  Anything else, counsel? |
| 09:36 | 15 | MR. SUAREZ:  Unless Your Honor has |
| 09:36 | 16 | further questions, I don't have anything else. |
| 09:36 | 17 | THE COURT:  Okay. |
| 09:36 | 18 | (Off-the-record bench conference.) |
| 09:38 | 19 | THE COURT:  Okay.  The defendant has a |
| 09:38 | 20 | Rule 12(c) motion with respect to the '485 patent.  The |
| 09:38 | 21 | Court is going to grant -- the defendant has the same |
| 09:38 | 22 | motion with respect to the '369 patent.  The Court is |
| 09:38 | 23 | going to grant that. |
| 09:38 | 24 | The plaintiff has essentially mirror |
| 09:38 | 25 | motions for summary judgment of no invalidity on those |

09:38  1   two patents.  The Court is going to deny those.

09:38  2              With respect to the plaintiff's motion

09:38  3   for no invalidity under Section 101, the Court is going

09:38  4   to grant that motion, which my understanding is not

09:38  5   opposed.

09:38  6              The next issue I have up is the motion

09:39  7   for summary judgment from the plaintiff -- I'm sorry.

09:39  8   Yeah.  The plaintiff's motion for summary judgment on

09:39  9   ownership and unclean hands.

09:39  10             For some reason I have down here -- what

09:39  11  I have written here is it's plaintiff's motion, but

09:39  12  what makes sense to me is it's defendant's motion for

09:39  13  unclean hands, isn't it?  Or is it the plaintiff's

09:39  14  motion of non unclean hands?

09:39  15             MR. MILLER:  Your Honor, first of all, my

09:39  16  name is Michael Miller.

       17             THE COURT:  Yes, welcome.

09:39  18             MR. MILLER:  I'm with Steptoe in

09:39  19  New York.  This is my first time before you and a

09:39  20  pleasure to be here.

09:39  21             THE COURT:  So is it your motion -- I

09:39  22  discussed with my clerks.  I'm just -- you're making

09:39  23  the motion that is opposing their argument that -- of

09:39  24  unclean hands?

09:39  25             MR. MILLER:  Yes, Your Honor.  The

09:40   1   plaintiff has filed a motion for summary judgment.

09:40   2                   (Clarification by Reporter.)

09:40   3                   MR. MILLER:  Yes, Your Honor.  The

09:40   4   plaintiff has filed --

09:40   5                   MR. AINSWORTH:  Judge, I'm going to

09:40   6   interrupt because I think we've got -- I couldn't hear

09:40   7   what your ruling was, first, I guess, very well.  I'm

09:40   8   sorry.

09:40   9                   THE COURT:  On the summary judgment?

09:40  10                   MR. AINSWORTH:  Yes, sir.

09:40  11                   THE COURT:  Earlier on the Rule 12(c)

09:40  12   motion?

09:40  13                   MR. AINSWORTH:  No, on the 101 motion.

09:40  14                   THE COURT:  So on the 12(c) motion, I'm

09:40  15   happy to say it again and I'm happy to make sure I got

09:40  16   it right, with regard to both patents where the

09:40  17   defendant is moving for 12(c), I've granted those.  The

09:40  18   plaintiff had corresponding motions for summary

09:40  19   judgment of no invalidity going the other --

09:40  20                   (Interruption.)

09:40  21                   THE COURT:  -- of no invalidity under 101

09:40  22   going the other way and I have denied those.

09:40  23                   The plaintiff has a motion for no

09:40  24   invalidity, and this motion is only dealing with

09:40  25   Section 101, no invalidity under Section 101.  I'm

09:40  1    granting that motion that the -- and I can find the

09:41  2    patent, if I need to.  Let me put that on the record

09:41  3    for the '400 patent.  I'm granting the motion --

4                    (Clarification by Reporter.)

5                    THE COURT:  Pardon?

09:41  6                    No.  The '400 patent is the one where I'm

09:41  7    saying the plaintiff's motion for summary judgment of

09:41  8    no invalidity under Section 101 is granted.

09:41  9                    And so that -- because the defendants did

09:41  10   not move for either 12(c) or motion for summary

09:41  11   judgment on that, under Section 101 my understanding is

09:41  12   there are other invalidity arguments for the '400

09:41  13   patent that we will get to.  And so that -- I'm

09:41  14   limiting that motion.

09:41  15                   Now, what I have up, and I'll admit I'm

09:41  16   slightly confused on, is this -- just because the order

09:41  17   these were put in -- presented to me.  Next up, I know

09:41  18   and I discussed with the clerks the issue about -- the

09:41  19   issue about clean hands, you know, with the issue in

09:42  20   Israel and stuff.  I just don't know who to start with

09:42  21   in terms of the motion for summary judgment, the

09:42  22   violation of clean hands or that you didn't violate

09:42  23   clean hands.  I'll do it in either order.  I understand

09:42  24   the issue.  I'm just not sure what order to take it up

09:42  25   in.

—31—

09:42    1          MR. SUAREZ:  Your Honor, if I may raise a

09:42    2    point just -- thank you for clarifying the ruling.

         3                (Clarification by Reporter.)

09:42    4          MR. SUAREZ:  With regard to the 12(c)

09:42    5    motion, as Your Honor is aware, that was filed several

09:42    6    months ago, and in the response to that motion we

09:42    7    indicated that we requested leave to amend the

09:42    8    pleadings in the event Your Honor were inclined to

09:42    9    grant the 12(c) motion.  And so to the extent Your

09:42   10    Honor is not going to allow this to proceed to trial in

09:42   11    Step 2 on -- based on the evidence we've put in, we'd

09:42   12    request the right to amend to put in the 12(c) -- or to

09:42   13    address the 12(c) issue with respect to those two

09:42   14    patents.

09:42   15          THE COURT:  When is the case set for

09:42   16    trial?

09:42   17          MR. AINSWORTH:  Jury selection is Monday,

09:42   18    and the week after the 4th of July is the actual trial

09:43   19    date, Your Honor.  The 7th, I think.  The 8th.  Sorry.

09:43   20          THE COURT:  I'm not sure how we would get

09:43   21    that done before the trial.  Thoughts?

09:43   22          MS. YANG:  Your Honor, if I may speak?

09:43   23          THE COURT:  Sure.

09:43   24          MS. YANG:  The plaintiffs had an

09:43   25    opportunity to amend their pleadings.  The deadline had

09:43  1   passed.  They chose not to amend their pleadings.  So

09:43  2   we don't think that it is proper at this time for them

09:43  3   to be allowed to amend their pleadings so close to

09:43  4   trial.

09:43  5                THE COURT:  Okay.

09:43  6                MR. NUTTALL:  Thank you, Your Honor.  Jay

09:43  7   Nuttall for Corrigent.

09:43  8                I don't recall the pleading deadline off

09:43  9   the top of my head, but the 12(c) motion was filed

09:43  10  later in the case well after the original pleadings

09:43  11  were filed shortly before summary judgment.  And if

09:43  12  that means we need to move to amend and talk about a

09:43  13  new trial date, we would --

09:43  14                THE COURT:  I'm not certain -- give me an

09:43  15  idea of what you would amend.  Are you talking about

09:43  16  amending legal arguments, amending factual allegations?

09:44  17  What is it you think you could amend that would help

09:44  18  you with the finding that we're making that these

09:44  19  claims fail under Step 1?

09:44  20                MR. NUTTALL:  Leave to amend to add

09:44  21  additional facts about why the patent is not invalid

09:44  22  under 101, Your Honor, in more detail.

09:44  23                THE COURT:  Okay.  If -- that was the

09:44  24  answer I was -- that needed to given, and with respect

09:44  25  to that, I'm going to deny it.

09:44 1          So next, if you all want to take up the
09:44 2  issue of good -- clean hands, I'll take that up.
09:44 3          Yes, sir.  Seems like a long time ago you
09:44 4  stood up.
09:44 5          (Laughter.)
09:44 6          THE COURT:  But I'm happy to hear you.
09:44 7          MR. MILLER:  Your Honor, Michael Miller
09:45 8  on behalf of Corrigent on the issue of our motion for
09:45 9  summary judgment on unclean hands.
09:45 10         Your Honor, our view is that Cisco has
09:45 11 failed to establish grounds for an unclean hands
09:45 12 defense.  It's an equitable issue.  I think it's
09:45 13 appropriate for resolution on a motion for summary
09:45 14 judgment.  There's a related motion in limine, which
09:45 15 I'm also happy to address, which addresses the
09:45 16 potential use of similar evidence but for different
09:45 17 reasons.
09:45 18         With respect to the unclean hands
09:45 19 defense, Your Honor, the Israeli court has exclusive
09:45 20 jurisdiction over disputes arising out of the patent
09:45 21 sale.  That's Israeli law that's also in the underlying
09:45 22 contract.  And the regulator, the Office of the Chief
09:45 23 Scientist, which is now called the Israel Innovation
09:45 24 Authority, that Cisco claims was misled also --
09:45 25         THE COURT:  Let me ask you this.  I have

| | | |
|---|---|---|
| 09:45 | 1 | a general understanding of what happened. |
| 09:46 | 2 | MR. MILLER:  Yeah. |
| 09:46 | 3 | THE COURT:  What facts are in dispute? |
| 09:46 | 4 | And let me tell you what I mean by that is my |
| 09:46 | 5 | general -- there's -- for example, I don't think |
| 09:46 | 6 | there's any dispute that the representation was made |
| 09:46 | 7 | that it was not an Israeli company at the time that the |
| 09:46 | 8 | sale took place, right? |
| 09:46 | 9 | MR. MILLER:  Yeah.  In November of 2015, |
| 09:46 | 10 | Your Honor, when the Orckit IP proposal went in, it |
| 09:46 | 11 | stated clear as a bell it was an American company. |
| 09:46 | 12 | THE COURT:  And then there was a transfer |
| 09:46 | 13 | after that? |
| 09:46 | 14 | MR. MILLER:  No.  I mean, it was -- it |
| 09:46 | 15 | was -- it's always been, it's still today a U.S. |
| 09:46 | 16 | company. |
| 09:46 | 17 | The issue that I think is -- the issue |
| 09:46 | 18 | that's been raised -- |
| | 19 | Can you hear me okay? |
| 09:46 | 20 | The issue that's been raised, Your Honor, |
| 09:46 | 21 | is that the original owner of Orckit IP was a gentleman |
| 09:46 | 22 | named Warren Hurwitz. |
| 09:46 | 23 | THE COURT:  Okay.  Was he Israeli? |
| 09:46 | 24 | MR. MILLER:  No.  He's an American |
| 09:46 | 25 | citizen. |

—35—

09:46     1                    THE COURT:  Okay.

09:46     2                    MR. MILLER:  I should say that when his

09:47     3     proposal -- when Orckit IP submitted its proposal in

09:47     4     November of 2015, it did so with a letter that

09:47     5     Mr. Hurwitz signed which completely disclosed

09:47     6     everyone's role.

09:47     7                         If we could throw Slide 5 up, Your Honor.

          8                         (Brief off-the-record discussion.)

09:47     9                    MR. MILLER:  Your Honor, Slide 5, which

09:47    10     is up on the screen now, are excerpts from a letter

09:47    11     that Mr. Hurwitz signed on behalf of Orckit IP in

09:47    12     November of 2015 when Orckit IP submitted its proposal.

09:47    13                         You will see Mr. Hurwitz identifies

09:47    14     himself as the owner of Orckit IP.  He says he's a U.S.

09:47    15     citizen.

09:47    16                         He -- in Paragraph 3, he's very

09:47    17     transparent that the idea of being involved in Orckit

09:48    18     IP was brought to him by Yehuda Binder, who is

09:48    19     another -- is an Israeli citizen, a prolific inventor,

09:48    20     highly capable and successful professional.

09:48    21                         And here's maybe the most important

09:48    22     thing, Your Honor.  In Paragraph 5, the letter

09:48    23     explicitly discloses that he is putting in this offer

09:48    24     in cooperation with Izhak Tamir and a company owned by

09:48    25     Mr. Binder.

09:48  1              He discloses the $1.35 million deposit by

09:48  2       Mr. Tamir is going to be the upfront payment to Orckit

09:48  3       Communications for the patents if the Orckit IP

09:48  4       proposal is accepted.  And lastly, that this amount

09:48  5       will serve as a convertible loan to Orckit IP.

09:48  6              This one document puts the line to about

09:48  7       50 percent of the dust that Cisco has thrown up in the

09:48  8       air.

09:48  9              THE COURT:  So let me ask you this:

09:48  10      Immediately after Orckit IP -- O-r-c-k-i-t IP --

09:49  11      acquires the patents, what happens?

09:49  12              MR. MILLER:  So the sequencing -- I know

09:49  13      what you're asking.  The sequencing is that on April --

09:49  14              THE COURT:  One of us should.

09:49  15              MR. MILLER:  It's really me.

09:49  16              On April 6th of 2016, Your Honor, the

09:49  17      Israeli insolvency court that has presided over the

09:49  18      insolvency of Orckit Communications from 2014 to the

09:49  19      very day today, the insolvency court issued an order

09:49  20      granting the insolvency trustee's request that Orckit

09:49  21      IP be allowed to buy the patents.  That's April 6th.

09:49  22              I think that the -- the fact that you are

09:49  23      focusing on is that the next day, on April 7th,

09:49  24      ownership of Orckit IP was transferred from Mr. Hurwitz

09:49  25      to Mr. Binder.

```
09:49    1                      THE COURT:  Right.
09:49    2                      MR. MILLER:  Okay.
09:49    3                      THE COURT:  I think that's what they're
09:49    4      unhappy about too.
09:50    5                      MR. MILLER:  Well --
09:50    6                      THE COURT:  I mean, I think they're going
09:50    7      to assign motivations to that, that -- are the basis
09:50    8      for the -- and that's what I'm really trying to get to,
09:50    9      is, I mean, there's no question that that happened.
09:50   10      And so what I'm trying to figure out is, for example,
09:50   11      am I just going to take all the facts and -- that
09:50   12      are -- I don't know what fact is in dispute here.
09:50   13                      I mean, the fact of why they did it in
09:50   14      the method they -- in the manner they -- why it was
09:50   15      done in the sequence it took place, all that, the
09:50   16      motivation for that.  Whether or not that's, quote,
09:50   17      unquote okay, it might be something that had to be
        18      decided.
09:50   19                      Are there any factual disputes about what
09:50   20      happened is what I am trying to figure out.
09:50   21                      MR. MILLER:  I really think -- I think
09:50   22      not.  I think the objective -- the objective facts are
09:50   23      that in February of 2016, on February 10th, when the
09:51   24      Office of the Chief Scientist issued conditional
09:51   25      approval to Orckit IP's proposal, they basically said,
```

09:51   1   look.  Anybody who is an officer or shareholder of this

09:51   2   company, Orckit Communications, more than five years

09:51   3   before bankruptcy started, so anything before 2009, can

09:51   4   be an owner or have a financial relationship with

09:51   5   Orckit IP.

09:51   6            Yehuda Binder falls squarely into that

09:51   7   category.  He was gone from the company by the year

09:51   8   2000.  Those facts are indisputable.

09:51   9            Equally indisputable is their own expert,

09:51  10   Ofer Granot, who I should point out is really -- is a

09:51  11   partner at Cisco's law firm in Israel.

09:51  12            THE COURT:  And I'm sorry I keep

09:51  13   interrupting you, but -- because if that's important to

09:51  14   you, please remember it.  Finish up with that.  But

09:51  15   what occurs to me is, and why I'm trying to drill down

09:51  16   on this is, looking through what happened and because I

09:52  17   think all the facts of what happened are mostly

09:52  18   undisputed -- or all undisputed, is, I'm trying to

09:52  19   figure out what misrepresentation could have been made.

09:52  20   I don't see any misrepresentation being made.  I see

09:52  21   the defendants saying that, nuh-uh, that they didn't --

09:52  22   that wasn't really -- we were going to do something

09:52  23   different and therefore -- but it seems to me, there

09:52  24   was no misrepresentation made anywhere along the lines.

09:52  25            MR. MILLER:  I couldn't agree more.

—39—

09:52  1              Can I show you a couple of slides that

09:52  2    really make that --

09:52  3              THE COURT:  Sure.  You can show me

09:52  4    whatever you want.

09:52  5              MR. MILLER:  Can we put up Slide 22,

09:52  6    please?

09:52  7              So Slide 22, Your Honor, it's an e-mail

09:52  8    from Yehuda Binder.  The e-mail is to Lior Dagan, who

09:52  9    is the trustee of Orckit Communications' bankruptcy.

09:53  10   He's a key player in this whole story.  And it's

09:53  11   important that the -- the date is April 21.  The reason

09:53  12   that's important, Your Honor, is because it was

09:53  13   April 26th or 27th when the patents were actually

09:53  14   transferred.

09:53  15             Look at how Mr. Binder describes himself

09:53  16   in the signature block.  Yehuda Binder, CEO and Owner,

09:53  17   Orckit IP, LLC.

09:53  18             Could not be clearer.  Could not be more

09:53  19   transparent that he's now the owner of Orckit IP.  And

09:53  20   he's communicating to the trustee, who is the judge's

09:53  21   right-hand man on this liquidation.

09:53  22             If we look at Slide 23.

09:53  23             Slide 23, Your Honor, is the Assignment

09:53  24   Agreement.  It was April 25th.  So April 25th, that is

09:53  25   when the patents ultimately moved from Orckit

09:53  1   Communications to Orckit IP pursuant to the judge's

09:53  2   April 6th decision.

09:53  3                Look at the signature line.  The

09:54  4   signature line identifies Mr. Binder as the CEO and

09:54  5   owner of Orckit IP, LLC.

09:54  6                Nobody's hiding anything from anyone.

09:54  7   And nobody had a problem with it.  The trustee didn't

09:54  8   say, hey, wait a second, Mr. Binder.  You can't be an

09:54  9   owner.

09:54  10               And there's nothing in the record that

09:54  11  suggests that the Court didn't know about this.

09:54  12  There's nothing in the record that suggests that the

09:54  13  regulators didn't know about this.

09:54  14               One thing we do know for sure is that in

09:54  15  the eight years that have passed since this event, only

09:54  16  one entity has complained about this.  And that's

09:54  17  Cisco.  The Court didn't complain.  The trustee didn't

09:54  18  complain.  The regulator didn't complain.  No

09:54  19  misrepresentations, Your Honor.  There's nothing

09:54  20  that -- I mean, that's why summary judgment should be

09:54  21  granted here based on the objective facts.

