**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **CORRIGENT CORPORATION,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. W-22-CV-00396-ADA** |
| | § | |
| **CISCO SYSTEMS, INC.,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION & ORDER GRANTING**
**<u>DEFENDANT'S MOTION FOR JUDGMENT ON THE AMENDED PLEADINGS</u>**

Before the Court is Defendant Cisco Systems, Inc.'s ("Cisco's") Motion for Judgment on the Amended Pleadings Under Federal Rule of Civil Procedure 12(c). ECF No. 302. The parties completed briefing on this issue on August 22, 2024. ECF Nos. 312, 313. The Court heard arguments on the matter during the November 15, 2024 pretrial conference and orally granted Cisco's Motion to allow the parties to proceed. *See* ECF No. 332 at 41:23–24. This opinion memorializes and further explains the Court's oral ruling.

**I.      BACKGROUND**

Plaintiff Corrigent Corporation ("Corrigent") filed its original complaint against Cisco alleging infringement of U.S. Patent Nos. 6,957,369 (the "'369 Patent") and 7,113,485 (the "'485 Patent") (Counts I and II, respectively), among others. ECF No. 1 at ¶ 1. On October 3, 2023, Cisco moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that Counts I and II of the original complaint should be dismissed with prejudice because the claims of the '369 and '485 Patents are directed to patent-ineligible subject matter. ECF No. 94. Corrigent countered that (1) the asserted claims of these patents are not invalid as patent ineligible, and that

(2) Cisco's motion was a belated attempt to avoid factual disputes that would arise on a motion for summary judgment or at trial. ECF No. 108 at 1. Thus, to the extent the Court considered Cisco's motion for judgment on the pleadings, Corrigent argued it should be allowed to amend its complaint to allege additional facts that "would suffice to overcome *Alice* step 2." *Id.* at 20.

During the pretrial conference on June 24, 2024, the Court granted Cisco's motion for judgment on the pleadings as to the '369 and '485 Patents but also granted Corrigent leave to amend its complaint as to these two patents. ECF No. 294 at 27:19–23, 29:14–17, 128:2–17. Corrigent filed its Amended Complaint on July 12, 2024. ECF No. 297. Corrigent did not amend its allegations regarding the '485 Patent, choosing instead to stand on its previous pleading and Rule 12(c) briefing with respect to this patent. ECF No. 312 at 2 n.1. Cisco now moves for judgment on the pleadings regarding Counts I and II of Corrigent's Amended Complaint, on the basis that the '369 and '485 Patents are not patent-eligible under 35 U.S.C. § 101.

## II.    LEGAL STANDARD

### A.    Rule 12(c)

Under the Federal Rules, a party may move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). "The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. The court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff," and the plaintiff "must plead enough facts to state a claim to relief that is plausible on its face." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (internal citations and quotation marks omitted).  In a patent case, the Federal Circuit reviews procedural aspects of motions for judgment on the pleadings using regional circuit law. *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1325–26 (Fed. Cir. 2017).

B.    **Patent Eligibility**

Section 101 of the Patent Act defines the subject matter eligible for patent protection: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However, courts have long recognized that laws of nature, natural phenomena, and abstract ideas are not patentable under § 101 because they are "the basic tools of scientific and technological work." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citations omitted).

In *Alice*, the Supreme Court articulated a two-step framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent eligible applications of those concepts. *Id*. at 217. In *Alice* step one, the court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*. In doing so, the court must be careful not to over generalize the invention because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id*. (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc*., 566 U.S. 66, 71 (2012)). Instead, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *McRO, Inc. v. Bandai Namco Games Am. Inc*., 837 F.3d 1299, 1312 (Fed. Cir. 2016) (citation omitted). If the claims are not directed to one of those patent-ineligible concepts, the inquiry ends. If the claims are directed to one of those patent-ineligible concepts, then the inquiry proceeds to step two of the *Alice* framework.