09:54  22               There are a handful of other, you know,

09:54  23  allegations that they've made that, you know, are

09:54  24  probably worth a moment just chatting about.

09:54  25               You know, I should point out that as a

09:55   1    broad proposition, Cisco relies for its unclean hands

09:55   2    argument on an expert report submitted by its own

09:55   3    attorney.  Mr. Granot is a partner at the Hurwitz law

09:55   4    firm in Israel.

09:55   5                    THE COURT:  I'm --

09:55   6                    MR. MILLER:  Okay.

09:55   7                    THE COURT:  I'm -- don't give much weight

09:55   8    to --

09:55   9                    MR. MILLER:  Point well taken.  All

09:55   10   right.

09:55   11                   A couple of other just targeted things.

09:55   12                   THE COURT:  I'm a lawyer too.  I don't

09:55   13   give a lot of weight to --

        14                   MR. MILLER:  I understand.

09:55   15                   THE COURT:  -- lawyers coming in who have

09:55   16   been hired to tell me why someone did or didn't do

09:55   17   something.  So...

09:55   18                   MR. MILLER:  Understood.

09:55   19                   So Cisco alleges that Orckit's response

09:55   20   to the Office of the Chief Scientist's conditional

09:55   21   approval was not what the regulator was looking for.

09:55   22                   The record is clear -- if you look at --

09:55   23   pull up Slide -- I think it's Slide 6.  If you pull up

09:55   24   Slide 8.

09:56   25                   Slide 8, Your Honor, is an excerpt of a

09:56    1    February 18, 2016 report given by the trustee to the

09:56    2    insolvency court, and it includes the language from

09:56    3    the -- from the Office of the Chief Scientist's

09:56    4    conditional approval.  And you can see the highlighted

09:56    5    line below.  That approval letter was submitted to the

09:56    6    insolvency court along with this February 18th report.

09:56    7              If you look at Slide No. 9, Slide No. 9

09:56    8    is a paragraph from the same report describing the

09:56    9    Orckit IP response to the Office of the Chief

09:56    10    Scientist, and that is also submitted to the Court.

09:56    11              The -- Cisco is taking the view, Your

09:56    12    Honor, that the Orckit IP response was not what the

09:56    13    Office of the Chief Scientist was looking for way back

09:56    14    in February of 2016.  They say that's a

09:56    15    misrepresentation.  But that's February of 2016, and

09:57    16    nobody in Israel has ever complained about the

09:57    17    declaration.

09:57    18              The Court got copies of both documents.

09:57    19    No complaint.  The trustee got copies of both

09:57    20    documents.  No complaint.  The regulator, the Office of

09:57    21    the Chief Scientist got copies of those documents.  No

09:57    22    complaints.  The only one complaining is Cisco.

09:57    23              Cisco alleges that Orckit IP could not

09:57    24    owe Izhak Tamir 1.35 million and suggests that it was a

09:57    25    mystery to everybody that he was the source of the

43

09:57  1    1.35 million.

09:57  2                    We can see from the very first letter

09:57  3    back in November of 2015 that he could not have been

09:57  4    more transparent that he was the source of that money.

09:57  5    And every document attached to our motion papers show

09:57  6    that topic comes up again and again and again.

09:58  7    Everybody knew he was the owner -- he was the source of

09:58  8    the 1.35 million.  Everybody knew that Orckit IP owed

09:58  9    him that money, and everybody knew that at some point

09:58  10   Orckit IP was going to repay that money.  All of that

09:58  11   was transparently disclosed.

09:58  12                    Cisco alleges that in the year 2020,

09:58  13   Mr. Tamir should not have been allowed to acquire the

09:58  14   trustee's residual rights in the original 2016 deal

09:58  15   between Orckit Communications and Orckit IP.  It's kind

09:58  16   of a mysterious argument because the trustee who

09:58  17   handled the 2016 transaction was the party that sold

09:58  18   those residual rights to Mr. Tamir.

09:58  19                    And the insolvency court, the very same

09:58  20   judge that presided over the 2016 insolvency process,

09:58  21   blessed it.  Granted, it issued an opinion saying, I've

09:58  22   got no problem with the sale of these residual rights

09:59  23   to Mr. Tamir.

09:59  24                    I could go on and on, Your Honor, but I

09:59  25   think the point that I want to make is that Cisco's

—44—

| | | |
|---|---|---|
| 09:59 | 1 | arguments don't create material issues of fact.  They |
| 09:59 | 2 | just consistently disagree with decisions that were |
| 09:59 | 3 | made by the Court, by regulators, by people in Israel, |
| 09:59 | 4 | and they want you to hand down a decision that gets |
| 09:59 | 5 | them to a different outcome. |
| 09:59 | 6 | THE COURT:  Let me ask you a question. |
| 09:59 | 7 | I'm -- probably be the first question I ask the other |
| 09:59 | 8 | side as well. |
| 09:59 | 9 | Let's say I'm -- this is -- like when the |
| 09:59 | 10 | Supreme Court, you know, asks questions that are -- |
| 09:59 | 11 | it's a complete hypothetical, but let's say that I |
| 09:59 | 12 | accept all the facts as they have been presented and |
| 09:59 | 13 | let's say I -- for purposes of this question, I find |
| 09:59 | 14 | that there was some bad motivation on you all's part to |
| 09:59 | 15 | mislead the Israeli government about the citizenship of |
| 10:00 | 16 | the appropriate party.  This is what I'm going to ask |
| 10:00 | 17 | the other side to begin with:  What difference does |
| 10:00 | 18 | that make to me? |
| 10:00 | 19 | I mean, I don't understand the unclean |
| 10:00 | 20 | hands argument even if -- and I'm not saying they're |
| 10:00 | 21 | right.  I don't -- for this, I don't care, but |
| 10:00 | 22 | they're -- from their perspective they're going to say |
| 10:00 | 23 | look what happened.  We -- wink, wink, we all know it |
| 10:00 | 24 | happened.  So let's ascribe bad motive on the folks |
| 10:00 | 25 | in -- that were engaged in the chain of events. |

| | |
|---|---|
| 10:00 | 1 |
| 10:00 | 2 |
| 10:00 | 3 |
| 10:00 | 4 |
| 10:00 | 5 |
| 10:01 | 6 |

How have they been injured and what do I
care?  It -- from where I sit handling this case, seems
to me Israel may care or not.  They certainly haven't
shown any interest in this, but other than Israel, why
would I say this was clean hands?  How have they been
injured by whatever happened?

MR. MILLER:  I don't think at all.  You
know, as a practical matter, we know the trustee thinks
everything was completely appropriate and aboveboard.
You know, the -- our expert report on unclean hands
attached a copy of the letter that Mr. Dagan provided
back in January that reflects that.  Israel --

THE COURT:  Let me ask you one more
question and then I'll let them talk.

MR. MILLER:  Sure.

THE COURT:  Does the Israeli -- if the
Israeli government thinks some hanky-panky went on
here, for lack of a better word, do they have the power
to do any -- something about it?

MR. MILLER:  Absolutely, Your Honor.
They --

THE COURT:  Got it.

MR. MILLER:  Okay.  I'll put --

THE COURT:  And they haven't.

MR. MILLER:  And they haven't, Your

10:01  1    Honor.

10:01  2                    And, you know, I'll also point out that

10:01  3    what Cisco is looking for here is inequitable relief,

10:01  4    which I think under your standing orders this wouldn't

10:01  5    be for the jury, you know, on the 8th anyway.  But I

10:01  6    think as a practical matter, taking all the facts as

10:02  7    they allege, looking at the full record, Your Honor,

10:02  8    there's no "their" there and summary judgment should be

10:02  9    granted.  I'm happy to answer any questions you've got

10:02  10   about anything.

10:02  11                   THE COURT:  I'm all good.

10:02  12                   MR. MILLER:  Okay.  Thank you, Your

10:02  13   Honor.

10:02  14                   THE COURT:  A response?

10:02  15                   Good morning.  As you might be able to

10:02  16   tell, I'm skeptical.  And so that's no offense to you.

10:02  17   I mean, you've got -- but I'm -- I've asked questions

10:02  18   of opposing counsel I'd like you to address first.

10:02  19   One, if the Israeli government's taken no action, why

10:02  20   should I care, and how has Cisco been harmed?

10:02  21                   And maybe it's not -- maybe you're going

10:02  22   to tell me it's not Cisco, it's the whole world because

10:02  23   they did this terrible thing and Cisco's just the

10:02  24   current victim and all that, but I'm -- we sat and

10:02  25   tried to figure out how Cisco had been harmed by this

10:03  1    and we couldn't figure it out.

10:03  2                MS. MOULTON:  Thank you, Your Honor.

10:03  3    Libby Moulton for Cisco.

10:03  4                So when Mr. Tamir and Mr. Binder were

10:03  5    first in the insolvency proceedings and trying to find

10:03  6    a buyer --

10:03  7                (Clarification by Reporter.)

10:03  8                MS. MOULTON:  Okay.  In trying to find a

10:03  9    buyer for these patents, they already knew that they

10:03  10   planned to target Cisco with these patents, and so they

10:03  11   tried to get buyers and told them that Cisco was a

10:03  12   potential licensor or a potential target for these

10:03  13   patents.

10:03  14               They then tried to come up with a scheme

10:03  15   to acquire the patents back themselves without repaying

10:03  16   the Israeli government the $20 million investments that

10:03  17   the Israeli government --

10:03  18               THE COURT:  Okay.  Israel could be

10:03  19   incredibly unhappy about that.  I'm not sure why I

10:03  20   would be.

10:03  21               MS. MOULTON:  Mr. Tamir and Mr. Binder

10:03  22   wouldn't have these patents today if they had disclosed

10:03  23   their involvement in Orckit Communications and their

10:03  24   involvement with Mr. Hurwitz.  We would either have a

10:04  25   different plaintiff or we would have a different party

10:04   1   we'd be negotiating a license with.

10:04   2                 So the fact that Corrigent, who planned

10:04   3   this entire time to target Cisco, now has these patents

10:04   4   is unclean hands, and it's -- that's what creates the

10:04   5   nexus to this lawsuit and the harm to Cisco as the

10:04   6   defendant.

10:04   7                 As you know, unclean hands only applies

10:04   8   to --

10:04   9                 THE COURT:  I'm not even sure that --

10:04   10  again, I'm sorry, but, you know, if you look at the

10:04   11  recent case out of Amarillo that was argued in front of

10:04   12  the Supreme Court about the abortion medicine, you

10:04   13  know, those doctors' arguments were -- I mean, the

10:04   14  government's response was, you know, you don't have any

10:04   15  standing because you don't have to prescribe this

10:04   16  medicine.  And they said, but we might have to

10:04   17  prescribe the medicine, and the Supreme Court said, no,

10:04   18  you don't have standing.

10:04   19                 I'm not -- I don't really even see how

10:04   20  Cisco has the standing to make this argument.  Again, I

10:05   21  think Israel could be unhappy, but the fact that it

10:05   22  could be a different plaintiff suing you, I don't see

10:05   23  how that -- I'm not following your argument.  I don't

10:05   24  see what your injury is.  I'm not following it.

10:05   25                 MS. MOULTON:  Our injury is that we're

| 10:05 | 1 | being accused of infringing these patents, and they're |
| 10:05 | 2 | asking for 300-plus-million dollars for our |
| 10:05 | 3 | infringement when they shouldn't own the patents in the |
| 10:05 | 4 | first place because they lied to the Israeli government |
| 10:05 | 5 | about the involvement of Mr. Binder and Mr. Tamir in |
| 10:05 | 6 | purchasing these patents out of liquidation.  If we -- |
| 10:05 | 7 | THE COURT:  But again, if they did |
| 10:05 | 8 | something that misled the Israeli government and the |
| 10:05 | 9 | Israeli government hasn't done anything about it, we |
| 10:05 | 10 | have nothing more than your argument that that's what |
| 10:05 | 11 | happened.  Are you following me? |
| 10:06 | 12 | I mean, Israel doesn't feel like they -- |
| 10:06 | 13 | and they -- by the way, while you are unhappy, I get |
| 10:06 | 14 | it.  I represented defendants, a lot of defendants, and |
| 10:06 | 15 | they were always unhappy when they got sued.  So I'm |
| 10:06 | 16 | not saying that that's not a harm.  I represented a |
| 10:06 | 17 | defendant, Mike -- Mr. Jones was suing us in Tyler and |
| 10:06 | 18 | I was -- my client was offended by that. |
| 10:06 | 19 | But it seems to me the entity that would |
| 10:06 | 20 | have the most un- -- direct legitimate unhappiness |
| 10:06 | 21 | would be Israel, and they have done nothing, if there |
| 10:06 | 22 | really was this nefarious plot to mislead them about |
| 10:06 | 23 | the nationality. |
| 10:06 | 24 | MS. MOULTON:  So Israel doesn't have all |
| 10:06 | 25 | the facts right now. |

```
10:06    1                    THE COURT:  Well, okay.

10:06    2                    MS. MOULTON:  If we go to Slide 27.

10:06    3                    THE COURT:  Okay.

10:06    4                    Are they -- Israel's unaware that all

10:06    5     this is going on?

10:06    6                    MS. MOULTON:  Yes.  They are.  Now...

10:07    7                    THE COURT:  You could tell them.

10:07    8                    MS. MOULTON:  Corrigent has said

10:07    9     Corrigent does not consent to Cisco sharing the Granot

10:07   10     report with the Israeli Innovation Authority.  They

10:07   11     have asked us not to tell Israel about this.

10:07   12                    THE COURT:  Okay.

10:07   13                    MS. MOULTON:  And that's where we are

10:07   14     now.  That's in an e-mail from this -- from February of

10:07   15     this year.

        16                    THE COURT:  Okay.

10:07   17                    MS. MOULTON:  So Israel doesn't have all

10:07   18     these -- all the facts that are in front of this Court.

10:07   19     And I'd ask the Court to look really carefully at what

10:07   20     the Office of the Chief Scientist or the Israeli

10:07   21     Innovation Authority actually knew about the final

10:07   22     contours of the purchase agreement at the time that

10:07   23     that closed.

10:07   24                    THE COURT:  Can I ask you another

10:07   25     question here?  You're -- everyone in here is a much
```

10:07  1    better patent lawyer than I am.  You probably are even

10:07  2    a much higher level than that.  I'm probably at least

10:07  3    as close as Charley Ainsworth is.  So I'm giving you --

10:07  4    but -- and you notice I left his wife out of that when

10:08  5    I made the comparison.

10:08  6                     (Laughter.)

10:08  7                THE COURT:  But the doctrine of unclean

10:08  8    hands is -- does that apply when to -- would that apply

10:08  9    to both the legal remedies and the -- any equitable

10:08  10   remedies that the plaintiff is seeking, would that in

10:08  11   essence trump their ability to get damages if they were

10:08  12   to show infringement?

10:08  13               MS. MOULTON:  Yes.  The unclean hands

10:08  14   would make the patents unenforceable against Cisco.

10:08  15               THE COURT:  Okay.  Got it.

10:08  16               MS. MOULTON:  Yeah.  Okay.  So do you

10:08  17   want me to walk through what we think are the material

10:08  18   disputes of fact?

10:08  19               THE COURT:  Sure, please.

10:08  20               MS. MOULTON:  Okay.  So let's go back to

10:08  21   Slide 18.

10:08  22               So this has some of the unclean -- the

10:08  23   material disputes of fact that we would prove to Your

10:08  24   Honor in a bench trial on unclean hands.  So one is

10:08  25   Mr. Hurwitz, who was the fence for Mr. Tamir and

| | | |
|---|---|---|
| 10:09 | 1 | Mr. Binder, was his declaration to the liquidation |
| 10:09 | 2 | court false or misleading when he said that as of |
| 10:09 | 3 | today, there are not financial or equity relationships |
| 10:09 | 4 | between Orckit IP and Orckit Communications. |
| 10:09 | 5 | We think that was false or misleading and |
| 10:09 | 6 | that they knew at that time that Binder and Tamir would |
| 10:09 | 7 | be involved, and we also think it's misleading to say |
| 10:09 | 8 | that as of today, when just weeks later he transferred, |
| 10:09 | 9 | for free, his interest in the patents to Mr. Binder. |
| 10:09 | 10 | So the next dispute of fact is whether |
| 10:09 | 11 | they conceal -- Mr. Tamir, Binder and Hurwitz concealed |
| 10:09 | 12 | their involvement in Orckit IP from the Office of the |
| 10:09 | 13 | Chief Scientist. And there's a lot of letters and |
| 10:09 | 14 | things from different dates and back-and-forth about |
| 10:09 | 15 | what they disclosed to the trustee, but there's not |
| 10:09 | 16 | evidence that the Office of the Chief Scientist knew |
| 10:09 | 17 | about the involvement of Mr. Binder -- of Mr. Binder |
| 10:09 | 18 | owning Orckit IP or the treatment of Mr. Tamir's loan |
| 10:10 | 19 | at the time the transactions closed in the liquidation |
| 10:10 | 20 | court. All there is is evidence that the trustee knew |
| 10:10 | 21 | about that but not the Office of the Chief Scientist, |
| 10:10 | 22 | and that's an important distinction. Because leading |
| 10:10 | 23 | up to this point, the Office of the Chief Scientist had |
| 10:10 | 24 | objected to Mr. Tamir's involvement and objected to the |
| 10:10 | 25 | treatment of his loan. So we don't think that the |

10:10   1   Israeli court would have approved all this had they

10:10   2   known all these facts.

10:10   3            So the next one is, again, whether the

10:10   4   Office of the Chief Scientist was aware that Mr. Binder

10:10   5   received Orckit IP for free just one day after they

10:10   6   approved of the sale but before the closing of the

10:10   7   sale.

10:10   8            The next one, the treatment of the loan,

10:10   9   which I already talked about.  And then the next,

10:10   10   Mr. Tamir and Mr. Binder have a profit sharing

10:10   11   agreement.  When we get to the standing motion, we'll

10:11   12   get into how ████████████████████████████████████

10:11   13   ████████████████████████████████████████████████

10:11   14   ████████████████████████████████████████████████.

10:11   15   ██████████████████████████████████████████████

10:11   16   ███████████████████████████████████  And there's a

10:11   17   dispute of fact about when they entered into that

10:11   18   agreement.

10:11   19            Mr. Binder first testified in his

10:11   20   deposition that it was during this whole liquidation

10:11   21   process, and then later changed his testimony to say

10:11   22   no, no, no, it wasn't until 2020.  We think that the

10:11   23   Court is going to have to resolve what's more credible,

10:11   24   his original testimony that they entered into this

10:11   25   agreement on much earlier or his changed testimony that

10:11  1    it wasn't until 2020.