In *Alice* step two, the court considers whether the claims contain an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 217–18 (omitted). In doing so, the court considers "the elements of each claim both individually and 'as an ordered combination'" to determine whether they are "'sufficient to ensure that the

patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id*. (quoting *Mayo*, 566 U.S. at 72–73). *Alice* step two is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc*., 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Alice*, 573 U.S. at 225 and *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,* 776 F.3d 1343, 1347–48 (Fed. Cir. 2014)). However, to recite an inventive concept, a patent must do more than recite an abstract idea "while adding the words 'apply it.'" *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72). "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 566 U.S. at 82. Likewise, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

"While the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc*., 882 F.3d 1121, 1128 (Fed. Cir. 2018). As such, "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that must be "proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. Thus, "factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019). However, "[a]ny allegation about inventiveness, wholly divorced from the claims or the specification does not defeat a motion to dismiss." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (quoting *Cellspin*, 927 F.3d at 1317). Only

4

"plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Id.* (quoting *Cellspin*, 927 F.3d at 1317).

### III.    ANALYSIS OF THE '369 PATENT

#### A.    The '369 Patent

The '369 Patent is entitled "Hidden Failure Detection" and focuses on the detection of failures of idle components in an electronic system. ECF No. 297-1 ("'396 Patent") at Title, 1:11–15, 2:26–29. The Background section of the '396 Patent explains that such failures are called "hidden failures" because "they do not affect service at the moment they occur and thus may go undetected," making them "a particularly troublesome problem, since they may remain undetected until the idle component is activated." *Id.* at 1:11–18. "It is therefore desirable to detect hidden failures while components are idle," ideally by non-intrusively testing idle components (*i.e.*, without interrupting the normal operation of active components). *Id.* at 1:19–24.

The '396 Patent is thus directed to systems and methods for self-testing whether an electronic system's idle lines are functioning properly "without intruding on normal traffic carried by the system's active lines." *Id.* at Abstract, 2:26–29. The preferred embodiment of the '369 Patent is illustrated in Figure 1 below:



Figure 1 illustrates a communication system 20 comprising main module 22 and a number of subsidiary modules 24, labeled A, B, . . . , K. *Id.* at 4:54–58. These modules plug into backplane 26 and communicate via traces 34 on the printed circuit board of the backplane. *Id.* at 4:58–67. Idle traces 38 are shown as dashed lines while active traces 36 are shown as solid lines. *Id.* at 5:29–30.

A system control processor 42 is embedded in main module 22 and communicates with subsidiary processors 44 on subsidiary modules 24. *Id.* at 5:41–45. To self-test, processor 42 selects an idle trace to serve as an aid trace 40. *Id.* at 5:61–67. Processor 42 then instructs a processor 44 on the subsidiary module 24 associated with the aid trace 40 "to loop back all traffic that it receives on trace 40." *Id.* at 5:67–6:2. Processor 42 then selects one of the idle traces and tests it by exchanging test traffic between the aid trace and idle trace through switch 28. *Id.* at 6:10–39. "As long as all traces and components are working properly," the exchange of test traffic between the aid trace and idle trace should occur within a predetermined timeout period. *Id.* at 6:23–39. "If the test traffic does not return on time, processor 44 concludes that a failure has occurred, and notifies processor 42 accordingly." *Id.* at 6:31–34. "A similar notification is sent if the traffic returns, but processor 44 . . . determines that the test data have been corrupted." *Id.* at 6:34–36. Processor 42 typically will send an alarm to the operator of system 20 when such failure occurs. *Id.* at 6:36–39.

Corrigent asserts independent Claims 1, 15, and 21, and dependent Claims 2 and 18, which depend from Claims 1 and 15, respectively. *See* ECF No. 312 at 1. Claims 1, 15, and 21 are substantially similar. Claim 15 recites:

15. Modular electronic apparatus, comprising:

plugged into the backplane;

6

a main module, plugged into the backplane, the main module comprising a switch having ports for connection to the traces of the backplane;

at least first and second subsidiary modules, plugged into the backplane so as to be connected to the main module by the traces, at least some of which traces are sometimes idle; and

a system control processor, which is operative to select a first idle trace among idle traces connecting the first subsidiary module to a first port of the switch on the main module to serve as an aid trace, to instruct the first subsidiary module to loop back traffic reaching the first subsidiary module via the aid trace, to select for testing a second idle trace among the idle traces connecting the second subsidiary module to a second port of the switch on the main module, and to configure the switch to link the first and second ports, the system control processor being further operative to cause test traffic to be transmitted over the second idle trace from the second subsidiary module to the main module, wherein the test traffic is conveyed via the switch to the aid trace connecting to the first subsidiary module, and to report that a failure has occurred if the test traffic does not return to the second subsidiary module within a predetermined period of time.