10:11  2              The next one, what was the motivation for

10:11  3    Mr. Hurwitz transferring Orckit IP for free to

10:11  4    Mr. Binder just one day after the insolvency court

10:11  5    approved the sale?  Was that a prearranged conclusion

10:11  6    such that Mr. Hurwitz was just a front so that the

10:11  7    Israeli citizens could get the patents without repaying

10:12  8    the Israeli government, or was something else going on

10:12  9    there?

10:12  10             And then there are disputes of fact as to

10:12  11   whether there's a nexus to Cisco, whether they planned

10:12  12   to target Cisco, and whether the Israeli government

10:12  13   would have given them the patents had it known all

10:12  14   these facts.  Those will need to be resolved in a bench

10:12  15   trial.

10:12  16             Thank you.

10:12  17             THE COURT:  Okay.  Thank you.

10:12  18             If you'll give me just one second.  Thank

10:12  19   you.

10:12  20             (Off-the-record bench conference.)

10:13  21             THE COURT:  Okay.  I will say this is

10:13  22   kind of, again, to me a confusing posture, but since

10:13  23   it's the plaintiff's motion for summary judgment of no

10:13  24   unclean hands, I want to make sure I get it right, I'm

10:14  25   granting that.

55

| | | |
|---|---|---|
| 10:14 | 1 | I'm finding that -- that there are no |
| 10:14 | 2 | unclean hands. |
| 10:14 | 3 | Next up, I have -- I have the motion with |
| 10:14 | 4 | respect to David Hahn, H-a-h-n. |
| 10:14 | 5 | Did that have to do with -- was that with |
| 10:14 | 6 | the unclean hands, so that's moot? |
| 10:14 | 7 | MR. MILLER:  Yes, Your Honor.  I believe |
| 10:14 | 8 | that there are expert -- |
| | 9 | Can I -- |
| | 10 | THE COURT:  Sure. |
| 10:14 | 11 | MR. MILLER:  I believe expert reports |
| 10:14 | 12 | have been submitted by both sides on the issue of |
| 10:14 | 13 | unclean hands. |
| 10:14 | 14 | THE COURT:  Okay.  And we had those.  And |
| 10:14 | 15 | so we can -- I considered them.  So if there is -- if I |
| 10:14 | 16 | need to say for the record that I'm allowing them to |
| 10:14 | 17 | file a supplemental report, that's fine.  It will be |
| 10:15 | 18 | considered.  It wouldn't change my decision with regard |
| 10:15 | 19 | to your motion. |
| 10:15 | 20 | I'm just not sure if there was a pending |
| 10:15 | 21 | motion with respect to Mr. Hahn being allowed to file |
| 10:15 | 22 | the report, or what exactly this issue is. |
| 10:15 | 23 | MR. MILLER:  I believe that -- I believe |
| 10:15 | 24 | that Cisco did make a motion looking to strike |
| 10:15 | 25 | Mr. Hahn's expert report, but that was I think premised |

| | | |
|---|---|---|
| 10:15 | 1 | on the notion that there would be an unclean hands |
| 10:15 | 2 | defense. |
| | 3 | THE COURT:  Okay. |
| 10:15 | 4 | MR. MILLER:  So it strikes us that both |
| 10:15 | 5 | sides' expert reports -- |
| 10:15 | 6 | THE COURT:  They're irrelevant. |
| 10:15 | 7 | MR. MILLER:  -- are irrelevant at this |
| 10:15 | 8 | point. |
| 10:15 | 9 | THE COURT:  Yes. |
| 10:15 | 10 | Yes, ma'am. |
| 10:15 | 11 | MS. MOULTON:  I think what you're |
| 10:15 | 12 | referring to is we filed a motion to file a surreply? |
| 10:15 | 13 | THE COURT:  That's what I have. |
| 10:15 | 14 | MS. MOULTON:  So you can -- I think you |
| 10:15 | 15 | can deny that as moot. |
| 10:15 | 16 | THE COURT:  Okay.  Thank you, ma'am. |
| 10:15 | 17 | That's what I'm going to do. |
| 10:15 | 18 | And I have great clerks.  They've |
| 10:15 | 19 | inserted MIL No. 1 here, which is exclude evidence and |
| 10:15 | 20 | arguments regarding unclean hands. |
| 10:15 | 21 | That's granted.  And so -- |
| 10:16 | 22 | MR. JONES:  Your Honor, could I be heard |
| 10:16 | 23 | on that just for a moment? |
| 10:16 | 24 | THE COURT:  Okay. |
| 10:16 | 25 | MR. JONES:  And the issue here is we |

10:16  1    don't want to present any evidence of unclean hands.

10:16  2    The defense is out of the case.  Obviously we can't do

10:16  3    this.  We also don't want to present any evidence that

10:16  4    what they did, as you've said, the facts are what the

10:16  5    facts are.

10:16  6                We're not going to say that, you know,

10:16  7    anything illegal's been done here, anything improper's

10:16  8    being done here.  But, Your Honor, what this motion

10:16  9    goes to is the economic facts concerning these patents

10:16  10   that are contained in our damages expert report.

10:16  11               THE COURT:  So let me do this.  I don't

10:16  12   know what's coming ahead, but if there is a -- if it's

10:16  13   anything -- this is bilateral, but I'm picking on you

10:16  14   right now because you're in front of me.

10:16  15               MR. JONES:  Yes, sir.

10:16  16               THE COURT:  If it's in your expert

10:16  17   report --

10:16  18               MR. JONES:  Yes, sir.

10:16  19               THE COURT:  -- and they haven't asked me

10:16  20   to keep it out in the form of a Daubert, you can put it

10:17  21   on at trial.

10:17  22               What you can't do at trial is intimate

10:17  23   that there's some unclean hands aspect to it.  But if

10:17  24   your damages expert is going to say, this is what

10:17  25   happened and so my damages numbers are X, and they

| | | |
|---|---|---|
| 10:17 | 1 | haven't asked me today to keep you from doing that, |
| 10:17 | 2 | then you can assume you get to do that.  That's why |
| 10:17 | 3 | we're here today. |
| 10:17 | 4 | MR. JONES:  Thank you, Your Honor. |
| 10:17 | 5 | MR. MILLER:  Could I be briefly heard on |
| 10:17 | 6 | that, Your Honor? |
| 10:17 | 7 | THE COURT:  Sure. |
| 10:17 | 8 | MR. MILLER:  Your Honor, the motion in |
| 10:17 | 9 | limine with respect to the use of unclean hands |
| 10:17 | 10 | evidence that we have before you, which I think you've |
| 10:17 | 11 | granted, speaks to a variety of topics that you just |
| 10:17 | 12 | heard Mr. Jones argue. |
| 10:17 | 13 | THE COURT:  Let me go back and say: |
| 10:17 | 14 | Motions in limine are not Daubert motions.  What I -- |
| 10:17 | 15 | if you want to present to me that certain of their |
| 10:17 | 16 | damages -- the basis of their damages opinion should be |
| 10:18 | 17 | excluded because it only has to do with unclean hands, |
| 10:18 | 18 | this is your chance to do that. |
| 10:18 | 19 | MR. MILLER:  Thank you, Your Honor. |
| 10:18 | 20 | Can I just say, it appears to us that |
| 10:18 | 21 | they're trying to get through the side or the back door |
| 10:18 | 22 | what they can't get through the front door.  Their own |
| 10:18 | 23 | damages expert, Dr. Laura Stamm, made it clear both in |
| 10:18 | 24 | her expert report and which -- |
| 10:18 | 25 | THE COURT:  I need you to tell me what it |

```
10:18    1   is you think they want to put in that would only go to

10:18    2   unclean hands and should not be allowed in.

10:18    3                   MR. MILLER:  All of the history --

10:18    4                   THE COURT:  You're not going to get

10:18    5   through all the history.  Specifically, if they want to

10:18    6   put in the history of how it happened and they can just

10:18    7   -- unless you are telling me now in the form of a

10:18    8   Daubert that it's unnecessary for them to do that, I'm

10:18    9   going to allow them to do that.

10:18   10                   MR. MILLER:  Yeah.  So basically,

10:18   11   Ofer Granot, their expert, details a series of

10:19   12   factual -- of allegedly factual events that ultimately

10:19   13   support his opinion that there were unclean hands.

10:19   14                   THE COURT:  That's not coming in.

10:19   15                   MR. MILLER:  Ms. Stamm wraps some of

10:19   16   those -- Dr. Stamm wraps some of those into her

10:19   17   opening --

10:19   18                   THE COURT:  Is she the damages person?

10:19   19                   MR. MILLER:  I'm sorry.  She's their

10:19   20   damages expert.

10:19   21                   THE COURT:  Got it.

10:19   22                   MR. MILLER:  But then, and interestingly

10:19   23   enough, in her own report, and then again in the

10:19   24   deposition, says, that's not really relevant to my

10:19   25   decision.
```

10:19  1          My ask is that the Court consider just

10:19  2   not allowing Cisco to get in through the side door what

10:19  3   they can't get in through the front door.  It's not

10:19  4   relevant to damages, even according to their own

10:19  5   expert.

10:19  6          THE COURT:  So here's what we're going to

10:19  7   do.  When we get to the point where your -- tell me her

10:19  8   name?  Ms.?

10:19  9          MR. MILLER:  Dr. Laura Stamm.

10:19  10          THE COURT:  Okay.  Before Ms. Stamm goes

10:19  11   on -- I'll have a much better idea of this case during

10:19  12   that time -- anything -- Mr. Jones, you usually put

10:19  13   these people on, and you do a good job at it, and if

10:19  14   you're going to put her on in this case, if there's

10:20  15   anything that you want to put on in your direct that

10:20  16   you know that at her deposition or somewhere she said

10:20  17   that fact wasn't relevant to my -- we'll take that up

10:20  18   before she goes on.

10:20  19          So that will kind of be the -- go through

10:20  20   her deposition.  You can go through her deposition,

10:20  21   tell Mr. Jones what you're -- whatever that is, as

10:20  22   opposed to -- the only other way to do it is,

10:20  23   Mr. Jones, for you to, you know, approach the bench and

10:20  24   explain to me each time why you want to put it in, and

10:20  25   that will be wonky and that won't be very effective.

10:20   1          So if there are facts that you want your

10:20   2   damages expert to say that there may be an issue

10:20   3   because at some point along the way she said that they

10:20   4   were -- yes, they were included in her report but they

10:20   5   weren't actually necessary for her to come up with her

10:20   6   opinion for the jury, let us know, and I will take that

10:20   7   up outside of the presence of the jury before we put

10:20   8   her on the witness stand.

10:20   9          MR. MILLER:  Your Honor, can I say two

10:21  10   quick things?

10:21  11          First of all, a short while ago, we gave

10:21  12   Cisco a draft of a stipulation that we think distills

10:21  13   anything from that factual record that might have a

10:21  14   bearing on damages.  And I just gave Mr. Jones another

10:21  15   copy of that.  Number one.

10:21  16          Number two, our first witness, Your

10:21  17   Honor, is likely to be Izhak Tamir.  And one of the

10:21  18   concerns that we have is, you know, we could definitely

10:21  19   ring-fence our direct examination so we don't get into

10:21  20   any of these underlying facts.

10:21  21          My concern is that on cross-examination

10:21  22   they may try to draw out of Mr. Tamir the very facts

10:21  23   that they have been, you know, trumpeting for months

10:21  24   now in support of their unclean hands argument.

10:21  25          So I think our motion in limine is --

| | | |
|---|---|---|
| 10:21 | 1 | THE COURT:  So I can't -- I can't do |
| 10:21 | 2 | things prophylactically.  I just can't.  Because I |
| 10:21 | 3 | just -- there's no way I can do it. |
| 10:21 | 4 | So again, I've ruled on the evidence -- |
| 10:22 | 5 | I've ruled on the argument of unclean hands.  If |
| 10:22 | 6 | someone from the defendant wants, on cross-examination |
| 10:22 | 7 | of your person, is asking these questions of your -- of |
| 10:22 | 8 | your -- is he the inventor or the owner of the patent? |
| 10:22 | 9 | MR. MILLER:  No.  His name is |
| 10:22 | 10 | Izhak Tamir, and he -- he was an owner of the company |
| 10:22 | 11 | at the time these inventions were made. |
| 10:22 | 12 | THE COURT:  Okay.  So when a question is |
| 10:22 | 13 | asked, you can object that it's irrelevant.  And I will |
| 10:22 | 14 | expect the defendant to be able to tell me how it's |
| 10:22 | 15 | relevant to infringement or validity or damages or, you |
| 10:22 | 16 | know, if there's a little background involved here as |
| 10:22 | 17 | well.  And there's some play there. |
| 10:22 | 18 | If I get the sense that I have to sustain |
| 10:22 | 19 | a number of -- that I -- |
| 10:22 | 20 | Here's the way I see the world, and maybe |
| 10:23 | 21 | I'm wrong, but y'all are stuck with me.  I know that |
| 10:23 | 22 | you all -- and I did when I was in your shoes.  You |
| 10:23 | 23 | know, you're worried that every question -- you know, |
| 10:23 | 24 | there's just no question that's not so important it |
| 10:23 | 25 | couldn't change the course of the trial, which is not |

10:23  1   true pretty much after the sixth or seventh minute we

10:23  2   start.  But the way I see the world is, let's say --

10:23  3   I'm sure he didn't, but let's say this gentleman has

10:23  4   two DWIs.  I'm sure he doesn't, but just for --

10:23  5                   MR. MILLER:  For the record, he does not.

10:23  6                   THE COURT:  If someone on their side

10:23  7   says, isn't it true you have two DWIs, you can object

10:23  8   and say, that's irrelevant.  But the jury knows he has

10:23  9   two DWIs and you can't unring that bell.

10:23  10                  So that's the kind of thing I think you

10:23  11  all need to be careful about asking.

10:23  12                  If there's a question of it involves most

10:23  13  of this stuff, the jury is not going to be horrified by

10:24  14  hearing that there was a sale on a date or this or

10:24  15  that, and, you know, and I can just over- -- I can

10:24  16  sustain an objection, or I can do all that.  That's why

10:24  17  I can't do a motion.  To me, a motion in limine is

10:24  18  to -- is to prevent something where the bell can't be

10:24  19  unrung.

10:24  20                  Now, there comes a point where if I feel

10:24  21  like -- and at least half the time I'm listening to

10:24  22  what you guys are talking about during a trial.  I

10:24  23  mean, it varies.  But if I happen to be listening, if I

10:24  24  find that the questions are I think inappropriately

10:24  25  directed to something I've kept out, I can assure you,

| | | |
|---|---|---|
| 10:24 | 1 | just like I did a week ago, I can pretty -- I can |
| 10:24 | 2 | express my disappointment with some zeal to either |
| 10:24 | 3 | side. |
| 10:24 | 4 | And so I -- we've gone over this enough. |
| 10:25 | 5 | I understand the issue.  I'll be listening and they get |
| 10:25 | 6 | to ask their questions, and unless it's something |
| 10:25 | 7 | that's really, you know, isn't it true that the Israeli |
| 10:25 | 8 | government -- that you defrauded the Israeli |
| 10:25 | 9 | government, you know, I think that would be an |
| 10:25 | 10 | inappropriate and unfortunate question that I would |
| 10:25 | 11 | deal with pretty harshly.  But most of this stuff is |
| 10:25 | 12 | just the same background stuff that we hear in every |
| 10:25 | 13 | trial.  So I'm not granting this motion.  I will take |
| 10:25 | 14 | it up on a question-by-question basis. |
| 10:25 | 15 | MR. MILLER:  Understood.  Thank you, Your |
| 10:25 | 16 | Honor. |
| 10:25 | 17 | THE COURT:  Mr. Jones? |
| 10:25 | 18 | MR. JONES:  Thank you, Your Honor. |
| 10:25 | 19 | THE COURT:  Okay.  Now -- and thank you |
| 10:25 | 20 | for helping me clarify that for you in advance.  I |
| 10:25 | 21 | think that's helpful. |
| 10:25 | 22 | Now I have -- and see, what you all |
| 10:25 | 23 | should know is -- this probably makes me unlike most |
| 10:25 | 24 | judges -- is I'm actually really enjoying this hearing |
| 10:25 | 25 | with these issues and really -- and you all because |

| | | |
|---|---|---|
| 10:25 | 1 | this afternoon I start a discrimination trial.  And so |
| 10:26 | 2 | the morning will be -- all of this argument over this |
| 10:26 | 3 | will be the highlight of my day. |
| 10:26 | 4 | (Laughter.) |
| 10:26 | 5 | THE COURT:  So, you know -- so next up, I |
| 10:26 | 6 | have a motion for summary judgment that Corrigent |
| 10:26 | 7 | Corporation lacks standing. |
| 10:26 | 8 | And if it helps you to know, I actually |
| 10:26 | 9 | am pretty up to speed on what standing is.  If you have |
| 10:26 | 10 | a bunch of slides, like you want to tell me what the |
| 10:26 | 11 | law is on standing, you -- I have a pretty good idea of |
| 10:26 | 12 | that. |
| 10:26 | 13 | MS. MOULTON:  Okay.  Thank you, Your |
| 10:26 | 14 | Honor.  Libby Moulton again.  So go to the next slide. |
| 10:26 | 15 | Okay.  So Corrigent is the plaintiff |
| 10:26 | 16 | here.  Nahum is the person that Corrigent purportedly |
| 10:26 | 17 | acquired the patents from, the prior owners.  At the |
| 10:27 | 18 | end of this litigation if Corrigent gets its full |
| 10:27 | 19 | damages request, ███████████████████████████ |
| 10:27 | 20 | ████████████████████████████.  They are |
| 10:27 | 21 | the -- Corrigent is the owner of these patents in name |
| 10:27 | 22 | only. |
| 10:27 | 23 | When the company that's getting ████ |
| 10:27 | 24 | ████████████████████████████████████ |
| 10:27 | 25 | ██, that's a standing problem.  And on top of this |

| | | |
|---|---|---|
| 10:27 | 1 | money problem, Corrigent can't settle the case without |
| 10:27 | 2 | Nahum's permission.  They can't license the patents |
| 10:27 | 3 | without Nahum's permission, and they can't make |
| 10:27 | 4 | litigation decisions independent of Nahum.  Because |
| 10:27 | 5 | Nahum remains the real owner of the patents, they need |
| 10:27 | 6 | to be joined in this case to proceed. |
| 10:27 | 7 | So we moved on both statutory standing |
| 10:27 | 8 | and constitutional standing.  In the interest of time |
| 10:27 | 9 | I'll just argue this statutory standing, and we'll rest |
| 10:27 | 10 | on the papers on constitutional standing. |
| 10:27 | 11 | So as Your Honor noted, you have to have |
| 10:28 | 12 | obtained all substantial rights in order to be the |
| 10:28 | 13 | owner of the patent for statutory standing. |
| 10:28 | 14 | So what we're going to look at is the |
| 10:28 | 15 | patent sale agreement that purportedly transferred |
| 10:28 | 16 | ownership from Nahum to Corrigent.  And as we can see |
| 10:28 | 17 | from this patent sale agreement, it says that |
| 10:28 | 18 | █████████████████████████████████████████████ |
| 10:28 | 19 | █████████████████████████████████████████████ |
| 10:28 | 20 | ████████████.  So what are those terms? |
| 10:28 | 21 | The terms ███████████████████ |
| 10:28 | 22 | ████████████████████████████████████████████ |
| 10:28 | 23 | ████████████████████████████████ |
| 10:28 | 24 | ████████████████████████████. |
| 10:28 | 25 | █████████████████████████████ |



```
10:28   1   ████████████████████████████████████████████
10:28   2   ██████████████████████████████████████.  And
10:28   3   that distinguishes this case from cases where they --
10:28   4   agreement just requires giving information or updates
10:29   5   to the prior owner.  ████████████████████████████
10:29   6   ████████████████████
10:29   7           And then they -- we also have
10:29   8   restrictions on the rights for alienation.  ████████
10:29   9   ████████████████████████████████████████████
10:29  10   ████████████████████████████████████████████
10:29  11   ████████████████████████████████████████████
10:29  12   ████████████████████████████████████████████
10:29  13   ███████████████████████
10:29  14                ████████████████████████████████████
10:29  15   and Mr. Baker, who's the president of Corrigent, agreed
10:29  16   that ████████████████████████████████████
10:29  17   ████   ████████████████████████████████████
10:29  18   ████████████████████████████████  And all
10:29  19   of these are factors that the courts considered in
10:29  20   cases like the Alfred Mann Foundation and Lone Star as
10:29  21   supporting a finding of no standing.
10:29  22           Now, Corrigent has made sort of three
10:30  23   arguments I'd like to address before they get up.  ██
10:30  24   ████████████████████████████████████████████
10:30  25   ████████████████████████████████████████████
```

10:30   1   ████████████████████████████████████████████

10:30   2   But all of those clauses are -- say something like

10:30   3   subject to the rest of this agreement, and the Federal

10:30   4   Circuit in Lone Star and Alfred Mann is really clear.