'369 Patent, Claim 15. Because the parties address the differences among the claims only at *Alice* step two, the Court does as well.

## B.    *Alice* Step One: The asserted claims are directed to an abstract idea

Cisco contends the asserted claims of the '369 Patent are directed to the abstract idea of "transmitting a test communication and reporting whether the communication is received—*i.e.*, transmitting and reporting information about a communication path." ECF No. 302 at 5. Cisco alleges that this idea "is no different than the longstanding practice of testing whether a communication line is functioning properly by asking for a message to be repeated back." *Id.* at 6. For example, Cisco describes the common practice of when a dispatch operator or field commander sends out an instruction, asks "do you copy?", and the recipient repeats it back to acknowledge receipt. *Id.* Thus, Cisco contends that the asserted claims are similar to claims the Federal Circuit has held invalid for being directed to "collecting information, analyzing it, and displaying certain results of the collection and analysis." *Id.* at 6–7 (citing *Electric Power Grp.,*

*LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017)).

The Court agrees with Cisco that the claims are directed to the abstract idea of transmitting a test communication and reporting whether the communication is received. Here, the claims of the '369 Patent recite an apparatus comprising a processor that sends "test traffic" over two selected idle traces in a loop, and then "report[s] that a failure has occurred if the test traffic does not return . . . within a predetermined period of time." *See* '369 Patent, Claim 15.[1] Such claimed advance is similar to that found by the Federal Circuit to be abstract in *Two-Way Media*. The claims at issue in *Two-Way Media* recited "transmitting message packets over a communications network" by (1) "converting a plurality of streams of . . . information into a plurality of streams of addressed digital packets," (2) routing each stream of packets to one or more users, (3) "controlling the routing of the stream of packets in response to selection signals," and (4) "monitoring the reception of packets by the users and accumulating records that indicate which streams of packets were received by which users." *Two-Way Media*, 874 F.3d at 1334–35. The Federal Circuit held that the claims were "directed to the abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information." *Id.* at 1337.

Similarly, the claims of the '369 Patent are directed to the abstract idea of (1) sending information (here, sending test traffic over an idle line from one module), (2) directing the sent information (here, to a second module), (3) monitoring the receipt of the sent information (here,

---

[1] Independent Claim 1 of the '369 Patent recites the method equivalent of Claim 15. *Compare* '369 Patent, Claim 1 *with* '369 Patent, Claim 15; *see also* ECF No. 312 at 5–6. Independent Claim 21 includes the claim requirements of Claims 1 and 15, along with the requirement that "the first and second subsidiary modules [are] configured to transmit and receive the data in different, respective first and second formats." '369 Patent, Claim 21. The parties analyze this additional requirement under step two of *Alice*, and the Court does so as well. Dependent Claims 2 and 18 are likewise discussed by the parties under *Alice* step two.

monitoring the return of the test traffic), and (4) accumulating records about receipt of the sent information (here, collecting the time it took from the test traffic to return). The asserted claims further "report the result[]," *i.e.*, whether the sent information returned within a predetermined period of time. *See also In re Gale*, 856 F. App'x 887, 889 (Fed. Cir. 2021) (finding abstract claims directed in part to "calculating a usage pattern and determining its compliance with a predetermined usage pattern" and "reporting the results").