10:30   5   The Court doesn't look for magic words.  It has to read

10:30   6   the entire agreement to consider the scope of the

10:30   7   rights transferred.

10:30   8               THE COURT:  Do you want to address any

10:30   9   impact the recent Zebra case had on this?

10:30   10              MS. MOULTON:  Sure.  So the Zebra case

10:30   11  just turned on constitutional standing, and it remanded

10:30   12  to Your Honor to consider statutory standing and also

10:30   13  joinder.  So just looking at the statutory standing,

10:30   14  the Zebra case has no impact.

        15              THE COURT:  Okay.

10:30   16              MS. MOULTON:  The other thing that

10:30   17  Corrigent has argued is that it doesn't matter ████████

10:30   18  ██████████████████████████████████████████████████████

10:30   19  ██████   They say that's neutral.  The courts' cases in

10:30   20  VirnetX and Diamond, they both say that getting between

10:31   21  50 and 25 percent of the recovery -- for the prior

10:31   22  owner to get between 50 and 25 percent of the recovery

10:31   23  that supports a finding of no standing.  ███████████████

10:31   24  ███████████████████████████████████████, that's a clear

10:31   25  indication that Nahum is an owner of these patents.

10:31   1       And then Corrigent rests on ████████████

10:31   2    ███████████████████, but that's irrelevant to

10:31   3    Corrigent, which is a nonpracticing entity, and the

10:31   4    agreement itself says ████████████████████████████

10:31   5    ████████████████████████████████

10:31   6       So where does that leave us?  While

10:31   7    constitutional standing can't be cured with joinder,

10:31   8    statutory standing could be, but it wouldn't be

10:31   9    appropriate in this case to allow Corrigent to join

10:31   10   Nahum or Mr. Tamir.  Corrigent withheld the patent

10:31   11   service agreement, the patent sale agreement, until

10:31   12   July 2023.  They filed this case in 2022 and didn't

10:31   13   give us that agreement for months.

10:31   14       And Corrigent has known since at least

10:32   15   November that we contended Nahum was a necessary party

10:32   16   and have since made no effort to join Nahum.  So

10:32   17   they've already had a chance to cure this defect and

10:32   18   failed.  Adding Nahum now a week before jury selection

10:32   19   and two weeks before trial would be extremely

10:32   20   prejudicial.

10:32   21       Because Nahum wasn't a party, they

10:32   22   haven't been served requests for admission, they

10:32   23   haven't been served interrogatories.  We haven't had a

10:32   24   chance to take the deposition of the sole owner of

10:32   25   Nahum.  They haven't given us a privilege log despite

10:32  1   us asking for it, and they've continued producing

10:32  2   documents through last week that discuss the transfer

10:32  3   of these patents.

10:32  4          So we would need an orderly discovery

10:32  5   process to add Nahum and take party discovery from

10:32  6   Nahum instead of being limited to third-party

10:32  7   discovery, if the Court were to allow them to be joined

10:32  8   to cure the statutory standing defect.

10:32  9          THE COURT:  I didn't hear you mention

10:32  10  anything, and maybe you did and I missed it, about --

10:33  11  my understanding is you all have a disagreement with

10:33  12  the plaintiff with regard to Section 12.4, your

10:33  13  interpretation of that.  If you'd like to have them go

10:33  14  first on that and then respond, or if you'd like to

10:33  15  address it in advance, either one is fine.

10:33  16          MS. MOULTON:  Sure.  ████████████████

10:33  17  ███████████████████████████████████████

10:33  18  ████████████████████████████████████████

10:33  19  ████████████████████████████████████████

10:33  20  ███████████████████████  ████████████████

10:33  21  █████████████████████████████████  █████

10:33  22  ████████████████████████████████████  ███

10:33  23  ████████████████████████████████████████

10:33  24  ███████

10:33  25          So because Corrigent can't transfer

10:33   1   ownership of the patents without Nahum's permission,

10:33   2   that deprives Corrigent -- that means Corrigent doesn't

10:33   3   have all substantial rights and lacks statutory

10:33   4   standing.

10:33   5                   THE COURT:  Okay.  Thank you.

10:33   6                   MS. MOULTON:  Thank you.

10:33   7                   THE COURT:  And if you would start with

10:33   8   that -- thank you, ma'am.  If you'd start with that

10:33   9   issue to a -- your interpretation versus theirs.  And

10:34  10   good morning.

10:34  11                   MR. KAPPERS:  Robert Kappers on behalf of

10:34  12   Corrigent.  Pull up Section 12.4.  Would you go to

10:34  13   Slide 51, please?

10:34  14   ██████████████████████████████████

10:34  15   ████████████████████████████████████████████

10:34  16   ████████████████████████████████████████████

10:34  17   ██████████████████████████████████████████████

10:35  18   ████████████████         And there are other provisions within

10:35  19   this agreement that when you view it in total are

10:35  20   consistent with that understanding.

10:35  21                   If you could go to Slide 45, please.

10:35  22   ██████████████████████████████

10:35  23   ████████████████████████████████████████████

10:35  24   ██████████████████████████████████████

10:35  25   ██████████████████████         And if I could give Your Honor

—72—

10:35  1   a little bit of background, the director of Corrigent

10:35  2   is named Rich Baker.  He's a patent practitioner in

10:35  3   this market.  He has decades of experience in patent

10:35  4   licensing and monetization.

10:35  5          We've heard a little bit about Izhak

10:35  6   Tamir.  He's the CEO of the operating company in

10:35  7   Israel, Orckit Communications.  He doesn't have that

10:35  8   experience.  And so part of -- part of what Corrigent

10:35  9   came to the table with and Mr. Baker came to the table

10:36  10  with was his experience in monetizing patents.  And so,

10:36  11  you know, this is one provision where it makes sense

10:36  12  for ███████████████████████████████████████

10:36  13  ██████████████████████████████████████████

10:36  14  ████████████████████████████████████████████████

10:36  15  ████████████

10:36  16          If we could go to Slide 46, please,

10:36  17  Chris.

10:36  18              ████████████████████████████████████

10:36  19  ██████████████████████████████████████████

10:36  20  ██████████████████████████████████████████

10:36  21  ██████████████████████████████████  One of

10:36  22  the things that -- one result of that monetization

10:36  23  could certainly be Corrigent's assignment of the

10:36  24  patents.  You know, that happens all the time in

10:36  25  litigations, campaigns, as a way of settling a dispute.

73

10:37  1    You know, a patent owner will assign the patents rather

10:37  2    than licensing or, you know, just settling a case.

10:37  3              And so we believe that, you know, just

10:37  4    in -- in total we think that █████████████████████

10:37  5    ████████████████████████████████████████████████████

10:37  6    █████████████████  █████████████████████████████████

10:37  7    ████████████████████████████████████████████████████

10:37  8    ███████████████████████████████████

10:37  9              And if we could go to Slide 37, Chris.

10:37  10             I want to be very brief about

10:37  11   constitutional standing because, you know, counsel

10:37  12   spent little time on this issue and I think that is

10:37  13   telling.  You know, this slide, the chain of title goes

10:37  14   from the inventors to Orckit Communications.

10:37  15             Next slide, please, Chris.

10:37  16             Then through liquidation it goes down to

10:38  17   Orckit IP.

10:38  18             Next slide.

10:38  19             And then Orckit IP and a company called

10:38  20   SUCA agreed that Orckit IP would transfer the patents

10:38  21   to Nahum.

10:38  22             If we go to the next slide, Chris,

10:38  23   please.

10:38  24             And then Nahum transfers the patents down

10:38  25   to Corrigent.

10:38  1          Now, I heard counsel say that, you know,

10:38  2   Corrigent purportedly owns the patents.  They've never

10:38  3   challenged that Corrigent owns these patents.  That's

10:38  4   not at issue.  They do not dispute that Corrigent has

10:38  5   title to the patents and that they're the owner.

10:38  6          And, you know, Your Honor mentioned that

10:38  7   you're familiar with constitutional standing law.  You

10:38  8   mentioned the Zebra Technologies case.  As a patent

10:38  9   owner, it really lowered the bar -- lowered the bar for

10:38  10  constitutional standing.  The Federal Circuit stated in

10:38  11  that case:  A patent owner has exclusionary rights as a

10:38  12  baseline matter unless it's transferred all

10:39  13  exclusionary rights away.

10:39  14          I don't think any exclusionary rights

10:39  15  have been transferred away, but certainly we haven't

10:39  16  transferred away all exclusionary rights.

10:39  17  ███████████████████████████████████████

10:39  18  ███████████████████████  Cisco doesn't dispute

10:39  19  that.

10:39  20          The next section, ███████████████████

10:39  21  ██████████████████████████████████

10:39  22  ███████████████████  Cisco doesn't dispute that.

10:39  23          Only Corrigent has the right to assign

10:39  24  the patents.  Only Corrigent has the right to license

10:39  25  the patents.  So taken together, we certainly think

| 10:39 | 1 | that Corrigent has exclusionary rights.  Definitely |
|---|---|---|

10:39    1    that Corrigent has exclusionary rights.  Definitely

10:39    2    haven't transferred all exclusionary rights away.

10:39    3              Let's go to Slide 41, Chris.

10:39    4              So I think that, you know, the question

10:39    5    here for statutory standing is really whether Corrigent

10:39    6    has all substantial rights or whether Corrigent needs

10:39    7    to -- or whether -- excuse me -- Nahum was the

10:39    8    necessary party to bring this case.

10:40    9              Now I want to address the two issues in

10:40   10    turn.  First, it's our position Corrigent has all

10:40   11    substantial rights.  We're the only necessary party in

10:40   12    this case.

10:40   13              The second issue is, Nahum has

10:40   14    volunteered here discovery in this case.  Nahum's

10:40   15    produced tens of thousands of pages of documents.

10:40   16    Nahum sat for a deposition.  And if the Court's

10:40   17    inclined to find that Corrigent lacks substantial

10:40   18    rights or all substantial rights, we just ask the Court

10:40   19    for permission to join Nahum.

10:40   20              If you could go to Slide 42, please.

10:40   21              So Corrigent received all substantial

10:40   22    rights.

10:40   23

10:40   24

10:40   25

—76—

10:41  1  ███████████████████████████

10:41  2              Let me just -- I'll just stay here.  I'll

10:41  3  look at the -- I'll start here with the right of

10:41  4  alienation.

10:41  5              ████████████████████████████

10:41  6  ████████████████████████████████████████████████

10:41  7  ██████████  Counsel said that the Court shouldn't --

10:41  8  there are no magic words.  And that's certainly in the

10:41  9  law -- that is a --  ████████████████████████

10:41 10  ████████████████████████.

10:41 11              You know, we've talked about

10:41 12  Section 12.4.  Our position is that that provision

10:41 13  doesn't, you know, encumber Corrigent's right of

10:41 14  alienation to the patents.

10:41 15              Chris, if you could please turn to Slide

10:41 16  44.  And I'll turn to the Right of Enforcement.

10:42 17              So this is Section 1.2, Your Honor.  I

10:42 18  just want to make this clear here.

10:42 19              ████████████████████████████████████

10:42 20  ████████████████████████████████████████████████

10:42 21  ████████████████

10:42 22              And if you could please turn to Slide 46,

10:42 23  Chris.

10:42 24              Oh, here we go.

10:42 25              ████████████████████████████

| 10:42 | 1 | ██████████████████████████████████ |
| 10:42 | 2 | ████████████████████████ |
| 10:42 | 3 | ███████ |

10:42  4           Now, if we could go to the next slide,

10:42  5  please.

| 10:42 | 6 | ██████████████████████  ████ |
| 10:42 | 7 | ████████████████████████████ |
| 10:42 | 8 | ████████ |

10:42  9           You know, we don't dispute that -- that

10:43  10  Corrigent has to do that.  But ultimately what matters

10:43  11  is that Corrigent -- ████████████

| 10:43 | 12 | ██████████████████████████ |
| 10:43 | 13 | ██████████████. |
| 10:43 | 14 | ██████████████████████ |
| 10:43 | 15 | ███  ██████████████████ |

10:43  16           And we've cited several cases -- Vaupel

10:43  17  is one.  Hailo Techs and Nomos -- where those cases

10:43  18  deny motions for summary judgment and found there was

10:43  19  statutory standing, despite similar provisions where

10:43  20  the patent owner had to inform -- keep the prior patent

10:43  21  owner informed.

10:43  22           If we could go to Slide 52, please,

10:43  23  Chris.

10:43  24           Here's Rich Baker here on the screen, and

10:44  25  he was asked at his deposition about the intent of this

78

10:44  1    provision, Section 5.2.  And so, yeah, he confirmed

10:44  2    that 5.2 says what it says, █████████████████████

10:44  3    ████████████████████████████████████████████

10:44  4    ██████████████████████████████████████.

10:44  5              He was then asked: ██████████████████

10:44  6    ████████████████████████████████████████████

10:44  7                    ██████████████████

10:44  8                    ████████████████████████

10:44  9    █████████████

10:44  10                   ██████████████████████

10:44  11   ███████████████████████████████████

10:44  12                  ████████████████████████████

10:44  13   █████████████████████████████████████████

10:44  14   ████████████████████████████████████████████

10:44  15   ████████████████████████████████████████████

10:44  16   ████████████████████

10:44  17             If we go to Slide 42, Chris.

10:44  18             Just walking down the line here, Your

10:45  19   Honor, Right to License.

10:45  20             Again, Corrigent is the owner of the

10:45  21   patents.  It's not in dispute.  With ownership comes

10:45  22   the ability to license the patents unless it's

10:45  23   otherwise retained by Nahum.

10:45  24                  █████████████████████████

10:45  25   █████████████████████████

79

10:45   1   ███████████████████████████████████████

10:45   2   ████████████████████████████   I believe counsel

10:45   3   mentioned that that's not -- that is not the right to

10:45   4   license.  Corrigent is the only party that can license

10:45   5   the patents.

10:45   6            Corrigent also has the right to practice.

10:45   7   Again, that's -- that comes along with the title of the

10:45   8   patents, that they own the patents.

10:45   9            Cisco has argued, well, it's irrelevant

10:45   10  here because Corrigent doesn't -- is a nonpracticing

10:46   11  entity.  We don't practice the patents.

10:46   12           I think that just kind of misses the

10:46   13  point.  Corrigent has the right to practice the

10:46   14  patents.  That's one.  And the more important point is

10:46   15  that Nahum didn't obtain the right to practice the

10:46   16  patents.  And so certainly, it's another factor that

10:46   17  would counsel towards a finding of statutory standing

10:46   18  that Corrigent received all substantial rights.

10:46   19           So let's go to the Right to Proceeds

10:46   20  here.

10:46   21           Under the agreement, ███████████████

10:46   22  ████████████████████████████████████████████████

10:46   23  ████████████████████████

10:46   24           You know, our position, Your Honor, is

10:46   25  that there are several cases from the Federal Circuit.

10:46   1   Vaupel and Intellectual Property Development.  Both of

10:47   2   those cases support a finding that provisions like this

10:47   3   are just typical consideration for transferring patents

10:47   4   and consistent with an assignment of the patents.

10:47   5          You know, certainly ███████████ is, you

10:47   6   know, a large percentage, but we believe that, given

10:47   7   the entirety of the agreement, it's really

10:47   8   consideration for the patent transfer.

10:47   9          And even if it weren't neutral, just

10:47  10   given the other transfer of substantial rights to

10:47  11   Corrigent, we still believe Corrigent has statutory

10:47  12   standing and received all substantial rights.

10:47  13          My last point, Your Honor, on statutory

10:47  14   standing is that the reversionary rights are neutral in

10:47  15   this case.

10:47  16          Section 10 --

10:47  17          If you could go to Slide 50, please,

10:47  18   Chris.