Corrigent counters that the asserted claims are "directed to a specific implementation of network failure testing on idle lines that utilizes a particular configuration and data transmission methodology as recited in the patent claims." ECF No. 312 at 8. Corrigent compares the asserted claims to those that the Federal Circuit has deemed eligible as being directed to solving particular problems in computer networking. *Id.* at 8–9 (citing *SRI Int'l v. Cisco Systs.*, 930 F.3d 1295 (Fed. Cir. 2019); *TecSec, Inc. v. Adobe, Inc.*, 978 F.3d 1278 (Fed. Cir. 2020); *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299 (Fed. Cir. 2020); *Visual Memory LLC v. Nvidia Corp.*, 867 F.3d 1253 (Fed. Cir. 2017)). Corrigent highlights that another federal district court has held Claim 15 of the '369 Patent to be patent-eligible at step one for reciting a "'sufficiently specific' implementation of network failure testing that is not 'claiming an abstract idea.'" *Id.* at 9 (citing *Corrigent Corp. v. Dell Techs.*, No. 22-CV-00496-RGA, D.I. 21 at 1 (D. Del. Mar. 3, 2023)).

The Court is unpersuaded. As a preliminary matter, the court in the District of Delaware did not, as Corrigent contends, hold Claim 15 to be patent-eligible because it recited a specific implementation of network failure testing. Rather, the district court stated that Claim 15 "claims an apparatus that performs diagnostic testing on idle traces, and it seems sufficiently specific that I do not think I can say it is claiming an abstract idea." *Dell Techs.*, No. 22-CV-00496-RGA, D.I.

21 at 1. Nothing in the memorandum order refers to the "implementation of network failure testing." *See id.*

The Court does not find that the asserted claims are directed to "network failure testing." The asserted claims do not recite a network or any network communications. *See* '369 Patent, Claims 1, 2, 15, 18, 21. The specification and unasserted claims confirm this understanding. The specification describes a communication system comprising a switch that aggregates upstream traffic "to an uplink trunk connecting to a high-speed network." *Id.* at 4:54–5:5; *see also id.* at FIG. 1. And certain unasserted dependent claims recite such switch "coupled to connect the traces [or lines] to a network communication trunk." *See, e.g., id.*, Claim 23. Thus, the network is external to the claimed electronic system/electronic apparatus. Accordingly, the asserted claims are not directed to solving specific problems in computer networking. As explained above, the '369 Patent is directed to detecting hidden failures in electronic equipment. *Id.* at 5:34–37.

The asserted claims accomplish this by implementing generic hardware. For example, Claim 15 recites "a backplane," "traces," "modules," "switches," "ports," and a "processor." *Id.*, Claim 15. These elements are nothing more than generic computer components. *See id.* at 4:65–67 ("[T]he ports comprise serializer/deserializer (SERDES) interfaces, as are known in the art, although other types of backplane interfaces may also be used."), 5:1–12 (describing the use of switches to form a virtual connection between subsidiary modules and main modules as a "cross-connection function . . . commonly available in off-shelf physical layer switches"), 5:46–50 (naming commercially available integrated communications processors). As the patent specification states, "[t]he testing method makes use of existing components in the system and requires substantially no dedicated testing hardware." *Id.* at 2:29–31. The specification reiterates that the method is "applicable to all types of subsidiary modules, even in systems that mix different

modules using different formats and communication protocols." *Id.* at 2:31–34. Thus, the asserted claims perform the abstract idea using well-known, generic processes and machinery. *See Two-Way Media*, 874 F.3d at 1338 (finding that the use of generic computer components to carry out the recited abstract idea to be insufficient).

For these reasons, the Court finds the asserted claims directed to an abstract idea.

**C.    *Alice* Step Two: The asserted claims lack an inventive concept**

The parties do not dispute that Claims 1 and 15 include substantially the same elements such that they may be analyzed together. *See* ECF No. 302 at 15; ECF No. 312 at 17. Thus, the Court addresses these two claims together, and Claims 2, 18, and 21 separately.

**1.    Claims 1 and 15 lack an inventive concept**

Cisco argues that Claims 1 and 15 fail to recite "significantly more" than the abstract idea itself because its elements, whether considered individually or as an ordered combination, are merely conventional computer components that perform their ordinary functions. ECF No. 302 at 10–14. Cisco emphasizes that the specification itself indicates that these components are generic and that the claimed invention utilizes them in ways that are well-understood, routine, and conventional. *Id.* Cisco further argues that Corrigent's pleadings cannot plead around the admissions in the patent itself. *Id.* at 13.