10:47  19   ██████████████████████████████████

10:48  20   ████████████████████  ████████████████

10:48  21   ████████████████████████████████████████

10:48  22   ██████████████████████████████████

10:48  23   █████████

10:48  24   ████████████████████████  ████████████

10:48  25   ██████████████████████████  The statutory

10:48   1   standing analysis would be the same.  So this really

10:48   2   isn't a reversionary right.

10:48   3           And if we could go back to Slide 49,

10:48   4   please.

10:48   5   ████████████████████████████████

10:48   6   ████████████████  ████████████████

10:48   7   ████████████████████████████████

10:48   8   ████████████████████████████

10:49   9           And I would point Your Honor again to the

10:49   10  case in Vaupel and McNeil Lab and Prima Tek where the

10:49   11  Federal Circuit's basically explained that these are --

10:49   12  these provisions are common, they're completely

10:49   13  consistent with an assignment of the patent rights.

10:49   14          Essentially it's like -- it's likened to

10:49   15  a mortgage on a home where the bank has a right if

10:49   16  there's some material breach, you know, failure to pay

10:49   17  your mortgage.  But certainly, you own the home in that

10:49   18  sense.

10:49   19          Slide 53, please.

10:49   20          So our position -- our first position is

10:49   21  that Corrigent is the patentee under the statute, has

10:49   22  statutory standing.  We are the only necessary party.

10:49   23  But if Your Honor were to find that Corrigent lacked

10:50   24  all substantial rights, we'd request permission to join

10:50   25  Nahum.

| | | |
|---|---|---|
| 10:50 | 1 | It's been a little unclear to us who |

10:50    1              It's been a little unclear to us who

10:50    2    Cisco believes is another necessary party, but from

10:50    3    today I understand it's Nahum.

10:50    4              Nahum provided discovery in this case.

10:50    5    They provided tens of thousands of --

10:50    6              THE COURT:  I got it.  I don't need to

10:50    7    hear.  I'm good on the discovery.

10:50    8              MR. KAPPERS:  Thank you.

10:50    9              Then unless Your Honor has any questions

10:50   10    for me, I'll conclude for now.  We just ask that Your

10:50   11    Honor deny Cisco's motion.

10:50   12              THE COURT:  Anything else from Cisco?

10:50   13              MS. MOULTON:  So just briefly, Your

10:50   14    Honor, Corrigent is trying to play these provisions off

10:50   15    as typical provisions in an assignment, but that's

10:50   16    inconsistent with the Federal Circuit's case law.

10:51   17    ██████████████████████████████████████████████

10:51   18    ████████████  is completely different than the 50 or

10:51   19    25 percent in cases like Propat, Diamond Coatings and

10:51   20    VirnetX.  █████████████████████████████████████████

10:51   21    is very different than just the right to be kept

10:51   22    informed.  So it's more consistent with Alfred Mann and

10:51   23    Propat where the Federal Circuit found no standing.

10:51   24    And these reversionary rights and their prohibition on

10:51   25    assignment is consistent with Lone Star where the

| | | |
|---|---|---|
| 10:51 | 1 | Federal Circuit found that those were fundamentally |
| 10:51 | 2 | inconsistent with ownership rights.  And so for that |
| 10:51 | 3 | reason Nahum and Mr. Tamir need to be joined as parties |
| 10:51 | 4 | in this lawsuit. |
| 10:51 | 5 | Thank you. |
| 10:51 | 6 | (Off-the-record bench conference.) |
| 10:51 | 7 | THE COURT:  The Court is going to deny |
| 10:52 | 8 | the motion. |
| 10:52 | 9 | Next up, I have a motion for summary |
| 10:52 | 10 | judgment of noninfringement of the '369 patent. |
| 10:52 | 11 | MR. ROSENBERG:  Good morning, Your Honor. |
| 10:52 | 12 | Stuart Rosenberg from Gibson Dunn for Cisco.  I believe |
| 10:52 | 13 | this motion can be denied as moot.  This is one of the |
| 10:52 | 14 | patents Your Honor was dismissing on the pleadings. |
| 10:52 | 15 | THE COURT:  Okay.  And is the same true |
| 10:52 | 16 | with -- oh, no.  We need to take up the motion for |
| 10:52 | 17 | summary judgment of invalidity.  I guess this is |
| 10:52 | 18 | plaintiff's motion.  Plaintiff's motion of no |
| 10:52 | 19 | invalidity of the '400 patent for lack of written |
| 10:52 | 20 | description enablement. |
| 10:52 | 21 | Yes, sir. |
| 10:52 | 22 | MR. NUTTALL:  Thank you, Your Honor. |
| 10:52 | 23 | Good morning.  Jay Nuttall on behalf of Corrigent.  If |
| 10:52 | 24 | we could start on Slide 89, please. |
| 10:52 | 25 | THE COURT:  And we can combine this with |

| 10:52 | 1 | also the -- let's see, I've got -- are there two |
| 10:53 | 2 | separate motions?  I have... |
| 10:53 | 3 | MR. NUTTALL:  Yes, sir. |
| 10:53 | 4 | THE COURT:  I think of the two motions |
| 10:53 | 5 | together, but they both have to do with the '400 patent |
| 10:53 | 6 | and lack of description enablement, right? |
| 10:53 | 7 | MR. NUTTALL:  That's correct, Your Honor. |
| 10:53 | 8 | Cisco also moved for summary judgment of |
| 10:53 | 9 | noninfringement.  I think both of these motions relate |
| 10:53 | 10 | to the same issue that I'll be talking about today.  I |
| 10:53 | 11 | think we can deal with them all here. |
| 10:53 | 12 | THE COURT:  Great. |
| 10:53 | 13 | MR. NUTTALL:  And this really, we |
| 10:53 | 14 | believe, relates to a claim construction issue.  Just |
| 10:53 | 15 | real briefly, Your Honor, the '400 patent relates to |
| 10:53 | 16 | these large distributed networks and when data packets |
| 10:53 | 17 | come in, how does the network learn, you know, where |
| 10:53 | 18 | the destination is where this packet needs to go and |
| 10:53 | 19 | the source address where it came from.  It has novel |
| 10:53 | 20 | aspects about how you reduce data and traffic flow, but |
| 10:53 | 21 | that's not necessarily relevant to this issue. |
| 10:53 | 22 | If we go to the next slide, please. |
| 10:53 | 23 | Now, what is really going on here is |
| 10:54 | 24 | Cisco is making two new claim construction arguments. |
| 10:54 | 25 | One, they're saying there's an order of steps required |

| 10:54 | 1 | for the '400 patent claims, and that the first line |
| 10:54 | 2 | card is limited to only the egress line card.  It's |
| 10:54 | 3 | egress and egress only.  It cannot be the ingress line |
| 10:54 | 4 | card, and we disagree with that and ask the Court to |
| 10:54 | 5 | construe the claims not to require an order of steps |
| 10:54 | 6 | and that the first line card is not limited to an |
| 10:54 | 7 | egress card. |
| 10:54 | 8 | So if we go to the next slide, please. |
| 10:54 | 9 | The Court did construe, and this is |
| 10:54 | 10 | important because it relates to the claims we're going |
| 10:54 | 11 | to be looking at that said FDB in one of the |
| 10:54 | 12 | limitations was the said FDB of said first line card. |
| 10:54 | 13 | So I just wanted to put that up because that will be |
| 10:54 | 14 | popping up here in a minute. |
| 10:54 | 15 | Next slide. |
| 10:54 | 16 | THE COURT:  Okay.  Let me see if I can |
| 10:55 | 17 | kind of summarize this, and I had this recently in a |
| 10:55 | 18 | trial.  So the patent says ingress, right? |
| 10:55 | 19 | MR. NUTTALL:  Yes, sir. |
| 10:55 | 20 | THE COURT:  And plaintiff's argument is |
| 10:55 | 21 | the accused product does ingress. |
| 10:55 | 22 | MR. NUTTALL:  Yes, Your Honor.  Cisco's |
| 10:55 | 23 | product looks at the destination and source address on |
| 10:55 | 24 | ingress, correct. |
| 10:55 | 25 | THE COURT:  Okay.  Cisco says if I -- and |

—86—

10:55  1    correct me if I'm wrong, based on your construction the

10:55  2    term must mean egress.

10:55  3                  MR. NUTTALL:  Correct, Your Honor.

10:55  4                  THE COURT:  Okay.  So if you're right --

10:55  5    if Cisco is right about what they say you say that

10:55  6    ingress means egress, then there's not written

10:55  7    description for egress.

10:55  8                  MR. NUTTALL:  That's correct, Your Honor.

10:55  9    We do not dispute the patent does not disclose

10:55  10   destination checking on egress.

10:55  11                 THE COURT:  And your position is it

10:56  12   doesn't matter because we say it's ingress.  And so I

10:56  13   literally had this a week ago at which time I had the

10:56  14   same thing where the plaintiff said nothing that you

10:56  15   have -- nothing that you accuse us of -- the patent has

10:56  16   nothing that is in our product, but because you're

10:56  17   accusing our product, then there's a lack of written

10:56  18   description because nothing in our product is in your

10:56  19   patent.  And that made absolutely no sense to me.

10:56  20                 The noninfringement position made sense

10:56  21   to me.  The lack of written description did not make

10:56  22   any -- and I'll tell you it doesn't make very much

10:56  23   sense to me here either.

10:56  24                 So let me hear from Cisco on this because

10:56  25   it -- that doesn't make much sense to me either on --

10:56  1   with regard to the lack of written description with

10:56  2   regard to the issue of ingress.

10:56  3              MR. NUTTALL:  Okay.  Can I just look at

10:56  4   one slide and then I'll sit down?

10:57  5              THE COURT:  Sure.

10:57  6              MR. NUTTALL:  Can we go to Slide 115,

10:57  7   please?  115, there we go.

10:57  8              And I think the issue is -- here, Your

10:57  9   Honor, the -- the said first line card is in the claim

10:57  10  multiple times.  And we don't dispute Step 1[e] says

10:57  11  you convey the data packet to at least said first line

10:57  12  card.  So we agree in that element it's -- the first

10:57  13  line card is referring to the egress line card.  That's

10:57  14  where it's being conveyed to.  It's being conveyed to

10:57  15  the egress line card.

10:57  16             The dispute is really does that mean the

10:57  17  first line can only be the egress?  And if you look at

10:57  18  Step 1[f], it's talking about this MAC destination

10:57  19  address checking on the first line card.  That is an

10:57  20  ingress line card function.

10:57  21             THE COURT:  And what should scare you is

10:57  22  I actually know what a MAC destination address means.

10:57  23  So that's...

10:57  24             MR. NUTTALL:  Before this case I didn't,

10:57  25  Your Honor, so you might be ahead of me.

10:57  1          And so that's really the crux of the

10:57  2  dispute.  Cisco says, well, because you convey it to

10:57  3  the first line card, which is the egress, the first

10:58  4  line card can only be the egress line card, and that's

10:58  5  not what the claims say and that would be contrary to

10:58  6  the spec.

10:58  7          And just real quickly we look at 93.

10:58  8          Everyone agrees, Cisco agrees, Cisco's

10:58  9  expert will say up and down the patent discloses

10:58  10  checking the destination address on the ingress line

10:58  11  card.  So that's what the patent discloses, that's what

10:58  12  the claim says, and our view is consistent with that

10:58  13  the -- the first line card can be both the ingress and

10:58  14  the egress, and there's infringement.  They don't

10:58  15  dispute that they do these things.  They only say they

10:58  16  do it on ingress, not egress.

10:58  17          So with that, Your Honor, maybe I'll --

10:58  18  I'll let you ask your questions of Cisco and see if

10:58  19  there's anything remaining for me, Your Honor.

10:58  20          THE COURT:  Okay.

10:58  21          MR. ROSENBERG:  Good morning, Your Honor.

10:58  22  Stuart Rosenberg again.

10:58  23          So to be clear here, the issue is not an

10:59  24  order-of-steps issue, it's not a when does this happen,

10:59  25  does it happen on ingress or egress.  It's a where does

10:59   1    this happen.  Does it happen on the ingress card or the

10:59   2    egress card?  It is also not a question of whether the

10:59   3    card can serve both purposes.  It's a question of

10:59   4    whether there is written description support for what

10:59   5    is shown in Figure 1 of the patent, which is where the

10:59   6    card is not serving both purposes.  He's instead a --

10:59   7    there's one ingress card here shown on the top left

10:59   8    where the line comes in from computer No. 22.  That's

10:59   9    the ingress card.  And in the bottom right or on the

10:59   10   right side and in the figures that the plaintiff has

10:59   11   annotated, and I'll skip right to those, they've chosen

10:59   12   the bottom right to illustrate this, that's the egress

10:59   13   card.

10:59   14          And the problem is under their own

10:59   15   construction there is no written description support --

10:59   16   I'm sorry for all the skipping around here, but I will

11:00   17   get there shortly.  There is no written description

11:00   18   support for what's shown in the actual figure, and if

11:00   19   you look -- this is from their reply brief.

11:00   20          So on the left they have annotated

11:00   21   Figure 1, we think, properly.  They have just colored

11:00   22   in blue one of the lines that's actually in the figure

11:00   23   showing that the packet comes in at the top left, the

11:00   24   ingress card is the line card at the top left.  It goes

11:00   25   out the bottom right.  That is the egress card.

11:00  1          Under their own admission, there is no

11:00  2    written description support in the patent for how this

11:00  3    claim can work in that circumstance, the circumstance

11:00  4    shown in Figure 1, which presumably is within the scope

11:00  5    of the claim.  Instead, their argument is you should

11:00  6    reinterpret Figure 1 by changing where the packet comes

11:00  7    in to something that's not shown in Figure 1 -- on the

11:00  8    right here they've altered it -- to show the packet

11:00  9    going into and coming out of the same line card.  That

11:01  10   isn't in the patent and I think it's a pretty good

11:01  11   indication that the patent lacks written description

11:01  12   support when the plaintiff has to rely on a figure that

11:01  13   isn't actually in the patent to argue written

11:01  14   description.

11:01  15          But even if it were, that would not solve

11:01  16   the problem because of the actual figure.  And if we

11:01  17   just look at the claim language, we'll see that.  So

11:01  18   Figure 1, Claim 1, everyone agrees, and the

11:01  19   specification says this, that you receive the data

11:01  20   packet on an ingress port that's on an ingress card,

11:01  21   then you convey it across the switching port to an

11:01  22   egress card.  In Figure 1, by their own admission, that

11:01  23   is a different card.  That is a card that is not doing

11:01  24   ingress.  It is only doing egress.  And the claim as

11:01  25   construed for their own proposed construction is that

11:01    1    the lookup for the destination address has to happen on

11:01    2    the egress card.  Their argument is that in other

11:01    3    circumstances it could be the case that that could

11:01    4    happen to be the same card you've used for ingress and

11:02    5    therefore there should be deemed to be written

11:02    6    description support.  Frankly that's like arguing, you

11:02    7    know, well, my stopped clock is right twice a day so

11:02    8    it's working.  What about all of the times when the

11:02    9    egress card is not the ingress card, it's a different

11:02    10   card, as shown in the very figure in the patent that's

11:02    11   supposed to illustrate the typical circumstances in

11:02    12   which this invention is supposed to work?

11:02    13          Their expert admits there is no written

11:02    14   description support for the claim in that context.

11:02    15   When the egress card is not the ingress card, as shown

11:02    16   in Figure 1, there is no written description support

11:02    17   for how this claim works.  Absolutely there is a

11:02    18   mismatch between what the specification says, which is

11:02    19   you do this during ingress processing, and what the

11:02    20   claim requires, which is you do it on the egress card.

11:02    21   And the question is who bears the consequences of that?

11:02    22   The people who wrote the patent claim and shows what

11:02    23   they wanted to claim or a defendant in the litigation

11:02    24   years later?

11:02    25          We made the argument that this limitation

11:03  1    should be held indefinite because it really isn't clear

11:03  2    what they intended to refer to when they said, said

11:03  3    FDB, which database are you checking in?  The

11:03  4    specification says do it on the ingress side, but the

11:03  5    claim language would appear to be directed to something

11:03  6    else.  And Corrigent's resolution, their proposal to

11:03  7    Your Honor, was construe it to mean the first line

11:03  8    card, which is the egress line card, and Your Honor

11:03  9    adopted that resolution.  We think the logical

11:03  10   consequence of that is that the claim lacks written

11:03  11   description support.

11:03  12            THE COURT:  Why don't you leave that up

11:03  13   and I'll hear a response to it.

11:03  14            MR. NUTTALL:  Yes.  Thank you, Your

11:03  15   Honor.

11:03  16            So what this is talking about is Cisco's

11:03  17   argument that there's no written description for doing

11:03  18   a destination check on the egress line card, and we

11:03  19   agree with that.  That is not our infringement theory.

11:03  20   That is not what we say the patent claims require, and

11:03  21   we certainly do not admit that there's not written

11:04  22   description for the first line card being both the

11:04  23   ingress and the egress.

11:04  24            So Cisco sets this is up as our argument.

11:04  25   This is not our position.  This is Cisco's position

| 11:04 | 1 | that the first line card is limited to the egress line |

that the first line card is limited to the egress line

card and destination check --

        THE COURT:  So let me ask you this, and

I'm trying to think about how this would play out at

trial:  Cisco's noninfringement opinion relies on this,

right?

        MR. NUTTALL:  Yes, Your Honor.

        THE COURT:  And so is it the situation

where if the jury found noninfringement because of

this, would that then open up their argument of written

description?  Does that question make sense?

        Because I get your position.  I'm with

you that they're arguing there's no written

description -- your argument is they're arguing for no

written description for an argument that you are not

making.  I'm with you.  But if the jury were to go with

their argument and find no infringement, does that put

us in a weird position of then in a very unusual way of

having to ask the jury whether or not -- and to me does

that put a burden on them -- I'm not going to grant the

motion today, but I'm trying to figure out what to do

at trial.

        Does that put a burden on them of having

to argue to the jury in the event you find this, then

does it survive -- does it survive -- is it your motion

| | |
|---|---|
| 11:05 | 1 | for summary judgment that there is no -- does -- the |
| 11:05 | 2 | situation before I grant the motion for summary |
| 11:05 | 3 | judgment, because I get your argument, and I think with |
| 11:06 | 4 | respect to your position of what it means there is no |
| 11:06 | 5 | problem with written description. |

11:06   6            Here's the harder question now.  If --

11:06   7  could they argue to the jury --

11:06   8            Well, let me start over.

11:06   9            Let me ask Cisco.

11:06  10            Does Cisco have only an affirmative

11:06  11  defense of invalidity or did Cisco make a counterclaim

11:06  12  of invalidity?