Corrigent counters that Claims 1 and 15 recite numerous "inventive concepts," such as (1) the configuration of components, (2) the ability to use dedicated test traffic to test idle lines, and (3) the use of preconfigured configurations of links and loopbacks that can autonomously run in the background of a networking system to detect failures of various networking components. ECF No. 312 at 13. Corrigent points to Federal Circuit decisions that found the plaintiffs' allegations in the complaints sufficient to preclude dismissal. *Id.* at 14–16 (citing *Cellspin*; *BASCOM Glob.*

*Internet Sers. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016); *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127 (Fed. Cir. 2022)). Corrigent also argues that the specific implementation and failure testing recited in Claim 1 did not exist in the prior art. *Id.* at 14–15.

The Court agrees with Cisco and finds that the patent specification itself indicates that the claimed elements, viewed individually and as an arrangement, fail to transform the abstract idea of Claims 1 and 15 into a patent-eligible idea. As previously discussed, the specification provides that the elements of these claims (e.g., "a backplane," "traces" or "lines," "modules," "switches," "ports," and a "processor") are generic computer components that are known in the art and operate in accordance with their conventional functions. Corrigent does not contest that the claimed elements are existing computer components, instead alleging that the claims capture the three inventive ideas set forth above.

Regarding Corrigent's allegation that Claims 1 and 15 include an inventive configuration of components, the specification states that "[b]ackplane-based configurations are commonly used in communication and computing equipment." '369 Patent at 1:25–26. The claimed invention "makes use of existing components in the system and requires substantially no dedicated testing software" and may "be applied in other types of modular systems, particularly backplane-based systems." *Id.* at 2:29–38. Similarly, the allegation that the "preconfigured configurations of links and loopbacks" and "ability to use dedicated test traffic" supply an inventive concept is contradicted by the specification, which describes how "[v]arious methods are known in the art for self-testing of backplane-based communication equipment" and provides the example of a known "self-test circuit" that is "adapted to loop back cells . . . in a self-test function through a dedicated virtual circuit." *Id.* at 1:37–46. Moreover, contrary to Corrigent's assertions, Claims 1 and 15 do not require the loopbacks to run "autonomously." *See id.* at 7:2–25, 8:44–9:5; *see Two-*

*Way Media*, 874 F.3d at 1338 ("To save a patent at step two, an inventive concept must be evident in the claims . . . . The main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept."). And even if the claims did capture this purported feature, "mere automation . . . using generic computers does not constitute a patentable improvement in computer technology." *See Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017).

While Corrigent relies on *Cellspin*, *BASCOM*, and *Cooperative Entertainment*, the Court finds these cases distinguishable because the specifications of the patents at issue in those cases did not contradict the allegations plead in the complaint. *See Cellspin*, 927 F.3d at 1318 (finding "no basis, at the pleadings stage, to say that these claimed techniques . . . were well-known or conventional as a matter of law"); *Coop. Ent.*, 50 F.4th at 135 (noting that the plaintiff's allegations were consistent with the patent's specification); *BASCOM*, 827 F.3d at 1351 (finding nothing on the record that refuted the plaintiff's allegations that the claims pass step two of *Alice*). In contrast, the patent specification here admits that the claim elements were well-understood, routine, and conventional. *See Berkheimer v. HP Inc.*, 890 F.3d 1369, 1371 (Fed. Cir. 2018) ("In a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute."). Where the patent specification undermines or contradicts the plaintiff's allegations, the Court need not take the allegations as true. *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017).

Corrigent's argument that Claim 1 recites an inventive concept because the claimed implementation and configuration of the recited failure testing did not exist in the prior art is also unpersuasive. Corrigent alleges that "during prosecution the inventor successfully distinguished

the unique testing configuration and methodology of claim 1 of the '369 patent over the prior art,"

and further emphasizes that Cisco "has not been able to identify a single ground of anticipation

that it intends to pursue at trial." ECF No. 297 at ¶ 22.  However, the allowance of Claim 1 over

the prior art was based on § 102 and § 103, which are separate inquiries from § 101. *See Synopsys,

Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("Synopsys equates the

inventive concept inquiry with novelty and contends that the Asserted Claims contain an inventive

concept because they were not shown to have been anticipated by (35 U.S.C. § 102) or obvious

over (35 U.S.C. § 103) the prior art. . . . That position misstates the law. . . . [A] claim for a *new*

abstract idea is still an abstract idea.").