11:06  13            MR. ROSENBERG:  I believe we do have a

11:06  14  counterclaim, Your Honor.

11:06  15            THE COURT:  Okay.  So the way I've dealt

11:06  16  with that in the past, then, is at the jury verdict

11:06  17  form stage, if there's a counterclaim, then even if the

11:06  18  jury were to find noninfringement, they still answer

11:06  19  the questions of invalidity because Cisco has raised

11:06  20  that issue.

11:06  21            So if the plaintiff is -- the defendant

11:06  22  wants to make this argument that they don't infringe

11:07  23  because of this issue, do they -- should they still get

11:07  24  a question on invalidity at trial based on their

11:07  25  position of what this claim term makes?

| 11:07 | 1 | MR. NUTTALL:  I think the answer is |

```
11:07    1              MR. NUTTALL:  I think the answer is
11:07    2    their -- their argument is the same, so I think yes.
11:07    3    Their claim construction is the claim requires doing
11:07    4    destination address checking on egress.  That's their
11:07    5    noninfringement position.  That's also their written
11:07    6    description position.
11:07    7              So I think the answer is yes, Your Honor.
11:07    8    And of course we disagree with that claim construction
11:07    9    and both of those positions.
11:07   10              THE COURT:  Then the next question is, do
11:07   11    I need to have a mini Markman, which y'all have not
11:07   12    asked for but I'm going to go ahead and ask, do I need
11:07   13    to have a mini Markman about whether or not -- your
11:07   14    argument is ingress means ingress.  I get their
11:08   15    argument based on the way everything's charted.  There
11:08   16    has to be egress.
11:08   17              So I get both sides' argument.  Does
11:08   18    either side -- are you -- are both sides happy with
11:08   19    moving forward on where you're at with regard to what
11:08   20    your client -- your expert's saying on it infringes
11:08   21    because it means this, Cisco's argument is it doesn't
11:08   22    infringe because it means this?  Do I need to take
11:08   23    another step, or are you all happy to go to trial and
11:08   24    have your expert say what they say and you, on behalf
11:08   25    of plaintiffs, say, we're right, our expert's right,
```

| | | |
|---|---|---|
| 11:08 | 1 | there's infringement.  Their -- they say, you're wrong, |
| 11:08 | 2 | there's no infringement based on this term? |
| 11:08 | 3 | What do you suggest I have to do? |
| 11:08 | 4 | MR. NUTTALL:  We do think it's a claim |
| 11:08 | 5 | construction issue, Your Honor, that we would like to |
| 11:08 | 6 | have resolved.  And Cisco's argument that the claim is |
| 11:08 | 7 | limited to MAC destination checking on egress only or |
| 11:09 | 8 | their argument that the first line card is egress only, |
| 11:09 | 9 | we disagree with.  We don't think -- we think that's |
| 11:09 | 10 | contrary to the spec.  We think that's a claim |
| 11:09 | 11 | construction issue that we would like to have resolved. |
| 11:09 | 12 | THE COURT:  Okay.  So -- and the trial's |
| 11:09 | 13 | not next week; it's the following week? |
| 11:09 | 14 | MR. NUTTALL:  Yes, Your Honor.  July 8th. |
| 11:09 | 15 | THE COURT:  Okay.  What is Cisco's -- |
| 11:09 | 16 | before I do anything, what is Cisco's position with |
| 11:09 | 17 | regard to this? |
| 11:09 | 18 | MR. ROSENBERG:  So respectfully, Your |
| 11:09 | 19 | Honor, I'm not sure what construction the plaintiffs |
| 11:09 | 20 | would require and what would be supported that's |
| 11:09 | 21 | different than either indefiniteness or what Your Honor |
| 11:09 | 22 | has -- |
| 11:09 | 23 | THE COURT:  And I'm not either.  But I'm |
| 11:09 | 24 | just -- I'm trying to -- I just -- I've found it's |
| 11:09 | 25 | better for us to think about these things when we're |

| | | |
|---|---|---|
| 11:09 | 1 | not two days in trial and you're about to put your |
| 11:09 | 2 | witness -- like happened two weeks ago, where I have to |
| 11:09 | 3 | decide whether or not the defendant can put on their |
| 11:09 | 4 | expert to say what was in their expert report because |
| 11:09 | 5 | no one had raised it before we were in trial. |
| 11:09 | 6 | So you all have been good enough to raise |
| 11:09 | 7 | this issue now.  If -- let's do this, because we're -- |
| 11:10 | 8 | we've gone long and I have a trial this afternoon. |
| 11:10 | 9 | By -- what's today?  Monday?  By the end |
| 11:10 | 10 | of the day Thursday, I want something no longer than |
| 11:10 | 11 | five pages from the plaintiff.  Actually, I'm going to |
| 11:10 | 12 | make it Wednesday by 5:00, of why you believe -- what |
| 11:10 | 13 | it is you think I might need to construe. |
| 11:10 | 14 | Cisco can respond.  And then I will have |
| 11:10 | 15 | a hearing at some time either by the end of this week |
| 11:10 | 16 | or sometime next week. |
| 11:10 | 17 | (Off-the-record bench conference.) |
| 11:10 | 18 | THE COURT:  Maybe July 3rd.  And we'll do |
| 11:10 | 19 | it by Zoom.  But I will let you know in advance.  That |
| 11:10 | 20 | way, you're preparing your experts, knowing what I'm |
| 11:10 | 21 | going to do with regard to this issue. |
| 11:10 | 22 | So for purposes of -- |
| 11:11 | 23 | It'll be on July 3rd by Zoom.  I'm not |
| 11:11 | 24 | sure what time.  But for purposes of what we're doing |
| 11:11 | 25 | today, let me make sure I get my ruling correct on the |

11:11   1    record.

11:11   2                    So I am denying plaintiff's motion on --

11:11   3    with respect to no written description and enablement

11:11   4    on both issues.

11:11   5                    So that's for the record.  But I will

11:11   6    take this issue up on July 3rd of what we do, if

11:11   7    anything, about what the plaintiff's -- what both

11:11   8    parties' experts can say.

11:11   9                    MR. ROSENBERG:  Thank you, Your Honor.

11:11   10                   Should I very briefly address the

11:11   11   noninfringement part of this, or do you feel like that

11:11   12   should wait until you've determined the claim

11:11   13   construction issue as well?

11:11   14                   THE COURT:  If I understand this

11:11   15   currently, you've already won.  So I'm not sure why you

11:11   16   would want to address it.  So --

11:11   17                   MR. ROSENBERG:  Thank you, Your Honor.

11:11   18                   THE COURT:  So -- because I'm -- what I'm

11:12   19   holding is -- I'm denying the --

11:12   20                   MR. ROSENBERG:  So I'm sorry.  We had a

11:12   21   cross-motion --

11:12   22                   THE COURT:  Oh, you have a cross-motion.

11:12   23                   MR. ROSENBERG:  -- of invalidity and

11:12   24   noninfringement.

11:12   25                   THE COURT:  And so I'm going to deny all

11:12  1    of this until I have a chance to hear from you all and

11:12  2    take it up on the 3rd.

11:12  3                    MR. ROSENBERG:  Okay.

11:12  4                    THE COURT:  I'm denying it without

11:12  5    prejudice because once I make a ruling, there may be a

11:12  6    problem with infringement or -- I get your position is,

11:12  7    we win on one or the other.  Either there's no

11:12  8    infringement, or if there is infringement, then we

11:12  9    ought to win because they don't have written

11:12  10   description.

11:12  11                   So I'm good on what you all want to

11:12  12   argue, but let's get through a decision on -- if we

11:12  13   need to have one, on what the claim term means.

11:12  14                   Yes, sir?

11:12  15                   MR. NUTTALL:  Thank you, Your Honor.  No.

11:12  16   I think you clarified.

11:12  17                   I just -- when is defendant's response to

11:12  18   our filing --

11:12  19                   THE COURT:  If I didn't say it, by the

11:12  20   end of the day Friday.

11:12  21                   MR. NUTTALL:  Thank you, Your Honor.

11:12  22                   THE COURT:  And thank you for asking.  I

11:12  23   sometimes fade out there on important things.

11:13  24                   So let me -- I'm getting furious texts

11:13  25   from my clerks who -- so, yeah, we'll do it on

11:13   1    July 3rd.

11:13   2                   We're going to take a very quick break,

11:13   3    just a quick nature break, and then we'll come back.

11:13   4    And let me see -- just give me one second to see

11:13   5    what -- how much we have left.

11:13   6                   Okay.  Yeah.  We definitely should take a

11:13   7    break, and then we'll come back.

11:13   8                   THE BAILIFF:  All rise.

11:13   9                   (Recess taken.)

11:27   10                  THE BAILIFF:  All rise.

11:27   11                  THE COURT:  Thank you.  You may be

        12    seated.

11:27   13                  Just for planning purposes, I will do the

11:27   14    best I can to get through what we have left.  But in

11:27   15    about 45 minutes or so, we're going to go to lunch

11:27   16    because I'm starting a trial at 1:30.  And whatever we

11:27   17    don't finish today, we will finish on July 3rd.  And

11:27   18    we're going to have the hearing on July 3rd at 9:30 by

11:27   19    Zoom.

11:27   20                  So next up, I have -- I believe is the

11:27   21    Daubert motion with respect to Dr. -- is it Robert --

11:28   22    is it Akl? -- and Mr. Bratic.  Dr. Akl is -- needs a

11:28   23    vowel.

11:28   24                  (Brief off-the-record discussion.)

11:28   25                  THE COURT:  Yes, ma'am?

11:29  1                    MS. MOULTON:  I'm just waiting for the

2     slides.

3                    THE COURT:  Oh, okay.

11:29  4                    MS. MOULTON:  I can start, actually.

11:29  5                    Thank you.

11:29  6                    Okay.  So I'm going to go over how

11:29  7     Mr. Bratic calculated damages, and then three problems

11:29  8     with his damages.

11:29  9                    So we start, Dr. Akl is the technical

11:29  10    expert, and he goes through and counts up everything he

11:29  11    says belongs in the damages base.

11:29  12                    Then Mr. Bratic applies Cisco's gross

11:29  13    margins to those revenues, and we get profits from what

11:29  14    Corrigent contends is the infringing sales.

11:29  15                    Then we have an apportionment analysis.

11:29  16    There's two steps.  The first step is a

11:29  17    feature-counting step where they have a Cisco marketing

11:29  18    document describing the features of Cisco's software,

11:29  19    and they count up how many features they say are

11:29  20    infringing over the total number of features.

11:29  21                    And then he moves from that step to a

11:30  22    further reduction, which we'll get into.  He says it's

11:30  23    based on mathematics, but he does not disclose any of

11:30  24    that math in his expert report, and he didn't disclose

11:30  25    any of it at his deposition.

11:30  1              Then Mr. Bratic, the damages expert,

11:30  2   applies a benefits split, and we get the total number

11:30  3   of damages.  So we've got a base, essentially a times

11:30  4   and apportionment rate, and then the damages.

11:30  5              So starting with the revenue base.  In

11:30  6   the revenue base, we have conventional hardware, the

11:30  7   operating system software, and then the DNA software.

11:30  8   Over the weekend, Corrigent told us they're no longer

11:30  9   going to try and include the DNA software in their

11:30  10  revenue base.  So they've agreed -- I think it's

11:30  11  Cisco's MIL No. 3.  They've agreed that that's moot.

11:30  12  They're taking that out.  They're updating the damages

11:30  13  base to take out the DNA software.  But we just need to

11:30  14  understand what's in the revenue base to understand the

11:31  15  apportionment problem.

11:31  16              So in the revenue base, there are

11:31  17  hardware product identification numbers and then

11:31  18  software product identification numbers, and they've

11:31  19  included both of those in their revenue base.

11:31  20              So these -- these aren't relevant anymore

11:31  21  now that they've agreed DNA software does not belong in

11:31  22  the revenue base.  But when we get to the first

11:31  23  apportionment step, which is this feature-counting

11:31  24  step, we've got the accused products which have

11:31  25  hardware features and software features.  And they've

| | | |
|---|---|---|
| 11:31 | 1 | put both hardware and software revenue in the base. |
| 11:31 | 2 | But then when they go through the infringement |
| 11:31 | 3 | analysis, they agree that all they're accusing is the |
| 11:31 | 4 | software.  So all the infringing functionality is in |
| 11:31 | 5 | software, not in hardware. |
| 11:31 | 6 | And when they go through this |
| 11:31 | 7 | feature-counting analysis, they are only looking at |
| 11:31 | 8 | software features.  This document that they're relying |
| 11:31 | 9 | on is a list of features that are found in the Cisco |
| 11:32 | 10 | operating system software and the Cisco DNA software, |
| 11:32 | 11 | and they're using that to try and figure out how many |
| 11:32 | 12 | features are infringing versus the total number of |
| 11:32 | 13 | features.  They do not include any hardware features in |
| 11:32 | 14 | the feature counting. |
| 11:32 | 15 | So the problem that we run into is that |
| 11:32 | 16 | we're looking at hardware and software revenue but then |
| 11:32 | 17 | only apportioning based on the software features.  So |
| 11:32 | 18 | what we end up with is this -- |
| 11:32 | 19 | THE COURT:  Can you go back one slide? |
| 11:32 | 20 | MS. MOULTON:  Yes. |
| 11:32 | 21 | THE COURT:  If you'll give me just one |
| 11:32 | 22 | second. |
| 11:32 | 23 | MS. MOULTON:  Yes. |
| 11:32 | 24 | THE COURT:  Okay. |
| 11:32 | 25 | MS. MOULTON:  Okay.  So they -- |

| 11:33 | 1 | THE COURT:  And I'm sorry I keep |
|---|---|---|

11:33   1    THE COURT:  And I'm sorry I keep

11:33   2    interrupting.  But when the plaintiff gets up, they

11:33   3    should -- this is, whatever, I don't know what slide

11:33   4    this is of your presentation, but I look forward to

11:33   5    hearing the plaintiffs respond to this point.

11:33   6    MS. MOULTON:  Yes.  They need to explain

11:33   7    how --

11:33   8    THE COURT:  I got it.

11:33   9    MS. MOULTON:  Okay.

11:33   10    THE COURT:  I have a passing experience

11:33   11    with damages.

11:33   12    MS. MOULTON:  Okay.  Thank you, Your

11:33   13    Honor.

11:33   14    Okay.  So the problem that we're getting

11:33   15    is we have this combined base times a software only

11:33   16    rate and that leads to a mismatch demand.  This is the

11:33   17    analogy that I came up with trying to explain why this

11:33   18    is a problem.  If you go out to dinner and your goal

11:33   19    for dinner is $100, you tip 25 percent, you leave the

11:33   20    waitress $125.

11:33   21    If you go out to dinner and you spend

11:33   22    $100 and then you get a $100 gift certificate, you

11:33   23    don't tip 25 percent on the gift certificate, so you

11:34   24    need to make sure that your base and your rate are

11:34   25    looking at the same things.  That they're looking at

11:34  1    the same categories of evidence.

11:34  2               So what Dr. Akl needed to do is either

11:34  3    limit the base to software and then apply the software

11:34  4    royalty rate, or he needed to have a combined software

11:34  5    and hardware royalty rate where he considered the value

11:34  6    of the hardware features.  And only if he did that

11:34  7    could he actually use the combined hardware and

11:34  8    software revenue base.

11:34  9               So that's the problem with his first

11:34  10   apportionment step is this mismatch between the rate

11:34  11   and the base.  And that's the -- one of the reasons

11:34  12   that his -- Mr. Bratic's opinions were excluded in the

11:34  13   Intelligent Verification System.  He essentially failed

11:34  14   to apportion out the value of the hardware features and

11:34  15   instead only did a software-based apportionment, and

11:34  16   the Court in the Eastern District of Virginia found

11:35  17   that that was error.

11:35  18               So now we'll look -- so that's the first

11:35  19   step.  Did you want me to stop there or go to the

11:35  20   second step?

11:35  21               THE COURT:  Why don't I hear a response

11:35  22   and then I'll hear the -- please, let them go.

11:35  23               MS. MOULTON:  Okay.

11:35  24               MR. NUTTALL:  Your Honor, I don't have

11:35  25   their slides, but I think I understand the issue is

| 11:35 | 1 | they're saying Dr. -- and I believe it's "Akl" so I |
|---|---|---|
| 11:35 | 2 | don't know if that solves the pronunciation issue or |
| 11:35 | 3 | not.  But he looked at the features that were provided |
| 11:36 | 4 | in Cisco's documentation which lists the relevant |
| 11:36 | 5 | features.  And Cisco says these features are only |
| 11:36 | 6 | software related, but if you look at, for example, the |
| 11:36 | 7 | very first feature, essential switch capabilities.  The |
| 11:36 | 8 | switch is the hardware.  The general idea is it has |
| 11:36 | 9 | capabilities that the software is going to implicate. |
| 11:36 | 10 | And what Dr. Akl did is he said I looked at the |
| 11:36 | 11 | specific product IDs for either software or |
| 11:36 | 12 | software-enabled hardware that specifically relates to |
| 11:36 | 13 | the asserted claims. |
| 11:36 | 14 | And so something like an official -- |
| 11:36 | 15 | essential switch capability was implicated by the |
| 11:36 | 16 | claims and included in its feature counting.  And so he |
| 11:36 | 17 | did specifically look at this issue about which |
| 11:36 | 18 | features are relevant to the asserted claims and |
| 11:36 | 19 | whether it was software. |
| 11:36 | 20 | THE COURT:  Do you -- I'm sorry.  Do you |
| 11:36 | 21 | have any other hardware citations? |
| 11:36 | 22 | MR. NUTTALL:  Any other hardware -- |
| 11:36 | 23 | THE COURT:  And your argument here is -- |
| 11:36 | 24 | if I understand your argument, is -- from the slide is |
| 11:37 | 25 | that Dr. Akl -- "Akl," "Akl," "Akl"? |

11:37   1          MR. NUTTALL: "Akl."

11:37   2          THE COURT: Dr. Akl did -- that Cisco's

11:37   3   wrong when they're saying that it's mismatched because

11:37   4   they did include hardware. Do you have any other

11:37   5   examples besides what you have on this slide with the

11:37   6   Catalyst 9000 and Catalyst 8000 EDGE Series features?

11:37   7          MR. NUTTALL: This is one example for one

11:37   8   of the patents. It's detailed in his report, Your

11:37   9   Honor.

11:37   10          THE COURT: Okay. I just -- I'm -- so

11:37   11   which patent is this for?