Thus, the Court finds that the claim limitations, whether considered individually or as an

ordered combination, fail to present an "inventive concept" that "transform[s] the nature of the

claim into a patent-eligible application." *Alice*, 573 U.S. at 217.

### 2.    Claim 2 lacks an inventive concept

Claim 2, which depends from Claim 1, requires "configuring the first subsidiary module to

loop back the traffic to the main module substantially without processing data comprised in the

test traffic." '369 Patent, Claim 2. Corrigent contends that the implementation of this method is

inventive because it "improves both the speed and efficiency of network failure detection systems"

by "minimiz[ing] the intrusiveness of the testing on the bandwidth and processing capacity of the

networking system." ECF No. 312 at 5, 16. The patent specification, however, describes prior art

circuits that are "adapted to loop back cells" in a "self-test function." '369 Patent at 1:44–46. The

processors that instruct the claimed subsidiary module to loopback the test traffic, and the

subsidiary modules themselves, are generic computing components. *Id.* at 2:29–34, 5:45–50. This

loopback function is performed by the backplane interface component, "which simply buffers and

returns the stream of data bits that it receives." *Id.* at 6:2–6. Simply receiving and transmitting data is a conventional function of computer components and thus does not supply an inventive concept.

### 3. Claim 18 lacks an inventive concept

Claim 18, which depends from Claim 15, requires the system control processor "to select one or more further idle traces for testing" and "to repeatedly configure the switch, cause the test traffic to be transmitted, and report the failure when it occurs with respect to the further idle traces until all the idle lines have been tested." '369 Patent, Claim 18.

Corrigent contends that this claim supplies the inventive concept of autonomously conducting failure testing on all the idle traces in a system without the need for manual intervention. ECF No. 312 at 17. Cisco counters that the concept of conducting autonomous failure testing does not appear in the claim. ECF No. 313 at 9. Even assuming Claim 18 requires automation, "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *See Credit Acceptance Corp.*, 859 F.3d at 1055; *see also Cellspin*, 927 F.3d at 1316 ("[T]he need to perform tasks automatically is not a unique technical problem." (quoting *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2016)).

### 4. Claim 21 lacks an inventive concept

Independent Claim 21 contains substantially the same the claim elements recited in independent Claims 1 and 15 but substitutes determining whether a packet returned "within a predetermined time" with determining "whether the test traffic is returned intact." '369 Patent, Claim 21. The claim further recites that "the first and second subsidiary modules [are] configured to transmit and receive the data in different, respective first and second formats" *Id.* The Court determines that these differences to not constitute an inventive concept. Whether the claimed

apparatus utilizes a predetermined time or the condition of the test traffic upon return does not change the focus of the claim, which is directed to the abstract idea of transmitting and reporting information about a communication path. *See Two-Way Media*, 874 F.3d at 1334–37.

Corrigent emphasizes that "the first and second subsidiary modules [are] configured to transmit and receive the data in different, respective first and second formats," arguing that this limitation supplies an inventive concept by ensuring that failure testing can be conducted in an efficient, flexible manner. ECF No. 312 at 6, 18. However, the specification indicates that the invention's ability to use test traffic that is agnostic to the format of the modules derives from the fact that the subsidiary module does not process the data it receives when looping the data back to the main module. *See* '369 Patent at 6:2–9. As discussed above with respect to Claim 2, this merely captures the idea of utilizing the conventional function of computer components to receive and transmit data, which is insufficient to supply an inventive concept. Moreover, the fact that the versatility of the test traffic purportedly increases efficiency does not change the analysis—"a claim that results in increased speed or efficiency may still be directed to an abstract idea, as is the case here." *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1372 (Fed. Cir. 2024).