11:37   12          MR. NUTTALL: This I believe relates --

11:37   13   well, this -- it relates to one accused product, the --

11:37   14   or the Catalyst 9000 and 8000, and it has -- this has

11:37   15   three patents listed here.

11:37   16          THE COURT: Okay. And what -- give me

11:37   17   one second.

11:37   18          Okay. And what other products are you

11:37   19   accusing and do you have any slides or any argument

11:37   20   you're going to make with regard to where in Dr. Akl's

11:38   21   report he identifies hardware?

11:38   22          MR. NUTTALL: He certainly in his report

11:38   23   goes through and details why he looked at certain what

11:38   24   he calls software-enabled hardware and why he

11:38   25   applied --

11:38  1          THE COURT:  For which products?

11:38  2          MR. NUTTALL:  For all the products, Your

11:38  3  Honor.

11:38  4          THE COURT:  How -- I don't know your case

11:38  5  obviously.  I have Catalyst 9000 and Catalyst 8000 EDGE

11:38  6  Series.  How many other products are there?

11:38  7          MR. NUTTALL:  Yes, Your Honor.  If we

11:38  8  could go to Slide 138.

11:38  9          This shows the different accused products

11:38  10  by patent, Your Honor, so there are several.

11:38  11          THE COURT:  And your argument is

11:38  12  that with regard to all these products, Dr. Akl showed

11:38  13  an equivalent to what I just saw for the Catalyst 9000

11:38  14  and 8000, he showed -- articulated hardware features

11:38  15  that would support the methodology that Mr. Bratic

11:39  16  used?

11:39  17          MR. NUTTALL:  Yes, Your Honor.

11:39  18          THE COURT:  Okay.  And so let's go back

11:39  19  to the slide that I have with Catalyst 9000 and 8000,

11:39  20  and would it be fair to say that the other hardware

11:39  21  Dr. Akl cited for the other products that are not these

11:39  22  two is essentially the equivalent type of hardware as

11:39  23  this?

11:39  24          MR. NUTTALL:  Similar in that he would go

11:39  25  through and identify hardware that he said is software

11:39  1    enabled and went through that list and identified that

11:39  2    specifically.

11:39  3              THE COURT:  Okay.  Okay.  If you'll sit

11:39  4    down and let me hear a response to why -- I'm going to

11:39  5    use this as the proxy for all the products, and I'll

11:39  6    hear from Cisco as to why this is insufficient with

11:39  7    respect to their argument.  And then you can get back

11:39  8    up.  Thank you, sir.

11:39  9              MR. NUTTALL:  Thank you, Your Honor.

11:40  10             THE COURT:  Yes, ma'am.

11:40  11             MS. MOULTON:  So all of these features

11:40  12   that he has listed in his expert report we're going to

11:40  13   pull up the source document for those.  Those come

11:40  14   entirely from a document called Cisco Catalyst and

11:40  15   Cisco DNA Software Subscription Matrix for Switching.

11:40  16             THE COURT:  Okay.

11:40  17             MS. MOULTON:  So all of these features

11:40  18   are described in the underlying Cisco source document

11:40  19   as software features, and Dr. Akl has never given an

11:40  20   opinion that that document accounts for hardware

11:40  21   features.  That is not in his expert report.

11:40  22             THE COURT:  Okay.  So let me turn to --

11:40  23   then to plaintiff and ask where in -- and I'll just

11:40  24   use, again, this one as a proxy, show me where in his

11:40  25   report he identifies what Cisco argues are only

11:40  1    software features where the -- Dr. Akl states as

11:40  2    support for Mr. Bratic that they were actually

11:40  3    hardware, or if you have something from Dr. -- from

11:40  4    Mr. Bratic where he says in his report the support for

11:41  5    my position that this was hardware for Catalyst 9000

11:41  6    and Catalyst 8000, I'll take support from either

11:41  7    report.

11:41  8              MR. NUTTALL:  Okay.  Yes, Your Honor.

11:41  9    And in our opposition to this motion on Page 9, and

11:41  10   I'll give you the citations to the report, Dr. Akl

11:41  11   looks at not only the software matrix that we're

11:41  12   looking at here, but also Cisco's other documents like

11:41  13   their configuration guides, which also talks about

11:41  14   hardware, and in his report Paragraph 721 to 724, 765

11:41  15   to --

11:41  16             THE COURT:  Slow down.  Slow down.

11:41  17             MR. NUTTALL:  I'm sorry.

       18             THE COURT:  That's okay.

11:41  19             MR. NUTTALL:  Paragraph 765 to 767.

11:41  20   Those are examples of where he went through different

11:41  21   Cisco documents.

11:41  22             THE COURT:  Do you have access to show me

11:41  23   those parts of the report?

11:41  24             MR. NUTTALL:  I think we can pull that

11:41  25   up, Your Honor.

—111—

| | | |
|---|---|---|
| 11:41 | 1 | THE COURT: You guys always amaze me that |
| 11:41 | 2 | you can do this. |
| 11:41 | 3 | MR. NUTTALL: Well, I have to look for |
| 11:41 | 4 | help here. |
| 11:42 | 5 | (Conference between counsel.) |
| 11:42 | 6 | MR. NUTTALL: Your Honor, may I continue |
| 11:42 | 7 | for just a second while he's -- |
| 11:42 | 8 | THE COURT: Oh, yeah, of course. |
| 11:42 | 9 | MR. NUTTALL: Also in Dr. Akl's reply |
| 11:42 | 10 | report he addresses this criticism from Cisco as well |
| 11:42 | 11 | and specifically talks about the hardware cannot |
| 11:42 | 12 | operate without the software in the components that he |
| 11:42 | 13 | looked at, and he details that in Paragraph 367 and 368 |
| 11:42 | 14 | of his reply report as well. |
| 11:43 | 15 | THE COURT: Okay. It would help me a lot |
| 11:43 | 16 | if you can show me those portions of the report. |
| 11:43 | 17 | MR. NUTTALL: Let's start with, I think, |
| 11:43 | 18 | 722. I wish I knew all 700-some paragraphs off the top |
| 11:43 | 19 | of my head. |
| 11:43 | 20 | THE COURT: You just have to show me -- |
| 11:43 | 21 | no. You just have to show me it's in some of them. I |
| 11:43 | 22 | mean, Cisco's position is it's not in there, and if I |
| 11:43 | 23 | can see it... |
| 11:44 | 24 | MR. NUTTALL: I believe in Paragraph 719, |
| 11:44 | 25 | Your Honor, he's talking about -- |

| | |
|---|---|
| 11:44 | 1 |

THE COURT:  I just need to see it.  Let
me read it and then you can say what you care to.

So -- and I'm -- not to take Cisco's role
in arguing this, but if -- but trying to figure this
out.  Where -- so what I read Dr. Akl saying is Mr. --
in 719, Paragraph 719, Mr. Bratic provided me a list of
unique PIDs, which I then reviewed.  The PIDs
highlighted in Exhibit 4 include the PIDs that
correspond to accused hardware and software components
that are either themselves software PIDs or are
software-enabled hardware PIDs.

But where does Dr. Akl use his expertise
to identify these as having accused hardware and
software components that are themselves software or
software-enabled hardware PIDs?  Where does Dr. Akl
confirm that what Mr. Bratic said was correct?

MR. NUTTALL:  If you're asking, Your
Honor, did Dr. Akl do the analysis of the product IDs,
I don't think that is disputed where he went through
and determined which ones were software --

THE COURT:  But what I'm -- I'm sorry.
What I'm looking for is Cisco's arguing -- and I -- you
know, she just did argue that you have literally on the
screen in front of me, if I understand correctly, is
all actually software, and what I am looking for is

11:46  1   where Dr. Akl says, no.  It's software -- it may be

11:46  2   software, but it's software-enabled hardware.

11:46  3            I mean, I -- tell me if -- tell me what

11:46  4   Dr. Akl would say when he's supporting what Mr. Bratic

11:46  5   is going to say that they couldn't object to and say

11:47  6   that's not in his expert report and I would find it.

11:47  7            MR. NUTTALL:  Yes, Your Honor.  Dr. Akl

11:47  8   would say I've looked at the features both in this

11:47  9   document that we're looking at, the matrix, as well as

11:47  10  configuration guide and other documents and I went

11:47  11  through the product IDs to determine specifically which

11:47  12  features relate to the accused features, and then I

11:47  13  determined how to count those features and which

11:47  14  features relate to the accused product.

11:47  15            And then Mr. Bratic --

11:47  16            THE COURT:  No, no.  Show me in the

11:47  17  report -- this is what I need to know.

11:47  18            Dr. Akl is going to be on the witness

11:47  19  stand and you're going to say -- in advance of what

11:47  20  Mr. Bratic is going to say because Bratic's going to

11:47  21  say, I relied on Akl, because he's going to any time

11:47  22  he's crossed say, oh, I'm not the technical guy.  I

11:47  23  don't know anything about technical.  I'm the damages

11:47  24  guy.

11:48  25            So where in Akl's report would it support

| | | |
|---|---|---|
| 11:48 | 1 | the question of what hardware did you consider in the |
| 11:48 | 2 | Cisco products? |
| 11:48 | 3 | MR. NUTTALL:  I believe it's in those |
| 11:48 | 4 | paragraphs I just mentioned, Your Honor.  Both in the |
| 11:48 | 5 | opening report, 721 through 724, 765 to 767, and in the |
| 11:48 | 6 | reply -- |
| 11:48 | 7 | THE COURT:  Okay.  Well, it's worth our |
| 11:48 | 8 | time for you to go through and show me them now and |
| 11:48 | 9 | I'll look at them.  Because if I have questions, I can |
| 11:48 | 10 | ask Cisco to -- it's a lot easier to do it now than |
| 11:48 | 11 | when Mr. -- I'm sorry -- when Dr. Akl is on the witness |
| 11:48 | 12 | stand. |
| 11:48 | 13 | MR. NUTTALL:  Can I look at the report, |
| 11:48 | 14 | Your Honor? |
| 11:48 | 15 | THE COURT:  You can do whatever you want |
| 11:48 | 16 | to -- I mean, I would -- we have to get this right. |
| 11:48 | 17 | We'll take as much time as we need to. |
| 11:48 | 18 | (Pause in proceedings.) |
| 11:51 | 19 | MR. NUTTALL:  Your Honor, I apologize |
| 11:51 | 20 | that we didn't have this more detailed, but this is the |
| 11:51 | 21 | reply report, Paragraph 367. |
| 11:51 | 22 | THE COURT:  Okay. |
| 11:51 | 23 | MR. NUTTALL:  I'm sorry.  I can't read it |
| 11:51 | 24 | from the podium.  But he is -- |
| 11:51 | 25 | THE COURT:  Just give me a chance and let |

11:51   1   me read through it.

11:51   2                   Okay.  Paragraph 367:  In addition,

11:52   3   Dr. Jeffay -- J-e-f-f-a-y -- opines the 25 percent is

11:52   4   consistent with his understanding that hardware is the

11:52   5   biggest cost driver for switch and router sales.

11:52   6                   That doesn't identify anything about what

11:52   7   of Cisco's is hardware.

11:52   8                   Dr. Wicker similarly opines that it's

11:52   9   consistent with his understanding of the primary value

11:52   10  driver being the hardware.

11:52   11                  That doesn't identify what the hardware

11:52   12  is.

11:52   13                  So again, what -- in Dr. Akl's report,

11:52   14  where does he identify the hardware that Mr. Bratic is

11:53   15  going to use in his damages testimony?

11:53   16                  MR. NUTTALL:  He provides specifically

11:53   17  the list of product IDs that he identified that's

11:53   18  attached as an exhibit, that he identified the hardware

11:53   19  that's software enabled, and he details that throughout

11:53   20  his report.

11:53   21                  If it would be helpful, Your Honor, we'd

11:53   22  be happy to take this up on July 3rd and give you

11:53   23  specific cites with specific quotes of where he details

11:53   24  the hardware.

11:53   25                  I believe it's also in Paragraph 368 he

11:53  1    talks about the relationship between hardware and

11:53  2    software that's confirmed in the data sheets and goes

11:53  3    through how the accused product's hardware is set forth

11:53  4    in specific documents.

11:53  5                THE COURT:  Okay.  Here's what we're

11:53  6    going to do.  I know this is all -- I'm -- at this

11:53  7    point, we can't get this done today.  And I'm about to

11:53  8    move to other issues with Mr. Bratic himself.  But in

11:53  9    your -- by Wednesday at 5:00, you're going to send to

11:54  10   the defendants whatever citations you have so they can

11:54  11   be prepared, and send -- copy us, so we can be

11:54  12   looking -- excuse me -- at it as well.

11:54  13               Now, I think there are issues with --

11:54  14   give me one second.

11:54  15               So I believe Cisco's also raised issues

11:54  16   of Mr. Bratic's analysis including nonaccused software;

11:54  17   is that right?

11:54  18               MR. NUTTALL:  I believe that's been

11:54  19   resolved, Your Honor, but Cisco can object.  I thought

11:55  20   that related to the DNA software issue.

11:55  21               MS. MOULTON:  That's right.  Corrigent

11:55  22   has agreed that they will no longer include the DNA

11:55  23   software in the revenue base.

11:55  24               THE COURT:  Okay.

11:55  25               MS. MOULTON:  But we do have the

| 11:55 | 1 | black-box apportionment issue. |
| 11:55 | 2 | THE COURT:  Okay.  Let's do that as well. |
| 11:55 | 3 | MS. MOULTON:  And if we can pull up our |
| 11:55 | 4 | slides, Slide 18. |
| 11:55 | 5 | Okay.  So we're looking at his second |
| 11:55 | 6 | apportionment. |
| 11:55 | 7 | So first he does this feature-counting |
| 11:56 | 8 | step, and for this example he gets to 8.3 percent for |
| 11:56 | 9 | the '369 patent.  And then he says, I need to do |
| 11:56 | 10 | another apportionment step to account for the fact that |
| 11:56 | 11 | there are some aspects that are beyond the features |
| 11:56 | 12 | accused of infringement, and he goes from 8.3 to -- |
| 11:56 | 13 | THE COURT:  This is in his effort to be |
| 11:56 | 14 | an conservative as possible. |
| 11:56 | 15 | MS. MOULTON:  It's not actually just |
| 11:56 | 16 | that, Your Honor. |
| 11:56 | 17 | THE COURT:  I'm kidding. |
|  | 18 | MS. MOULTON:  He agrees that it's -- |
| 11:56 | 19 | THE COURT:  I'm just saying, in every |
| 11:56 | 20 | trial, that's what they say right before. |
| 11:56 | 21 | What else -- to be as conservative as |
| 11:56 | 22 | possible, what else did he do, and that's what they're |
| 11:56 | 23 | going to say right before he gets to this step, I |
| 11:56 | 24 | anticipate. |
| 11:56 | 25 | MS. MOULTON:  I just want to emphasize |

11:56  1    two things about that.  He thinks that this is a

11:56  2    necessary second step to get to the value of the

11:56  3    patents, and he doesn't just rely on his -- you know,

11:56  4    he doesn't say, I'm just relying on my expertise and

11:56  5    every document I reviewed and my general feelings about

11:56  6    this.

11:56  7              He told us in his deposition that he was

11:56  8    doing a mathematical calculation to get from 8.3 to 3,

11:56  9    but he does not disclose that in his report, and he did

11:57  10   not disclose it at his deposition.

11:57  11             THE COURT:  Got it.

11:57  12             MS. MOULTON:  So that's what

11:57  13   distinguishes this case from just the expert saying,

11:57  14   I'm being conservative, and this is my final number.

11:57  15             THE COURT:  He doesn't even say, It's

11:57  16   just because I've done this a long time, I'm really

11:57  17   smart, and -- I mean, I've gotten -- I don't know that

11:57  18   that's any better, but I have heard that before, which

11:57  19   is, I'm an expert and I just think that's the right

11:57  20   number.

11:57  21             MS. MOULTON:  That's right.

11:57  22             THE COURT:  Is that his basis?  He had to

11:57  23   have some basis when asked it at his deposition for

11:57  24   doing it.