## IV.    ANALYSIS OF THE '485 PATENT

### A.    The '485 Patent

The '485 Patent is entitled "Latency Evaluation in a Ring Network" and generally relates to "measuring latency in a bi-directional ring network." ECF No. 297-2 ("'485 Patent") at Abstract, 1:6–9. The Background of the '485 Patent discusses the popularity of network ring topologies in which each node in a ring network can communicate directly with all other nodes through either the inner or outer ring. *Id.* at 1:13–55. The '485 Patent describes "simple, accurate methods for measuring round-trip latency between pairs of nodes in a network," in which "a latency

measurement packet (LMP)" is sent from one node (an originating node) to another node (a peer node), the peer node processes the LMP, and then the peer node returns the LMP to the originating node. *Id.* at 2:65–67, 6:41–47. The '485 Patent also describes "full circuit" latency, in which "the originating node sends a LMP in which it designates itself as both the source and destination address." *Id.* at 2:46–49, 6:47–53. However, methods known in the art for measuring round-trip latency suffer from the drawback of including the time taken by the peer node in processing the LMP. *Id.* at 2:38–45. The '485 Patent addresses the problem "by taking the difference between its own recorded times of transmission and receipt" between the originating node and peer node and then "subtract[ing] out the measured turnaround time to find the net round-trip latency." *Id.* at 3:48–55.

 Corrigent asserts independent Claim 9 and dependent Claims 4 and 14. Claim 9 recites:

 9. A method for measuring latency in a network, comprising:

 transmitting a sequence of latency measurement packets at given intervals from a source node in the network, while recording in the packets respective times of transmission thereof;

 noting respective times of receipt of the packets at a destination node in the network;

 determining respective latencies for the packets in the sequence by calculating differences between the respective times of transmission recorded in the packets and the respective times of receipt; and

 monitoring a variation in the latencies over the sequence based on the calculated differences,

 wherein transmitting the sequence of the latency measurement packets comprises recording respective serial numbers [*sic*] in the packets in the sequence, and wherein monitoring the variation in the latencies comprises disregarding the respective latencies of any of the packets that are received out of the sequence, as indicated by the serial numbers.

*Id.*, Claim 9.

**B.**  *Alice* **Step One: The asserted claims are directed to an abstract idea**

Cisco argues that the asserted claims of the '485 Patent are directed to the abstract idea of measuring latency of communications. ECF No. 94 at 7.[2] Cisco contends that measuring latency is not a technological improvement and is something humans have done throughout history, providing the example of measuring the latency of mail sent by the U.S. Postal Service. *Id.* Cisco further argues that claims merely invoke the use of conventional computer technology for the abstract function of calculating latency by simple subtraction. *Id.* at 8.

Corrigent counters that Cisco overgeneralizes the asserted claims, arguing that they are "generally directed to an improved network switch or router configured to measure latency between nodes in the network in a specific manner that involves a specific packet structure involving measurements that were not employed in the prior art." ECF No. 108 at 16. Corrigent further utilizes the implementation of a latency measurement packet (LMP), which utilizes specific parameters that account for processing time, delay variations, sequencing and removal of packets, and classes of service. *Id.* at 17.

The Court concludes, based on the specification and the language of the claims, that the claimed invention is directed to the abstract idea of measuring latency of communications via simple subtraction. The patent abstract describes "[a] method for measuring latency in a bi-directional ring network" and further states that "an object of the present invention [is] to provide improved methods and devices for measuring network latency." '485 Patent at Abstract, 2:59–61. Indeed, the entire specification confirms that the claimed invention is directed to the abstract idea of measuring latency of communications. *See supra* Part IV(A).

---

[2] Corrigent did not amend its pleadings with respect to the '485 Patent and stands on its previous pleading and Rule 12(c) briefing with respect to this patent. ECF No. 312 at 2 n.1. The Court therefore cites the parties' initial Rule 12(c) briefing, which consists of Cisco's Motion for Judgment on the Pleadings (ECF No. 94), Corrigent's Opposition (ECF No. 94), and Cisco's Reply (ECF No. 111).