11:57  25             MS. MOULTON:  At his deposition, he

| | | |
|---|---|---|
| 11:57 | 1 | said -- let me see if we can pull up -- |
| 11:57 | 2 | So this is the April testimony.  Let me |
| 11:57 | 3 | find the docket number. |
| 11:57 | 4 | It's Docket 153-1 at Page 549. |
| 11:57 | 5 | I can read it. |
| 11:58 | 6 | So Dr. Akl is talking and he's saying:  I |
| 11:58 | 7 | further reduced to 3 percent by fine-tuning and looking |
| 11:58 | 8 | at the subfeatures. |
| 11:58 | 9 | And then the question is:  Okay.  And |
| 11:58 | 10 | your reduction from 8.3 percent to 3 percent, was that |
| 11:58 | 11 | based on mathematics? |
| 11:58 | 12 | His answer is:  Yes.  Again, it's |
| 11:58 | 13 | counting. |
| 11:58 | 14 | And then he talks about counting |
| 11:58 | 15 | subfeatures. |
| 11:58 | 16 | So he says that he's doing a mathematical |
| 11:58 | 17 | analysis, but that is not disclosed in his report, and |
| 11:58 | 18 | he could not replicate it at his deposition. |
| 11:58 | 19 | THE COURT:  Okay.  Let's -- I think I -- |
| 11:58 | 20 | let me have them tell me where you're wrong, and they |
| 11:58 | 21 | can easily correct this by showing me where it is in |
| 11:58 | 22 | his report, and then I'll let you respond. |
| 11:58 | 23 | MS. MOULTON:  Thank you. |
| 11:58 | 24 | MR. NUTTALL:  Thank you, Your Honor. |
| 11:58 | 25 | And this will be -- we can look at our |

| | | |
|---|---|---|
| 11:58 | 1 | slides which take an excerpt from his report, or we can |
| 11:58 | 2 | look at Dr. Akl's opening report, Paragraphs 726 and |
| 11:59 | 3 | 727. |
| 11:59 | 4 | If we go to the next slide. |
| 11:59 | 5 | So what Dr. Akl actually said in his |
| 11:59 | 6 | report was:  After I've identified a feature, I looked |
| 11:59 | 7 | further into that feature to see how much of it related |
| 11:59 | 8 | to the asserted patent.  And some of these features |
| 11:59 | 9 | that Cisco identified subfeatures, so they gave further |
| 11:59 | 10 | detail about what that feature relates to. |
| 11:59 | 11 | And he looked at that, as well as his |
| 11:59 | 12 | experience and other things, and he did reduce his |
| 11:59 | 13 | initial feature -- |
| 11:59 | 14 | THE COURT:  I'd like you to show me why |
| 11:59 | 15 | 3 percent is -- where he explains why 3 percent is the |
| 11:59 | 16 | right number.  And not 1 percent or 5 percent or |
| 11:59 | 17 | 7 percent.  I mean, why is 3 percent -- have him -- |
| 11:59 | 18 | show me where he explained why 3 percent, in his |
| 11:59 | 19 | opinion, is the correct number. |
| 11:59 | 20 | MR. NUTTALL:  Sure. |
| 11:59 | 21 | Can we go to Paragraph 727 of Dr. Akl's |
| 12:00 | 22 | report? |
| 12:00 | 23 | Your Honor, I don't want to interrupt |
| 12:00 | 24 | you.  I can keep going.  I didn't know if you were |
| 12:00 | 25 | reading the paragraph in the report. |

| | | |
|---|---|---|
| 12:00 | 1 | THE COURT:  I don't see anything in there |
| 12:00 | 2 | that helps you. |
| 12:00 | 3 | MR. NUTTALL:  Okay.  Your Honor, he |
| 12:00 | 4 | starts with where -- |
| 12:00 | 5 | THE COURT:  So on 728, he says:  As |
| 12:00 | 6 | explained above, the '369 patent is relevant to at |
| 12:01 | 7 | least four out of 48 features, 8.3 percent. |
| 12:01 | 8 | So that's where the 8.3 comes from, is 4 |
| 12:01 | 9 | out of 48? |
| 12:01 | 10 | MR. NUTTALL:  Yes, Your Honor. |
| 12:01 | 11 | THE COURT:  Okay. |
| 12:01 | 12 | Which is high availability.  I further |
| 12:01 | 13 | reduced the percentage to 3 percent to account for the |
| 12:01 | 14 | fact there are some aspects of the features beyond the |
| 12:01 | 15 | BFD features.  However, 3 percent is conservative in |
| 12:01 | 16 | view of the degree of importance of the '369 patented |
| 12:01 | 17 | technology within the accused products. |
| 12:01 | 18 | So why -- show me anywhere in the report |
| 12:01 | 19 | why it's 3 percent. |
| 12:01 | 20 | MR. NUTTALL:  So -- |
| 12:01 | 21 | THE COURT:  I mean, I could -- I mean, I |
| 12:01 | 22 | hate to say this, but I could pick a number too.  And |
| 12:01 | 23 | so right now, that's all you have is, yeah, 3 percent's |
| 12:01 | 24 | more conservative than 8.3. |
| 12:01 | 25 | But where does he explain in this report |

```
12:01   1    why 3 percent is the right number?
12:01   2                MR. NUTTALL:  So let me just start by
12:02   3    saying, it's not a mathematical formula, and I don't
12:02   4    think all apportionment has to be mathematical.  I just
12:02   5    want to start with that presumption, so --
12:02   6                THE COURT:  He says:  I further reduced
12:02   7    the percentage to 3 percent to account for the fact,
12:02   8    et cetera.
12:02   9                And he says it's conservative in view of
12:02  10    the degree of importance.
12:02  11                Where in his report does he disclose
12:02  12    where the 3 percent number came from as opposed to 1 or
12:02  13    5?
12:02  14                MR. NUTTALL:  I think in the paragraphs
12:02  15    right around here, he talks --
12:02  16                THE COURT:  You're --
       17                MR. NUTTALL:  He just --
12:02  18                THE COURT:  You can show me anywhere he
12:02  19    explains that.
12:02  20                MR. NUTTALL:  Sure.
12:02  21                In Paragraph 726 and 727, he starts --
12:02  22                THE COURT:  Let's --
12:02  23                MR. NUTTALL:  -- explaining his
12:02  24    methodology for the second step.  And he looks at
12:02  25    subfeatures.  He looks at the importance of these
```

12:02  1    different features to the overall product, and in his

12:02  2    opinion he adjusts the feature counting from

12:02  3    8.3 percent to 3 percent for this particular patent.

12:02  4                    And he went through --

12:03  5                    THE COURT:  Why?

12:03  6                    MR. NUTTALL:  Why?  Because --

12:03  7                    THE COURT:  Why is it 3?

12:03  8                    MR. NUTTALL:  Because he looked at the

12:03  9    features and he said, I can't attribute all 8.3 percent

12:03  10   to this one feature.

12:03  11                    THE COURT:  I get that.  Why is it 3?

12:03  12   Either he or Bratic have to explain why.  Because,

12:03  13   otherwise, when they're cross-examining him, he just

12:03  14   says, nuh-uh.

12:03  15                    I mean, 3 percent's wrong.

12:03  16                    Oh, I think it's right.

12:03  17                    Why?

12:03  18                    Well, I looked at this other stuff.

12:03  19                    Okay.

12:03  20                    He has -- the way it works, for me at

12:03  21   least, he has to have in his report why it's 3 percent

12:03  22   as opposed to something else.  Whatever those reasons

12:03  23   are, he can articulate.  Because then the defense can

12:03  24   cross-examine him on why it's 3 percent and -- on the

12:03  25   basis of those reasons, and their expert can say it

12:03  1    isn't 3 percent because some of those reasons are

12:03  2    wrong, and it should only be 1 percent or whatever.

12:04  3                But right now all he has is I looked at

12:04  4    this other stuff and I came up with 3 percent.

12:04  5                MR. NUTTALL:  He looked at these other

12:04  6    features, including how many subfeatures were within

12:04  7    each feature, right, and he identifies the features

12:04  8    that are relevant and those that are not, and based on

12:04  9    that he adjusts it down.  So he gave his reasons for

12:04  10   that, and Cisco did cross-examine him on this.

12:04  11               THE COURT:  I don't care about that.  I

12:04  12   want to know where in the report it is.

12:04  13               MR. NUTTALL:  Yes, Your Honor.  I can --

12:04  14   these paragraphs in his report where he talks about

12:04  15   those both in his opening and his reply report, I can

12:04  16   get you those paragraphs as well.  But there's not -- I

12:04  17   can tell you there's not a mathematical formula that he

12:04  18   has that says here's how you get from 8 percent to

12:04  19   3 percent because he used his experience and judgment

12:04  20   looking at the further identification of subfeatures

12:04  21   and the importance of those features to the overall

12:04  22   product to reduce that second step.

12:05  23               THE COURT:  I'm not asking quite for

12:05  24   that.  Let me give you one more chance.  I'm asking

12:05  25   where he explains why the number -- why it's 3 percent

12:05  1  and not something else.  I understand what he looked

12:05  2  at.  And if the only thing you have is because I've

12:05  3  been doing this a long time.  I looked at the stuff

12:05  4  that is accused.  I've looked at other features that

12:05  5  aren't accused and I'm going to come up with 3 percent,

12:05  6  if that's your answer, it's an answer, but it's not

12:05  7  going to survive a Daubert challenge.

12:05  8          So what I -- because it's not fair to the

12:05  9  other party, they can't cross-examine that in my

12:05  10  opinion, and they can't defend against it other than to

12:05  11  have someone say, no, 3 percent is wrong.  Because he

12:05  12  hasn't explained why it's right.

12:05  13          So one more chance.  I need to know where

12:05  14  in his -- in this report, and I assume -- let me ask

12:05  15  you one more thing just so I'm not assuming something

12:05  16  wrong.  I assume that Mr. Bratic then took this and

12:06  17  went with -- because of what Dr. Akl said, took this

12:06  18  and went with the 3 percent in some of his numbers,

12:06  19  right?

12:06  20          MR. NUTTALL:  Mr. Bratic did use these

12:06  21  numbers, Your Honor.

12:06  22          THE COURT:  Okay.  So -- and relying on

12:06  23  Dr. Akl's expertise, right?

12:06  24          MR. NUTTALL:  Yes, Your Honor.

12:06  25          THE COURT:  Okay.  So anywhere you have

```
12:06  1   that he explains why the 3 percent number's correct as

12:06  2   opposed to a different number I'm happy to look at.

12:06  3                 MR. NUTTALL:  Can you give me just one

12:06  4   minute, Your Honor?

12:06  5                 THE COURT:  Whatever amount of time you

12:06  6   need.

12:06  7                 MR. NUTTALL:  We do cite to several other

12:07  8   paragraphs in his report, Your Honor, Paragraph 735.

12:07  9                 THE COURT:  Okay.  Shoot it down to 735.

12:07  10                Okay.  Could you scoot down just a little

12:08  11  bit so I can see the end of the paragraph?

12:08  12                Okay.  And am I missing something in the

12:08  13  change from 3 percent to 2 percent?

12:08  14                MR. NUTTALL:  I believe this is talking

12:08  15  about a different patent apportionment, Your Honor.

12:08  16  So...

12:08  17                THE COURT:  Okay.  So get me to where

12:08  18  he's explaining about the 3 percent.

12:08  19                MR. NUTTALL:  I believe we looked at

12:08  20  that, Your Honor, 727 to 728, where he talks about

12:08  21  those in his report.

12:08  22                THE COURT:  Okay.  I'm good on this issue

12:08  23  then.

12:08  24                Anything -- have we addressed all the

12:08  25  issues?
```

| 12:08 | 1 | MS. MOULTON: Yes, Your Honor. |
| 12:08 | 2 | THE COURT: Okay. |
| 12:08 | 3 | (Off-the-record bench conference.) |
| 12:09 | 4 | THE COURT: Okay. Okay. I'm about to |
| 12:10 | 5 | enter a ruling that's going to pretty dramatically |
| 12:10 | 6 | change the case. I'm going to grant the defendant's |
| 12:10 | 7 | motions, but I think Cisco's identified for the |
| 12:10 | 8 | plaintiff what the deficiencies are. So I'm going to |
| 12:10 | 9 | give the plaintiff an opportunity to cure those issues. |
| 12:11 | 10 | Now, you're not going to do it in a week. We're going |
| 12:11 | 11 | to have to reset the trial. And we'll find a time |
| 12:11 | 12 | within the next six months to do that. |
| 12:11 | 13 | We're not going to have a hearing on |
| 12:11 | 14 | July 3rd, but we will -- and you can push back -- well, |
| 12:11 | 15 | let's... |
| 12:11 | 16 | (Off-the-record bench conference.) |
| 12:11 | 17 | THE COURT: With respect to the issue of |
| 12:11 | 18 | the claim construction, we're going to have that |
| 12:11 | 19 | hearing next week. To the extent I talked about -- |
| 12:11 | 20 | there was something else that -- I believe it was |
| 12:11 | 21 | the -- whatever it was, we don't -- I don't think we |
| 12:11 | 22 | need to get anything else done other than that, but |
| 12:11 | 23 | we'll do that next week on the 3rd. That way you're -- |
| 12:11 | 24 | if Cisco needs to redo something, if the plaintiff |
| 12:11 | 25 | needs to redo something, you'll have the time to redo |

1    it.

12:11  2          I'm also -- the plaintiff earlier asked

12:11  3    for a chance to -- because it was a 12(c) motion to

12:12  4    amend their pleadings.  Now that you have more time,

12:12  5    I'm going to give -- I'll just say I'm skeptical

12:12  6    because of the way we dealt with the ruling, but in

12:12  7    fairness to you we have more time, and so what I would

12:12  8    suggest the plaintiff do with regard to the amended

12:12  9    pleading is get that to -- get that done I'd say as

12:12  10   quickly as possible but certainly within the next two

12:12  11   weeks, and once that's done, if the defendant -- I'm

12:12  12   going to say if -- when Cisco's unhappy with whatever

12:12  13   it is that you do, call me jaded, if you -- if they

12:12  14   want to file something in response, they can.  If they

12:12  15   feel like they don't need to file something, but if

12:12  16   you'll let -- I think this is Jake's matter -- if

12:12  17   you'll let Jake know.

12:12  18         We do want to -- very sadly I lose all

12:13  19   these kids or most of them at the end of the summer so

12:13  20   I do want to get everything we can get done with this

12:13  21   current team done over the summer, and then we'll get

12:13  22   you a trial date within the next six months where the

12:13  23   plaintiff can address the issues of Dr. Akl and any --

12:13  24   and I'm including allowing Mr. Bratic to amend, if he

12:13  25   does need to amend anything, he can.

```
12:13   1              And then, of course, I know you're going
12:13   2    to ask, well, then do we get to amend ours too?  No.  I
12:13   3    only -- yes, of course, you all get to amend yours too.
12:13   4    And then you're going to ask, and then do we get to
12:13   5    take depositions?  Any report that's sent, you get to
12:13   6    take a deposition on.  You probably ought to let the
12:13   7    flurry of things all get done so there's only like one
12:13   8    deposition of Dr. Akl and one deposition of whoever
12:13   9    Cisco's person is or people are or whatever.  Try and
12:13  10    get everything done.
12:14  11              If you all would let us know -- what I
12:14  12    would suggest you do because I actually -- it's dying
12:14  13    but I still currently like trial lawyers, is if you all
12:14  14    can sit down and figure out what makes the sense for
12:14  15    you all to get everything done where -- whatever gets
12:14  16    everything done for the plaintiff, I don't mean it that
12:14  17    way, but I'm saying you have more to do, and then Cisco
12:14  18    will want to do discovery on all that whenever -- if
12:14  19    you give us an end date when you can come -- when
12:14  20    everyone -- because whatever plaintiff does, Cisco's
12:14  21    going to want to do everything, which is fine.
12:14  22              If you'll get to us the date where you
12:14  23    get everything done "done," we'll get you a date for
12:14  24    trial as soon after that as possible.  And we're here
12:14  25    in Austin, but is the trial in Waco?
```

| | | |
|---|---|---|
| 12:14 | 1 | MR. NUTTALL:  Yes, Your Honor. |
| 12:14 | 2 | THE COURT:  Okay.  Okay.  So having said |
| 12:15 | 3 | all that, we -- I'll take up the motions.  Is there -- |
| 12:15 | 4 | let me ask you this, and we've got to run pretty soon, |
| 12:15 | 5 | but is there any motion in limine -- I didn't look |
| 12:15 | 6 | through those.  I don't look through those in |
| 12:15 | 7 | advance -- that needs to be ruled on -- it would help |
| 12:15 | 8 | to be ruled on?  And let me say this, I'm babbling, I |
| 12:15 | 9 | know:  Confer with each other.  If there are any |
| 12:15 | 10 | motions in limine, it would help for me to take up on |
| 12:15 | 11 | the 3rd -- it would help the trial going forward, let |
| 12:15 | 12 | me know and I'll take them up on the 3rd, otherwise |
| 12:15 | 13 | I'll take them up on the next pretrial conference. |
| 12:15 | 14 | But if there's something that is case |
| 12:15 | 15 | helpful to y'all preparing the case, I'll take them up |
| 12:15 | 16 | on the 3rd. |
| 12:15 | 17 | Yes, sir. |
| 12:15 | 18 | MR. ROSENBERG:  Your Honor, there was one |
| 12:15 | 19 | more summary judgment motion that was set to be argued |
| 12:15 | 20 | today.  Would you like to hear that next week?  It's on |
| 12:15 | 21 | the last of the patents. |
| 12:15 | 22 | THE COURT:  It was Kevin's.  And Kevin's |
| 12:15 | 23 | my favorite clerk, I think. |
| 12:15 | 24 | MR. ROSENBERG:  On the '602 patent. |
| 12:15 | 25 | THE COURT:  And so, Kevin, could we be |

| | | |
|---|---|---|
| 12:15 | 1 | prepared to go on -- on the 3rd? |
| 12:15 | 2 | MR. YANG:  Yeah. |
| 12:15 | 3 | THE COURT:  Yeah.  Let's go ahead and do |
| 12:15 | 4 | it then.  Thank you for asking. |
| 12:15 | 5 | MR. ROSENBERG:  Thank you, Your Honor. |
| 12:15 | 6 | I have one correction to something I said |
| 12:15 | 7 | earlier.  It turns out we do not have counterclaims for |
| 12:16 | 8 | invalidity and I wanted to apologize for -- |
| 12:16 | 9 | THE COURT:  No, no, no.  I'm glad -- you |
| 12:16 | 10 | know, unlike a lot of lawyers, at least you're honest. |
| 12:16 | 11 | No, I'm kidding. |
| 12:16 | 12 | (Laughter.) |
| 12:16 | 13 | THE COURT:  That was good.  So -- but |
| 12:16 | 14 | that does -- that might -- it probably will impact the |
| 12:16 | 15 | issue we have on written description because I will not |
| 12:16 | 16 | give -- if there is a finding of no infringement, the |
| 12:16 | 17 | verdict form will say, then do not answer the validity |
| 12:16 | 18 | issue because there's no counterclaim. |
| 12:16 | 19 | And so as we're going through your |
| 12:16 | 20 | argument, it will be pared down, as I understand it, to |
| 12:16 | 21 | whether or not there's a -- either a claim construction |
| 12:16 | 22 | issue or whether there's noninfringement based on the |
| 12:16 | 23 | claim term I need to take up. |
| 12:16 | 24 | MR. ROSENBERG:  Respectfully, Your Honor, |
| 12:16 | 25 | and we're happy to explain this in briefing, we believe |

12:16  1    that there is a case here to be made that the claim

12:16  2    lacks written description regardless of whether it's

12:17  3    infringed or not, but I can explain that in the

12:17  4    briefing.

12:17  5                  THE COURT:  Okay.  See, Kevin, because

12:17  6    he's not only my favorite clerk but the hardest

12:17  7    working, really would like us to go ahead and get that

12:17  8    wrapped up today.  However, I actually would like to

12:17  9    get to lunch so I can start my trial this afternoon.

12:17  10   So we'll take it up on the 3rd.  And so -- but is there

12:17  11   anything else we could take up today that would help

12:17  12   you guys out?

12:17  13                  MR. AINSWORTH:  Well, based on your

12:17  14   rulings, Your Honor, is there anything administratively

12:17  15   we need to do with Judge Manske or the --

12:17  16                  Okay.  All right.  Thanks.

12:17  17                  THE COURT:  So anything else?

12:17  18                  Okay.  Thank you all for being here.

12:18  19                  (Hearing adjourned.)

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS     )

3

4

5                I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10               I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13               Certified to by me this 2nd day of July

14   2024.

15

16                          */s/ Kristie M. Davis*
                            KRISTIE M. DAVIS
17                          Official Court Reporter
                            PO Box 20994
18                          Waco, Texas 76702
                            (254) 666-0904
19                          kmdaviscsr@yahoo.com

20

21

22

23

24

25