While Claim 9 elaborates on the specifics of the invention, the focus of the claim is on the purported advancement of measuring latency. Claim 9 recites the steps of (1) sending a sequence of LMPs and recording in the packets the respective times they were sent, (2) recording the respective times they are received at a destination node, (3) determining the respective latencies for the LMPs by calculating the respective differences between the recorded transmission times and receipt times, and (4) monitoring a variation in the latencies based on these differences. '485 Patent, Claim 9. In short, Claim 9 is directed to a method of sending information and measuring or monitoring the delivery of that information, which the Federal Circuit has found to be abstract. *See Two-Way Media*, 874 F.3d at 1336, 1340 (determining that claims "directed to monitoring the delivery of real-time information to user(s) or measuring such delivery . . . are similar to other concepts found to be abstract").

Corrigent identifies the use of an LMP, the monitoring of variation and packet sequences, and the discarding of out-of-order packets to argue that the asserted claims are not directed to an abstract idea. ECF No.  108 at 18. However, the Court determines that these limitations do not change the fact that the claims as a whole are directed to measuring latency by calculating the difference between two numbers (the time of transmission and the time of receipt), which is an abstract idea. *McRo*, 837 F.3d at 1312 ("[T]he claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."). That is, in light of the specification and the claim language, the Court does not find these limitations sufficient "to shift the claim's focus away from the abstract idea at step one" and instead considers these limitations at step two. *See Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1363 (Fed. Cir. 2020) (citing *Cellspin*, 927 F.3d at 1316; *BASCOM*,  827 F.3d at 1348–49).

## C.    *Alice* Step Two: The asserted claims lack an inventive concept

Corrigent's argument that the asserted claims[3] recite an inventive concept focuses on the use of an LMP "containing an indication that the packet belongs to a selected one of the classes of service" and the "monitoring [of] variations of latencies and/or monitoring [of] the sequence of latency measurement packets so as to discard out-of-order packets." *See* ECF No. 108 at 18–19. However, the LMP is a data packet, and the specification describes the use of data packets to measure latency as well-understood and conventional at the time of the invention. *See* '485 Patent at 2:38–41, 7:17–8:4. Moreover, the fact that a LMP identifies a class of service to which it belongs and reports results for that class does not supply an inventive concept, as the patent specification provides that classes of service were "common" at the time of the invention. '485 Patent at 1:56–63; *see also id.* at 2:24–33. Similarly, the patent specification indicates sending packets in sequence was known, and indeed particularly important, for packetized communications for real-time services. *Id.* at 1:58–67. Thus, the Court agrees with Cisco that sending and receiving packets in sequence, and discarding out of sequence packets as claimed does not supply an inventive concept, as the specification indicates these are conventional functions of packetized communications. Finally, the limitation related to monitoring variations of latency measurement packets is one this Court has identified as part of the abstract idea. *See Two-Way Media*, 874 F.3d at 1336, 1340 (determining that claims "directed to monitoring the delivery of real-time information to user(s) or measuring such delivery . . . are similar to other concepts found to be abstract"). This limitation,

---

[3] Asserted independent Claim 9 recites "monitoring a variation in the latencies over the sequence based on the calculated differences" and further recites "wherein monitoring the variation in the latencies comprises disregarding the respective latencies of any of the packets that are received out of the sequence." '485, Claim 9. Asserted Claim 4, which depends from Claim 1, similarly recites "wherein calculating the latency comprises calculating respective latencies of the packets returned to the originating node, so as to monitor a variation in the latencies." *Id.*, Claim 4. Claim 14, which depends from Claim 11, recites "wherein the first node transmits a plurality of latency measurement packets in sequences . . . and to calculate respective latencies of the packets returned to the first node so as to monitor a variation in the latencies." *Id.*, Claim 14.

therefore, also does not supply an inventive concept. *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1299 (Fed. Cir. 2020) ("The abstract idea itself cannot supply the inventive concept.").

## V.    CONCLUSION

In sum, the Court finds, based on the intrinsic record, that the asserted claims of the '369 Patent and the '485 Patents are directed to patent-ineligible subject matter and are not sufficiently transformed into something other than the abstract idea itself.

Accordingly, Cisco's Motion for Judgment on the Amended Pleadings (ECF No. 302) is **GRANTED**.

**IT IS THEREFORE ORDERED** that Counts I and II of Corrigent's First Amended Complaint (ECF No. 297) are **DISMISSED WITH PREJUDICE**.


**SIGNED** this 16th day of July, 2025.




_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE